JUDGE MARRERO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

13 CV 2282

CARYS I. EGLESTON, An Infant Under The
Age Of Fourteen (14) Years, By Her Mother
And Natural Guardian, CLAUDIA S.
EGLESTON, Individually And On Behalf Of All
Others Similarly Situated,

Civil Action:

                  Plaintiff,

vs.

ERNESTO VEGA, and WAL-MART De
MEXICO SAB De CV,

              Defendants.

**JURY DEMANDED**



Plaintiff alleges the following based upon the investigation by Plaintiff's counsel, which includes, among other things: a review of the Defendants' public documents, media interviews and reports, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Wal-Mart de Mexico SAB De CV ("Walmex" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.  This is a federal class action on behalf of purchasers (the "Class") of American Depositary Shares ("ADRs") of Walmex, who purchased or otherwise acquired the Company's ADRs between February 21, 2012 through April 22, 2012, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated under Section 10(b) of the Exchange Act (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1331.

4.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  The Company issued American Depositary Shares ("ADRs") that traded Over-the-Counter ("OTC").  Further, according to the Deposit Agreement between Walmex and the Bank of New York, Walmex consents and submits to the jurisdiction of New York in any suit or proceeding arising out of or relating to the ADRs.

5.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     **_Plaintiff Carys I. Egleston_**, an infant under the age of fourteen (14) years, by her mother and natural guardian, Claudia S. Egleston, purchased ADRs at artificially inflated prices during the Class Period and has been damaged thereby.

7.     **_Defendant Walmex_** owns and operates a network of retail stores in Mexico and Central America. The Company operates discount stores, hypermarkets, membership self-service wholesale stores, supermarkets, bank branches, and restaurants, as well as engages in the real estate development and management activities.  It also operates discount stores,

supermarkets, discount warehouse stores, hypermarkets, and membership self-service wholesale stores in Guatemala, El Salvador, Honduras, Nicaragua, and Costa Rica.

8.     **Defendant Ernesto Vega** ("Vega") was, at all relevant times, the Chairman of the Board of Directors, Chairman of the Audit and Corporate Practices Committee of Walmex.

## THE MATERIALLY FALSE AND MISLEADING STATEMENTS

9.     Walmex is a major retail chain in Mexico and Central America. As of March 31, 2012 it operated 2,754 units throughout 6 countries (Mexico, Guatemala, Costa Rica, Honduras, El Salvador and Nicaragua), including self-service stores, membership wholesale clubs, apparel stores, and restaurants. The Company has an ADR program with Bank of New York, the ticker symbol is WMMVY. The ADRs trade in the OTC.

10.     The     Walmex     website     (http://www.walmex.mx/en/financial-information/annual.html) presents an "Investor Relations" page that contains a section concerning corporate governance. This "Investor Relations" page represents that Walmex adhered to the Mexican Stock Exchange "Code Of Best Practices" which states that Walmex was required to: "Encourage the stating of corporate ethics by the Company . . . . Through its dissemination and also full compliance with company-established policies and procedures, such as the "Statement of Ethics", the "Anti-corruption Policy of Walmart de México y Centroamérica", and by including clauses regarding ethical compliance and environmental protection in agreements executed with our suppliers, and by informing and training our associates in matters pertaining to laws, policies and procedures that must be followed, promoting compliance with the same, and the involvement of Internal Audit."

11.     The Company's 2004 Annual Report stated in relevant part: "For Wal-Mart de Mexico, honesty and integrity continue being absolutely non-negotiable core values, and we

permanently oversee that these permeate all our activities . . . . Wal-Mart de Mexico has an area of corporate compliance charged with communicating and fostering compliance with our ethical behavior policies and corporate governance, as well as strict adherence to the statutes which govern our Company."

12.    The Company's 2005 Annual Report quotes Eduardo Solorzano, President and Chief Executive Officer, as stating: "Ladies and Gentlemen, we reiterate our commitment to Mexico and we thank you for the trust you have placed in each and every one of us who are part of Wal-Mart de Mexico; we shall continue working and making your investment grow, always mindful of the highest ethical standards and the best practices for corporate governance."

13.    The Company's 2005 Annual Report repeated the following representation that appeared in the 2004 Annual Report:

> "For Wal-Mart de Mexico, honesty and integrity continue being absolutely non-negotiable core values, and we permanently ensure that these permeate all our activities . . . . Wal-Mart de Mexico has an area of corporate compliance charged with communicating and fostering compliance with our ethical behavior policies and corporate governance, as well as strict adherence to the statutes which govern our Company."

14.    The Company's 2006 Annual Report stated in relevant part: "Since we began operations in the stock market some 30 years ago, we have always been one of the most consistent and professionally managed companies, always respectful of our minority shareholder rights.  These sound corporate governance practices, together with the results obtained from the operation of the company, have allowed us to become the second most important company in the Mexican Stock Exchange Index and one of the top three in trading volume in the Mexican market."

15. The Company's 2006 Annual Report also stated: "The structure and responsibilities of the Board of Directors, our Code of Ethics and in general all the activities performed by our Company follow the best practices of good corporate governance."

16. The Company's 2007 Annual Report quoted Defendant Vega, Chairman of the Board of Directors, as stating: "I appreciate not only the day-to-day efforts and the spirit of excellence of the top management team and all the associates of Wal-Mart de Mexico in protecting and growing the resources entrusted us by our shareholders, but also what you do every day to improve the quality of life for Mexican families."

17. The 2007 Annual Report also stated that the Company's "the highest standards of corporate governance and the respect shown to minority shareholders, makes WALMEX shares an excellent investment alternative for anyone." As in previous Annual Reports, the Company's 2007 Annual Report stated: "For Wal-Mart de Mexico, honesty and integrity continue being absolutely nonnegotiable core values, and we constantly oversee that these permeate all of our activities . . . . Wal-Mart de Mexico has an area of Corporate Compliance charged with communicating and fostering observance of our ethical behavior policies and corporate governance, as well as strict adherence to the statutes governing our Company."

18. The Company's 2008 Annual Report stated in relevant part: "At Wal-Mart de Mexico, we follow the most rigorous principles of corporate governance and transparency, which serve as constant guides to align our Company with new best practices trends. We have a Board of Directors that, with the support of the Executive, Audit, and Corporate Practices Committees, periodically reviews Company results and keeps a close watch on our control mechanisms and sound practices in all Company activities, and the proper use of assets. This is how we further strengthen the confidence of our shareholders."

19.     The Company's 2008 Annual Report further stated: "For Wal-Mart de Mexico, honesty and integrity continue being non-negotiable core values, and we always ensure that they permeate and govern all our activities . . . . Wal-Mart de Mexico's Ethics and Compliance area, which reports to the Legal Vice President, is charged with communicating and fostering observance of our ethical behavior policies and corporate governance, and strict adherence to the statutes governing our Company."

20.     The Company's 2009 Annual Report stated in relevant part: "For Walmart de México, honesty and integrity continue being non-negotiable core values, and we always ensure that they permeate and govern all our activities."

21.     The 2010 Annual Report contained a substantially identical representation.  The Company's 2010 Annual Report stated in relevant part:

> For Walmart de México y Centroamérica, honesty and integrity continue being non-negotiable core values, and we always ensure that they permeate and govern all our activities.
>
> The following are some of the primary points covered in our Code of Ethics [...]   No gifts and gratuities [...]  Inappropriate behavior [...] Financial integrity [...]  Anticorrupption..
>
> Walmart de México y Centroamérica's Ethics and Compliance area, which reports to the Senior Vice President of Legal, Compliance and Corporate Governance, and in charge of promoting a culture of compliance, ethical commitment, corporate governance, as well as strict adherence to the statutes governing our Company.  The Audit Committee periodically receives reports from this area.
>
> Each year we reply and send to the Mexican Stock Exchange the Code of Corporate Best Practices, available at the institution's website.

22.     On February 20, 2012, after the markets closed, Defendant Vega issued a letter to the investing public, which was included in the Company's 2011 Annual Report.  It stated in relevant part:

> In the performance of our duties, we have maintained strict compliance not only with the Mexican Securities Market Law, but we have also considered the recommendations contained in the Company's Code of Corporate Best Practices and Code of Conduct.
>
> With the purpose of complying with our supervisory process, the Audit and Corporate Practices Committees held four meetings during the last year to examine a general overview of the most relevant issues in terms of the company's Accounting, Legal, Operations and Ethics, supplemented by our involvement in the quarterly results analysis meetings and the Treasury, Real Estate and Ethics Committees . . . .

23.     The falsity of the foregoing representations was revealed on April 22, 2012, when *The New York Times* published an article (http://www.nytimes.com/2012/04/22/business/at-wal-mart-in-mexico-a-bribe-inquiry-silenced.html?_r=1&hp), which detailed a history of widespread corruption and illegal acts at Walmex and intentional misstatements of Walmex's financial statements.  Since the publication of this article, other news articles added additional specificity.

24.     In September 2005, Maritza I. Munich, the general counsel of Wal-Mart International, received an e-mail from Sergio Cicero Zapata ("Cicero"), who resigned from Wal-Mart de Mexico in 2004 after nearly a decade in the Company's real estate department. The email referenced "irregularities" authorized "by the highest levels" at Walmex.  In the e-mail and during follow-up conversations, Mr. Cicero described how Walmex's chief executive, Eduardo Castro-Wright, had for many years been the driving force behind the Company's

campaign of bribery to win market dominance. In its rush to build stores, he said, that Eduardo Castro-Wright had authorized the payment of bribes to obtain permits throughout Mexico.

25.     Mr. Cicero provided names, dates, and bribe amounts. He was fully aware of the details of the bribery because, for years, he had been the lawyer in charge of obtaining Walmex's construction permits. *The New York Times* reported that:

> Munich reacted quickly to Mr. Cicero's e-mail. Within days, she hired Juan Francisco Torres-Landa, a prominent Harvard-trained lawyer in Mexico City, to debrief Mr. Cicero. The two men met three times in October 2005, with Ms. Munich flying in from Bentonville for the third debriefing.
>
> During hours of questioning, Mr. Torres-Landa's notes show, Mr. Cicero described how Wal-Mart de Mexico had perfected the art of bribery, then hidden it all with fraudulent accounting. Mr. Cicero implicated many of Wal-Mart de Mexico's leaders, including its board chairman, its general counsel, its chief auditor and its top real estate executive.
>
> But the person most responsible, he told Mr. Torres-Landa, was the company's ambitious chief executive, Eduardo Castro-Wright, a native of Ecuador who was recruited from Honeywell in 2001 to become Wal-Mart's chief operating officer in Mexico.
>
> Mr. Cicero said that while bribes were occasionally paid before Mr. Castro-Wright's arrival, their use soared after Mr. Castro-Wright ascended to the top job in 2002. Mr. Cicero described how Wal-Mart de Mexico's leaders had set "very aggressive growth goals," which required opening new stores "in record times." Wal-Mart de Mexico executives, he said, were under pressure to do "whatever was necessary" to obtain permits.
>
> In an interview with *The Times*, Mr. Cicero said Mr. Castro-Wright had encouraged the payments for a specific strategic purpose. The idea, he said, was to build hundreds of new stores so fast that competitors would not have time to react. Bribes, he explained, accelerated growth. They got zoning maps changed. They made environmental objections vanish. Permits that typically took months to process magically materialized in days. "What we were buying was time," he said.

*     *     *

Mr. Cicero's allegations were all the more startling because he implicated himself. He spent hours explaining to Mr. Torres-Landa the mechanics of how he had helped funnel bribes through trusted fixers, known as "gestores."

Gestores (pronounced hes-TORE-ehs) are a fixture in Mexico's byzantine bureaucracies, and some are entirely legitimate. Ordinary citizens routinely pay gestores to stand in line for them at the driver's license office. Companies hire them as quasi-lobbyists to get things done as painlessly as possible.

But often gestores play starring roles in Mexico's endless loop of public corruption scandals. They operate in the shadows, dangling payoffs to officials of every rank. It was this type of gestor that Wal-Mart de Mexico deployed, Mr. Cicero said.

Mr. Cicero told Mr. Torres-Landa it was his job to recruit the gestores. He worked closely with them, sharing strategies on whom to bribe. He also approved Wal-Mart de Mexico's payments to the gestores. Each payment covered the bribe and the gestor's fee, typically 6 percent of the bribe. It was all carefully monitored through a system of secret codes known only to a handful of Wal-Mart de Mexico executives.

The gestores submitted invoices with brief, vaguely worded descriptions of their services. But the real story, Mr. Cicero said, was told in codes written on the invoices. The codes identified the specific "irregular act" performed, Mr. Cicero explained to Mr. Torres-Landa. One code, for example, indicated a bribe to speed up a permit. Others described bribes to obtain confidential information or eliminate fines.

Each month, Mr. Castro-Wright and other top Wal-Mart de Mexico executives "received a detailed schedule of all of the payments performed," he said, according to the lawyer's notes. Wal-Mart de Mexico then "purified" the bribes in accounting records as simple legal fees.

They also took care to keep Bentonville [WalMart] in the dark. "Dirty clothes are washed at home," Mr. Cicero said.

Mr. Torres-Landa explored Mr. Cicero's motives for coming forward.

Mr. Cicero said he resigned in September 2004 because he felt underappreciated.  He described the "pressure and stress" of participating in years of corruption, of contending with "greedy" officials who jacked up bribe demands.

As he told *The Times*, "I thought I deserved a medal at least."

The breaking point came in early 2004, when he was passed over for the job of general counsel of Wal-Mart de Mexico.  This snub, Mr. Torres-Landa wrote, "generated significant anger with respect to the lack of recognition for his work."  Mr. Cicero said he began to assemble a record of bribes he had helped orchestrate to "protect him in case of any complaint or investigation," Mr. Torres-Landa wrote.

26.     *The New York Times* reported that investigators dispatched through Munich

looked into the allegations and found evidence of widespread bribery:

On Nov. 12, 2005, Mr. Halter's team got to work at Wal-Mart de Mexico's corporate headquarters in Mexico City.  The team gained access to a database of Wal-Mart de Mexico payments and began searching the payment description field for the word "gestoria."

By day's end, they had found 441 gestor payments.  Each was a potential bribe, and yet they had searched back only to 2003.

Mr. Cicero had said his main gestores were Pablo Alegria Con Alonso and Jose Manuel Aguirre Juarez, obscure Mexico City lawyers with small practices who were friends of his from law school.

Sure enough, Mr. Halter's team found that nearly half the payments were to Mr. Alegria and Mr. Aguirre.  These two lawyers alone, records showed, had received $8.5 million in payments.  Records showed Wal-Mart de Mexico routinely paid its gestores tens of thousands of dollars per permit.  (In interviews, both lawyers declined to discuss the corruption allegations, citing confidentiality agreements with Wal-Mart.)

"One very interesting postscript," Mr. Halter wrote in an e-mail to his boss, Mr. Lewis.  "All payments to these individuals and all large sums of $ paid out of this account stopped abruptly in 2005."  Mr. Halter said the "only thing we can find" that changed was that Mr. Castro-Wright left Wal-Mart de Mexico for the United States.

Mr. Halter's team confirmed detail after detail from Mr. Cicero's debriefings.  Mr. Cicero had given specifics -- names, dates, bribe amounts -- for several new stores.   In almost every case, investigators found documents confirming major elements of his account.  And just as Mr. Cicero had described, investigators found mysterious codes at the bottom of invoices from the gestores.

"The documentation didn't look anything like what you would find in legitimate billing records from a legitimate law firm," a person involved in the investigation said in an interview.

Mr. Lewis sent a terse progress report to his boss, Mr. Senser: "FYI.  It is not looking good."

Hours later, Mr. Halter's team found clear confirmation that Mr. Castro-Wright and other top executives at Wal-Mart de Mexico were well aware of the gestor payments.

In March 2004, the team discovered, the executives had been sent an internal Wal-Mart de Mexico audit that raised red flags about the gestor payments.  The audit documented how Wal-Mart de Mexico's two primary gestores had been paid millions to make "facilitating payments" for new store permits all over Mexico.

The audit did not delve into how the money had been used to "facilitate" permits.  But it showed the payments rising rapidly, roughly in line with Wal-Mart de Mexico's accelerating growth. The audit recommended notifying Bentonville of the payments.

The recommendation, records showed, was removed by Wal-Mart de Mexico's chief auditor, whom Mr. Cicero had identified as one of the executives who knew about the bribes.  The author of the gestor audit, meanwhile, "was fired not long after the audit was completed," Mr. Halter wrote.

Mr. Ainley arranged to meet the fired auditor at his hotel.  The auditor described other examples of Wal-Mart de Mexico's leaders withholding from Bentonville information about suspect payments to government officials.

The auditor singled out José Luis Rodríguezmacedo Rivera, the general counsel of Wal-Mart de Mexico.

Mr. Rodríguezmacedo, he said, took "significant information out" of an audit of Wal-Mart de Mexico's compliance with the Foreign Corrupt Practices Act.  The original audit had described how Wal-

Mart de Mexico gave gift cards to government officials in towns where it was building stores. "These were only given out until the construction was complete," Mr. Ainley wrote. "At which time the payments ceased."

These details were scrubbed from the final version sent to Bentonville.

Investigators were struck by Mr. Castro-Wright's response to the gestor audit. It had been shown to him immediately, Wal-Mart de Mexico's chief auditor had told them. Yet rather than expressing alarm, he had appeared worried about becoming too dependent on too few gestores. In an e-mail, Mr. Rodríguezmacedo told Mr. Cicero to write up a plan to "diversify" the gestores used to "facilitate" permits.

"Eduardo Castro wants us to implement this plan as soon as possible," he wrote.

Mr. Cicero did as directed. The plan, which authorized paying gestores up to $280,000 to "facilitate" a single permit, was approved with a minor change. Mr. Rodríguezmacedo did not want the plan to mention "gestores." He wanted them called "external service providers."

Mr. Halter's team made one last discovery -- a finding that suggested the corruption might be far more extensive than even Mr. Cicero had described.

In going through Wal-Mart de Mexico's database of payments, investigators noticed the company was making hefty "contributions" and "donations" directly to governments all over Mexico -- nearly $16 million in all since 2003.

"Some of the payments descriptions indicate that the donation is being made for the issuance of a license," Mr. Ainley wrote in one report back to Bentonville.

They also found a document in which a Wal-Mart de Mexico real estate executive had openly acknowledged that "these payments were performed to facilitate obtaining the licenses or permits" for new stores. Sometimes, Mr. Cicero told *The Times*, donations were used hand-in-hand with gestor payments to get permits.

12

27.     An independent investigation by *The New York Times*' found "credible evidence that bribery played a persistent and significant role in Wal-Mart's rapid growth in Mexico, where Wal-Mart now employs 209,000 people, making it the country's largest private employer." It quantified illegal payments of approximately $24 million which were concealed through intentional falsification of Walmex's financial statements.

28.     This investigation was based upon hundreds of internal Company documents which *The New York Times* obtained that traced the evolution of Wal-Mart's 2005 Mexico investigation. *The New York Times*' examination also included "more than 15 hours of interviews with the former executive, Sergio Cicero Zapata, who resigned from Wal-Mart de Mexico in 2004 after nearly a decade in the company's real estate department."

> In the interviews, Mr. Cicero recounted how he had helped organize years of payoffs. He described personally dispatching two trusted outside lawyers to deliver envelopes of cash to government officials. They targeted mayors and city council members, obscure urban planners, low-level bureaucrats who issued permits -- anyone with the power to thwart Wal-Mart's growth. The bribes, he said, bought zoning approvals, reductions in environmental impact fees and the allegiance of neighborhood leaders.

29.     *The New York Times*' investigation also included the review of "thousands of government documents related to permit requests for stores across Mexico." It ascertained that there were "many instances where permits were given within weeks or even days of Walmex's payments to the two lawyers. Again and again, *The New York Times* found, legal and bureaucratic obstacles melted away after payments were made."

30.     A draft of an investigative report obtained by *The New York Times*, concluded that "top Wal-Mart de Mexico executives had failed to enforce their own anticorruption policies, ignored internal audits that raised red flags . . . even as Mr. Cicero was being debriefed in

October 2005, Wal-Mart de Mexico real estate executives made a request to pay a gestor

$14,000 to get a construction permit, records showed."

31.    According to *The New York Times*:

> The persistent questions and document requests from Mr. Halter's team provoked a backlash from Wal-Mart de Mexico's executives. After a week of work, records and interviews show, Mr. Halter and other members of the team were summoned by Eduardo F. Solórzano Morales, then chief executive of Wal-Mart de Mexico.

> Mr. Solórzano angrily chastised the investigators for being too secretive and accusatory. He took offense that his executives were being told at the start of interviews that they had the right not to answer questions - as if they were being read their rights.

> Mr. Halter prepared a report in December 2005 "laying out all the evidence that corroborated Mr. Cicero -- the hundreds of gestor payments, the mystery codes, the rewritten audits, the evasive responses from Wal-Mart de Mexico executives, the donations for permits, the evidence gestores were still being used. He stated: "There is reasonable suspicion to believe that Mexican and USA laws have been violated." He concluded that there was "no defendable explanation" for the millions of dollars in gestor payments.

> Munich submitted her resignation, effective February 1, 2006 after drafting a memo that argued for expanding the Mexico investigation and giving equal respect to Mexican and United States laws. The memo noted that: "The bribery of government officials is a criminal offense in Mexico."

32.    Munich's departure resulted in an expedient closure to the matter. As *The New*

*York Times* reported, "Mr. Rodríguezmacedo, the man now in charge, saw it differently. He

wrapped up the case in a few weeks, with little additional investigation." His report stated that

"[t]here is no evidence or clear indication of bribes paid to Mexican government authorities

with the purpose of wrongfully securing any licenses or permits."

33.    Thus, the unlawful activities were swept under the rug and effectively concealed

from the investment community until *The New York Times*' investigative report was published.

Defendants either participated in or were informed of the unlawful activities described above weeks before *The New York Times'* article was published and elected to continue to continue to conceal the Company's unlawful activities from the investing public.   The article, when published, caused the investment community to question the integrity of management and resulted in a 13% drop in the market price of Walmex's traded securities.

34.     A follow-up investigation by *The New York Times*, published December 17, 2012, revealed evidence that regulatory permission for siting, construction, and operation of nineteen stores had been obtained through bribery.   There was evidence that a bribe of $52,000 was paid to change a zoning map, which enabled the opening of a Walmex store a mile from a historical site. The bribes were given to rapidly obtain construction permits, which gave Walmex a substantial advantage over its business competitors.

35.     Each of the annual financial statements which the Company disseminated to the investing public during the Class Period was materially false and misleading because they misstated the nature of the Company's business operations and expenditures, and intentionally concealed the Company's illegal actions.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

36.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Walmex's ADRs between February 21, 2012 through April 22, 2012, inclusive, seeking to pursue remedies under the Exchange Act.

37.     The members of the Class are so numerous that joinder of all members is impracticable.   While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are

hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Walmex or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

38.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

39.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

40.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Walmex; and

(c)    whether the members of the Class have sustained damages and, if so, the proper measure of damages.

41.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

42.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

43.     During the Class Period, Plaintiff and the Class purchased ADRs of Walmex at artificially inflated prices and were damaged thereby.  The price of Walmex's ADRs significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

44.     Defendants acted with scienter because they: (i) knew that the public statements issued or disseminated by Defendants in the name of the Company were materially false and misleading; (ii) knew that such statements would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

45.     As set forth herein, Defendant Vega, by virtue of his receipt of information reflecting the true facts regarding Walmex, his control over, receipt and/or modification of Walmex's allegedly materially misleading statements and omissions, and/or his position with the Company which made him privy to confidential information concerning Walmex, participated in the fraudulent scheme alleged herein.

17

### Applicability of Presumption of Reliance:
### Fraud On The Market Doctrine

46.     At all relevant times, the market for Walmex's ADRs was an efficient market for the following reasons, among others:

(a)     Walmex's ADRs trades over-the-counter (OTC) with trading volume of in the hundreds of thousands and millions of shares throughout the Class Period;

(b)     Walmex regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c)     Walmex was followed by several securities analysts during the Class Period which were publicly available and entered the public marketplace.

47.     As a result of the foregoing, the market for Walmex's ADRs  promptly digested current information regarding Walmex from all publicly-available sources and reflected such information in Walmex's price.  Under these circumstances, all purchasers of Walmex's ADRs during the Class Period suffered similar injury through their purchase of Walmex's ADRs at artificially inflated prices and a presumption of reliance applies.

### NO SAFE HARBOR

48.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual

results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Walmex who knew that those statements were false when made.

## FIRST CLAIM

### Violation of Section 10(b) Of The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

49.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

50.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Walmex's ADRs at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

51.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ADRs in an effort to maintain artificially high market prices for Walmex ADRs in violation of Section 10(b) of the

Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

52.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Walmex's financial well-being, business relationships, and prospects, as specified herein.

53.    Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Walmex's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Walmex and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Walmex's ADRs during the Class Period.

54.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of supporting the artificially inflated price of its ADRs.

55.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Walmex's ADRs

was artificially inflated during the Class Period. In ignorance of the fact that market prices of Walmex's ADRs were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the ADRs trades, and/or in the absence of material, adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Walmex's ADRs during the Class Period at artificially high prices and were damaged thereby.

56.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

57.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's ADRs during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of The Exchange Act Against Defendant Vega

58.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

59.     Defendant Vega acted as controlling person of Walmex within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level position, and awareness of the Company's operations and/or intimate knowledge of the false statements described herein that were disseminated to the investing public, Defendant Vega had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Defendant Vega was provided with or had unlimited access to the Company's internal controls, and the financial condition of the

Company, issued the statements that Plaintiff alleges are materially false and misleading, and/or shortly after these statements were issued and had the ability to cause the statements to be corrected.

60.     In particular, Defendant Vega had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

61.     As set forth above, Defendant Vega violated Section 10(b) and Rule 10b-5 by his acts and omissions as alleged in this Complaint.  By virtue of his position as controlling person, Defendant Vega is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendant Vega's wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's ADRs during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding damages in favor of Plaintiff and the other Class members against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

<u>**JURY TRIAL DEMANDED**</u>

Plaintiff hereby demands a trial by jury.

22

Dated:  April 5, 2013

GAINEY McKENNA & EGLESTON

By: _Thomas J. McKenna_
Thomas J. McKenna
440 Park Avenue South, 5th Floor
New York, NY  10016
Telephone: 212-983-1300
Facsimile: 212-983-0383
Email: tjmckenna@gme-law.com

*Attorneys for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF

I, <u>Claudia S. Egleston, mother and natural guardian of Carys I. Egleston</u> ("Plaintiff") hereby retain Gainey McKenna & Egleston and such co-counsel it deems appropriate to associate with, subject to their investigation, to pursue my daughter's claims on a contingent fee basis and for counsel to advance the costs of the case, with no attorneys fee owing except as may be awarded by the court at the conclusion of the matter and paid out of any recovery obtained and I also hereby declare, as mother and natural guardian of Carys I. Egleston, the following as to the claims asserted under the law that:

Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

Plaintiff reviewed a copy of the complaint and is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

Plaintiff's transactions in *Wal-Mart de Mexico SAB De CV* security that is subject of this action during the Class Period are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Trade Date | Price Per Share |
|---|---|---|---|---|
| 100 | WMMVY | Buy | 04/16/2012 | $32.75 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**Please list other transactions on a separate sheet of paper, if necessary.**

Plaintiff has sought to serve as a class representative in the following cases within the last three years:

None

Plaintiff will not accept any payment serving as a representative party on behalf of the class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of April, 2013.

_____
Signature

<u>Claudia S. Egleston</u>
Mother and Natural Guardian of Carys I. Egleston