## UNITEFD STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CARYS I. EGLESTON, An Infant Under The Age Of Fourteen (14) Years, By Her Mother And Natural Guardian, CLAUDIA S. EGLESTON, Individually And On Behalf Of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>vs.<br><br>WAL-MART De MEXICO SAB De CV, ERNESTO VEGA, SCOT RANK, and WAL-MART STORES, INC.,<br><br>                Defendants. | Civil Action: 1:13-cv-02282-KPF<br><br><br>**AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |

Lead Plaintiff Michael Fogel ("Plaintiff"), individually and on behalf of all persons similarly situated, by his undersigned attorneys, for his amended complaint against Defendants alleges the following based upon personal knowledge as to his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants through their filings with the Mexican Stock Exchange ("MSE"), the United States Securities and Exchange Commission ("SEC"), wire and press releases published by and regarding Wal-Mart de México SAB De CV ("Wal-Mart de México" or the "Company"), securities analysts' reports and advisories about Wal-Mart de México, and information readily obtainable from public sources. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of purchasers (the "Class") of American Depositary Shares ("ADRs") of  Wal-Mart de México, who purchased or otherwise acquired the Company's ADRs between December 8, 2011 through April 24, 2012, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated under Section 10(b) of the Exchange Act (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1331.

4.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  The Company issued ADRs that traded Over-the-Counter ("OTC").

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      *Plaintiff Michael Fogel* purchased ADRs at artificially inflated prices during the Class Period and has been damaged thereby.  *See* D.I. 6-1.

2

7.     **Defendant Wal-Mart de México** owns and operates a network of retail stores in Mexico and Central America.   The Company operates discount stores, hypermarkets, membership self-service wholesale stores, supermarkets, bank branches, and restaurants, as well as engages in the real estate development and management activities.  It also operates discount stores, supermarkets, discount warehouse stores, hypermarkets, and membership self-service wholesale stores in Guatemala, El Salvador, Honduras, Nicaragua, and Costa Rica.

8.     **Defendant Ernesto Vega** ("Vega") was, at all relevant times, the Chairman of the Board of Directors, Chairman of the Audit and Corporate Practices Committee of Wal-Mart de México from January 1, 2005 to January 18, 2010, and, upon information and belief, a Director since approximately 2001.   As late as March 14, 2013, Wal-Mart de México in its communications to the public listed Defendant Vega as both an Alternate Director and an Independent Director, as well as a member of the Audit and Corporate Practices Committee of Wal-Mart de México.

9.     **Defendant Scot Rank** ("Rank") was, at all relevant times, the Executive President and Chief Executive Officer for Wal-Mart de México.  Defendant Rank has been the Chief Executive Officer and Executive President at Wal-Mart de México since January 18, 2010. Defendant Rank joined Wal-Mart de México in 2000 as Deputy Vice President for Bodega Aurrerá, being promoted to Vice President six months after.  Defendant Rank served as President and Chief Executive Officer of Wal-Mart CentroAmérica.  Since 2003, Defendant Rank served as senior vice president for self-service, responsible for the Walmart, Superama and Bodega Aurrerá business formats.  Since 2005, he served as Executive Vice President and Chief Operating Officer of Wal-Mart de México, overseeing the six retail sales business formats

3

that are part of the Group, including the three self-service formats, Sam's Club, Suburbia and the Vips restaurant division.

10.     Defendants Vega and Rank are hereinafter referred to as the "Individual Defendants."

11.     **_Defendant Wal-Mart Stores, Inc._** ("Wal-Mart") is the principal shareholder of Wal-Mart de México.     According     to     Wal-Mart     de     México's     website (http://www.walmex.mx/en/walmex-share/corporate-structure.html),     Wal-Mart owns 70% of Wal-Mart de México:



12.     Wal-Mart's Code of Ethics are provided to Wal-Mart de México's shareholders on Wal-Mart de México's website at http://www.walmex.mx/en/corporate-governance/code-of-ethics.html.

13.     Pursuant to the Corporate Bylaws of Wal-Mart de México, "[t]he supreme authority for [Wal-Mart de México] is the General Shareholder Assembly, who shall hold either regular or special meetings."  *See* Wal-Mart de México's 2011 Annual Report to the MSE at http://www.walmex.mx/assets/files/Informacion%20financiera/BMV/BMV/Eng/2012/Annual%20Report%20Walmex%202011%20MSE%20Format.pdf at 55.  Further, "[s]hareholders who own twenty percent or more of the capital stock may judicially oppose to the decisions reached by the Assembly."  *See id.* at p. 57.  Wal-Mart is the controlling shareholder of Wal-Mart de México (owning 70% of its ADRs), and therefore has "supreme authority" over decision making at the company.

14.     Many of the executives Wal-Mart de México report directly to Wal-Mart.  For example:

> Our Company is built on the foundations of integrity and the highest of ethical standards, always ensuring strict adherence to applicable legislation. For many years we have worked on reinforcing our compliance program, and therefore we have recently decided to strengthen our organizational structure. ***An Executive Vice President and Chief Officer for Compliance, Real Estate and Corporate Affairs was appointed, in addition to the Director for Anticorruption, who reports directly to the Global Compliance Officer for Walmart Stores, Inc***. With these actions, we reiterate our ongoing commitment to having all our activities follow the highest of ethical standards and generate value for our stakeholders: customers, shareholders, associates, suppliers, communities, and the environment. The structure and responsibilities of the Board of Directors, our Code of Ethics and, in general, all the activities performed by our Company follow corporate governance best practices.

*See* http://www.walmex.mx/en/corporate-governance/board-of-directors.html (emphasis added).

## FRAUDULENT SCHEME

### Wal-Mart de México Corruption

15.     According to Javier Oliva, a political scientist at National Autonomous University of Mexico ("UNAM"), the payment of corporate bribes within Mexico began to increase after the North American Free Trade Agreement came into force in Mexico in 1994.  As Mr. Oliva told *Reuters*: "Foreign companies in the main started to look for ways of speeding up official procedures.  Regrettably, this [corruption] is how it works in much of Mexico."  David Graham, "Wal-Mart Probe Lifts Lid on Culture of Bribery in Mexico", *Reuters* (Apr. 23, 2012) (available  at:  http://smallbusiness.yahoo.com/advisor/wal-mart-probe-lifts-lid-culture-bribery-mexico-014522507.html).

16.     A study by anti-corruption watchdog Transparencia Mexicana, the local arm of Transparency International ("TI"), showed Mexicans in 2010 paid a bribe to deal with more than one in 10 items of official paperwork or access to public services.  Illicit payments cover everything from connecting a telephone line to obtaining a driver's license, and average around 165 pesos.  *See id.*  According to TI's director, Eduardo Bohorquez, that figure leaps when big corporations try to operate in Mexico's capitol and 31 different states, each of which has its own set of rules on how to set up a business or lease property.  *See id.*

17.     Many bribes are paid through "gestores" (pronounced hes-TORE-ehs) or middlemen, who are used in Mexico to help companies perform a variety of tasks, from obtaining residency permits and resolving tax issues to obtaining planning authorization.  While gestores can be legitimate actors in Mexico's bureaucracy, they often play starring roles in Mexico's public corruption scandals, operating in the shadows, dangling payoffs to officials of every rank.

6

18.     Wal-Mart de México executives were keenly aware of how to expedite building a business in Mexico, as well as the laws against bribing government officials.  Nevertheless, the evidence strongly suggests that they chose to violate Mexican law in the interest of expediency.  As former Wal-Mart de México real estate attorney Mr. Sergio Cicero Zapata ("Cicero") told *The New York Times*:

> [T]he payments [were] for a specific strategic purpose.  The idea, he said, was to build hundreds of new stores so fast that competitors would not have time to react.  Bribes, he explained, accelerated growth.  They got zoning maps changed.  They made environmental objections vanish.  Permits that typically took months to process magically materialized in days.  "What we were buying was time," he said.

*The New York Times* article, dated April 21, 2012 (hereinafter "*New York Times* article").

**The Red Flags and Lax Internal Controls at Wal-Mart de México**

19.     According to *The New York Times* article, in 2003, Kroll Inc., ("Kroll") a leading investigative firm, conducted a confidential investigation for Wal-Mart Stores, Inc. ("Wal-Mart").  Kroll discovered that Wal-Mart de México had systematically increased its sales by helping favored high-volume customers evade sales taxes.

20.     A draft of Kroll's report, obtained by *The New York Times*, concluded that top Wal-Mart de México executives had failed to enforce their own anticorruption policies, ignored internal audits that raised red flags and even disregarded local press accounts asserting that Wal-Mart de México was "carrying out a tax fraud."  Wal-Mart ultimately paid $34.3 million in back taxes.

21.     Wal-Mart then asked Kroll to evaluate Wal-Mart de México's internal audit and antifraud units.  Kroll wrote another report that branded the units "ineffective."  Many

employees accused of wrongdoing were not even questioned; some "received a promotion shortly after the suspicions of fraudulent activities had surfaced."

**Wal-Mart de México's Bribery Practices are Revealed**

22.     The following conduct allegations are based in large part on *The New York Times* article.  *The New York Times* article was based on, among other things, the 15 hours of interviews with Mr. Cicero, a former Wal-Mart de México executive and Mexican lawyer who had retired in 2004 after nearly a decade in Wal-Mart de México's real estate department, and the review of hundreds of internal Company documents.

23.     On September 21, 2005, Mr. Cicero sent an e-mail to Maritza I. Munich ("Munich"), then-General Counsel of Wal-Mart International, telling her he had information about "irregularities" authorized "by the highest levels" at Wal-Mart de México.  "I hope to meet you soon," he wrote.

24.     Ms. Munich was familiar with the challenges of avoiding corruption in Latin America.  Before joining Wal-Mart in 2003, she had spent 12 years in Mexico and elsewhere in Latin America as a lawyer for Procter & Gamble.

25.     At Wal-Mart in 2004, she pushed the Wal-Mart Board of Directors (the "Wal-Mart Board") to adopt a strict anti-corruption policy that prohibited all employees from "offering anything of value to a government official on behalf of Wal-Mart."  It required every employee to report the first sign of corruption, and it bound Wal-Mart's agents to the same exacting standards.

26.     Ms. Munich reacted quickly to Mr. Cicero's e-mail.  Within days, she hired Juan Francisco Torres-Landa ("Torres-Landa"), a prominent Harvard-trained lawyer in Mexico City, to debrief Mr. Cicero.  The two men met three times in October 2005, with Ms. Munich flying

in from Bentonville, Arkansas (where Wal-Mart's corporate headquarters are located) for the third debriefing.  *See* Ex. H.

27.     During hours of questioning, Mr. Torres-Landa's notes show, Mr. Cicero described how Wal-Mart de México had perfected the art of bribery, then hidden it all with fraudulent accounting.  *See* Ex. A.  Mr. Cicero implicated many of Wal-Mart de México's leaders, including its Board Chairman, its General Counsel, its Chief Auditor and its top Real Estate Executive.

28.     But the person most responsible, he told Mr. Torres-Landa, was the Company's ambitious chief executive, Eduardo Castro-Wright ("Castro-Wright"), a native of Ecuador who was recruited from Honeywell International, Inc. in 2001 to become Wal-Mart's Chief Operating Officer in Mexico.

29.     Mr. Cicero said that while bribes were occasionally paid before Mr. Castro-Wright's arrival, their use soared after Mr. Castro-Wright ascended to the top job of Wal-Mart de México Chief Executive Officer in 2002.  Mr. Cicero described how Wal-Mart de México's leaders had set "very aggressive growth goals," which required opening new stores "in record times."  Wal-Mart de México executives, he said, were under pressure to do "whatever was necessary" to obtain permits.

30.     In an interview with *The New York Times*, Mr. Cicero said Mr. Castro-Wright had encouraged the bribery payments for a specific strategic purpose.  The idea, he said, was to build hundreds of new stores so fast that competitors would not have time to react.  Bribes, he explained, accelerated growth.  They got zoning maps changed.  They made environmental objections vanish.  Permits that typically took months to process magically materialized in days. "What we were buying was time," Cicero said.

31.     Wal-Mart de México's stunning growth made Mr. Castro-Wright a rising star at Wal-Mart.  In early 2005, when he was promoted to a senior position in the United States, CEO Michael T. Duke ("Duke"), as head of Wal-Mart International, would cite his "outstanding results" in Mexico.

32.     Mr. Cicero's allegations were all the more startling because he implicated himself.  He spent hours explaining to Mr. Torres-Landa the mechanics of how he had helped funnel bribes through gestores.

33.     Mr. Cicero told Mr. Torres-Landa it was his job to recruit the gestores.  He worked closely with them, sharing strategies on whom to bribe.  He also approved Wal-Mart de México's payments to the gestores.  Each payment covered the bribe and the gestore's fee, typically six percent of the bribe.

34.     It was all carefully monitored through a system of secret codes known only to a handful of Wal-Mart de México executives.

35.     The gestores submitted invoices with brief, vaguely worded descriptions of their services.  But the real story, Mr. Cicero said, was told in codes written on the invoices.  The codes identified the specific "irregular act" performed, Mr. Cicero explained to Mr. Torres-Landa.  One code, for example, indicated a bribe to speed up a permit.  Others described bribes to obtain confidential information or eliminate fines.

36.     Each month, Mr. Castro-Wright and other top Wal-Mart de México executives "received a detailed schedule of all of the payments performed," he said, according to the lawyer's notes.  Wal-Mart de México then "purified" the bribes in accounting records as simple legal fees.

37.     Mr. Torres-Landa explored Mr. Cicero's motives for coming forward.

38.     Mr. Cicero said he resigned in September 2004 because he felt underappreciated. He described the "pressure and stress" of participating in years of corruption, of contending with "greedy" officials who jacked up bribe demands.

39.     As he told *The New York Times*, "I thought I deserved a medal at least."

40.     The breaking point came in early 2004, when he was passed over for the job of General Counsel of Wal-Mart de México.  This snub, Mr. Torres-Landa wrote, "generated significant anger with respect to the lack of recognition for his work."  Mr. Cicero said he began to assemble a record of bribes he had helped orchestrate to "protect him in case of any complaint or investigation," Mr. Torres-Landa wrote.

41.     "We did not detect on his part any express statement about wishing to sell the information," Mr. Torres-Landa stated.

42.     According to people involved in Wal-Mart's investigation, Mr. Cicero's account of criminality at the top of Wal-Mart de México was impossible to dismiss.  He had clearly been in a position to witness the events he described.  Nor was this the first indication of corruption at Wal-Mart de México under Mr. Castro-Wright.  As discussed above, there was the 2003 Kroll investigation.

43.     None of these findings of corruption within Wal-Mart de México, though, had slowed Mr. Castro-Wright's rise.  Just days before Mr. Cicero's first debriefing, Mr. Castro-Wright was promoted again.  He was put in charge of all Wal-Mart stores in the United States, one of the most prominent jobs in the Company.  He also joined Wal-Mart's Executive Committee, Wal-Mart's inner sanctum of leadership.

**The Preliminary Inquiry:  "FYI.  It is Not Looking Good"**

44.     Ronald Halter, one of Wal-Mart's new "special investigators," was assigned to lead the preliminary inquiry into Mr. Cicero's allegations.  Mr. Halter had been with Wal-Mart only a few months, but he was a seasoned criminal investigator, having spent twenty-one (21) years at the Federal Bureau of Investigations (F.B.I.), and he spoke Spanish.

45.     Mr. Halter also had help.  Bob Ainley, a senior auditor, was sent to Mexico along with several Spanish-speaking auditors.

46.     On November 12, 2005, Mr. Halter's team got to work at Wal-Mart de México's corporate headquarters in Mexico City.  The team gained access to a database of Wal-Mart de México payments and began searching the payment description field for the word "gestoria."

47.     By day's end, they had found 441 gestor payments.  Each was a potential bribe, and yet they had searched back only to 2003.

48.     Mr. Cicero had said his main gestores were Pablo Alegria Con Alonso and Jose Manuel Aguirre Juarez, obscure Mexico City lawyers with small practices who were friends of his from law school.  Sure enough, Mr. Halter's team found that nearly half the payments were to Mr. Alegria and Mr. Aguirre.  These two lawyers alone, records showed, had received $8.5 million in payments.  Records showed Wal-Mart de México routinely paid its gestores tens of thousands of dollars per permit.

49.     "One very interesting postscript," Mr. Halter wrote in an e-mail to his boss, Mr. Joseph R. Lewis ("Lewis"), Wal-Mart's director of corporate investigations, "all payments to these individuals and all large sums of $ paid out of this account stopped abruptly in 2005."  Mr. Halter said the "only thing we can find" that changed was that Mr. Castro-Wright left Wal-Mart de México for the United States.

50.    Mr. Halter's team confirmed detail after detail from Mr. Cicero's debriefings. Mr. Cicero had given specifics -- names, dates, bribe amounts -- for several new stores. In almost every case, investigators found documents confirming major elements of his account. And just as Mr. Cicero had described, investigators found mysterious codes at the bottom of invoices from the gestores. Notably, the documentation did not look anything like what you would find in legitimate billing records from a legitimate law firm. Mr. Lewis sent a terse progress report to his boss, Mr. Kenneth H. Senser, vice president for global security, aviation and travel: "FYI. It is not looking good." *See* Ex. B.

51.    Hours later, Mr. Halter's team found clear confirmation that Mr. Castro-Wright and other top executives at Wal-Mart de México were well aware of the gestor payments. In March 2004, the team discovered, the executives had been sent an internal Wal-Mart de México audit that raised red flags about the gestor payments. The audit documented how Wal-Mart de México's two primary gestores had been paid millions to make "facilitating payments" for new store permits all over Mexico.

52.    The audit did not delve into how the money had been used to "facilitate" permits. But it showed the payments rising rapidly, roughly in line with Wal-Mart de México's accelerating growth. The audit recommended notifying Wal-Mart's senior executives in Arkansas of the payments.

53.    The recommendation, records showed, was removed by Wal-Mart de México's chief auditor, whom Mr. Cicero had identified as one of the executives who knew about the bribes. The author of the gestor audit, meanwhile, "was fired not long after the audit was completed," Mr. Halter wrote.

54.     Mr. Ainley arranged to meet the fired auditor at his hotel.  *See* Ex. J.  The auditor described other examples of Wal-Mart de México's leaders withholding from Wal-Mart senior executives information about suspect payments to government officials.  And, the auditor singled out José Luis Rodríguezmacedo Rivera, the general counsel of Wal-Mart de México.

55.     Mr. Rodríguezmacedo, he said, took "significant information out" of an audit of Wal-Mart de México's compliance with the Foreign Corrupt Practices Act ("FCPA").  The original audit had described how Wal-Mart de México gave gift cards to government officials in towns where it was building stores.  "These were only given out until the construction was complete, at which time the payments ceased," Mr. Ainley wrote.

56.     These details were scrubbed from the final version of the audit sent to Wal-Mart's Arkansas headquarters.

57.     Investigators were also struck by Mr. Castro-Wright's response to the gestor audit.  It had been shown to him immediately, Wal-Mart de México's chief auditor had told them.  Yet, rather than expressing alarm, he had appeared worried about becoming too dependent on too few gestores.  In an e-mail, Mr. Rodríguezmacedo instructed Mr. Cicero to write up a plan to "diversify" the gestores used to "facilitate" permits, and that "Eduardo Castro wants us to implement this plan as soon as possible."

58.     Mr. Cicero did as directed.  The plan, which authorized paying gestores up to $280,000 to "facilitate" a single permit, was approved with a minor change.  Mr. Rodríguezmacedo did not want the plan to mention "gestores."  He wanted them called "external service providers."

59.     Mr. Halter's team made one last discovery -- a finding that suggested the corruption might be far more extensive than even Mr. Cicero had described.

60.     In going through Wal-Mart de México's database of payments, investigators noticed Wal-Mart de México was making hefty "contributions" and "donations" directly to governments all over Mexico -- nearly $16 million in all since 2003.  "Some of the payment descriptions indicate that the donation is being made for the issuance of a license," Mr. Ainley wrote in one report.

61.     The investigators also found a document in which a Wal-Mart de México real estate executive had openly acknowledged that "these payments were performed to facilitate obtaining the licenses or permits" for new stores.  Sometimes, Mr. Cicero told *The New York Times*, donations were used hand-in-hand with gestor payments to get permits.

62.     Records show that Mr. Halter's findings were quickly elevated to the attention of the most senior executives at Wal-Mart.  The substantial evidence that Wal-Mart de México, the most profitable subsidiary of Wal-Mart and the showcase of its profitability model, under instructions from rising star Mr. Castro-Wright, was extensively bribing Mexican officials was a highly material, flagrant violation of the law.  Accordingly, within days of arriving in Mexico, Mr. Halter began making reports to Mr. Jose Luis Hernandez, the Chairman of Wal-Mart's Audit Committee, and the "Bentonville management," presumably including Wal-Mart's CEO, H. Lee Scott Jr. ("Scott") and Thomas A. Mars ("Mars"), Wal-Mart's General Counsel from 2002 to 2009.  Mr. Hernandez, as Chair of the Audit Committee, was in turn obligated to share Mr. Halter's reports with the other members of the Audit Committee, who also received reports from Mr. Mars on the subject.  In turn, the Audit Committee was obligated, under the Audit Committee Charter, to report the matter to the full Wal-Mart Board so that it could consider how to respond to this significant matter.

**Wal-Mart de México Executives Blame the Whistleblower and**
**Refuse to Cooperate with the Wal-Mart Investigation**

63.     When Mr. Halter's team became ready to interview executives at Wal-Mart de México, the first target was Mr. Rodríguezmacedo.  Before joining Wal-Mart de México in January 2004, Mr. Rodríguezmacedo had been a lawyer for Citigroup in Mexico.  Urbane and smooth, with impeccable English, he quickly won fans at Wal-Mart's corporate headquarters.  When Wal-Mart invited executives from its foreign subsidiaries to attend several days of discussion about the fine points of the Foreign Corrupt Practices Act, Mr. Rodríguezmacedo was asked to lead one of the sessions.  It was called "Overcoming Challenges in Government Dealings."

64.     Yet, Mr. Cicero had identified him as a participant in the bribery scheme.  In his debriefings, Mr. Cicero described how Mr. Rodríguezmacedo had passed along specific payoff instructions from Mr. Castro-Wright.  In an interview with *The New York Times*, Mr. Cicero said he and Mr. Rodríguezmacedo had discussed the use of gestores shortly after Mr. Rodríguezmacedo was hired.  "He said, 'Don't worry.  Keep it on its way.'"

65.     Mr. Halter's team hoped Mr. Rodríguezmacedo would shed light on how two outside lawyers came to be paid $8.5 million to "facilitate" permits.  Mr. Rodríguezmacedo, however, responded with evasive hostility.  When investigators asked him for the gestores' billing records, he said he did not have time to track them down.  They got similar receptions from other executives.

66.     Only after investigators complained to higher authorities were the executives more forthcoming.  Led by Mr. Rodríguezmacedo, they responded with an attack on Mr. Cicero's credibility.  The gestor audit, they told investigators, had raised doubts about Mr. Cicero, since he had approved most of the payments.  They began to suspect he was somehow

16

benefiting, so they asked Kroll to investigate.  It was then, they asserted, that Kroll discovered Mr. Cicero's wife was a law partner of one of the gestores.

67.     Mr. Cicero was fired, they said, because he had failed to disclose that fact.  They produced a copy of a "preliminary" report from Kroll and e-mails showing the undisclosed conflict had been reported to Wal-Mart's headquarters.

68.     Based on this behavior, Mr. Rodríguezmacedo argued, the gestor payments were in all likelihood a "ruse" by Mr. Cicero to defraud Wal-Mart de México.  Mr. Cicero and the gestores, he contended, probably kept every last peso of the "facilitating payments."

69.     According to Mr. Rodríguezmacedo, bribes could not have been paid if the money was stolen first.

70.     Indeed, there were several flaws in this argument by Mr. Rodríguezmacedo.  For example, even if Mr. Rodríguezmacedo's account were true, it did not explain why Wal-Mart de México's executives had authorized gestor payments in the first place, or why they made "donations" to get permits, or why they rewrote audits to keep Wal-Mart executives in the dark.

71.     Investigators also wondered why a trained lawyer who had supposedly gotten away with stealing a small fortune from Wal-Mart would now deliberately draw the Company's full attention by implicating himself in a series of fictional bribes.  Moreover, if Wal-Mart de México's executives truly believed they had been victimized, why hadn't they taken legal action against Mr. Cicero, much less reported the "theft" to Wal-Mart?

72.     Moreover, there was another problem.  Documents contradicted most of the Wal-Mart de México executives' assertions about Mr. Cicero.  Records showed Mr. Cicero had not been fired, but had resigned with severance benefits and a $25,000 bonus.  In fact, in a 2004 e-mail to Ms. Munich, Mr. Rodríguezmacedo himself described how he had "negotiated" Mr.

17

Cicero's "departure." The same e-mail said Mr. Cicero had not even been confronted about the supposed undisclosed conflict involving his wife. In fact, in an interview with *The New York Times*, Mr. Cicero flatly denied that his wife had ever worked with either gestor. The e-mail also assured Ms. Munich there was no hint of financial wrongdoing. "We see it merely as an undisclosed conflict of interest," Mr. Rodríguezmacedo wrote.

73.    There were other discrepancies. Mr. Rodríguezmacedo said Wal-Mart de México had stopped using gestores after Mr. Cicero's departure. This was false. As Mr. Cicero was being debriefed in October 2005, Wal-Mart de México real estate executives made a request to pay a gestor $14,000 to get a construction permit, Wal-Mart de México internal records showed.

74.    The persistent questions and document requests from Mr. Halter's team provoked a backlash from Wal-Mart de México's executives. After a week of work, Mr. Halter and other members of the team were summoned by Eduardo F. Solórzano Morales ("Solórzano"), the new chief executive of Wal-Mart de México who replaced Mr. Castro-Wright upon Mr. Castro-Wright's promotion.

75.    Mr. Solórzano angrily chastised the investigators for being too secretive and accusatory. He took offense that his executives were being told at the start of interviews that they had the right not to answer questions -- as if they were being read their rights.

76.    Mr. Lewis viewed the complaints as an effort to sidetrack his investigators. "I find this ludicrous and a copout for the larger concerns about what has been going on," he wrote.

77.    Nevertheless, Craig Herkert, the chief executive for Latin America for Wal-Mart, was notified about the complaints. Three days later, he and his boss, Mr. Duke, flew to Mexico City. Although the trip had long been planned -- Duke toured several stores -- they also used

the opportunity to reassure Wal-Mart de México's unhappy executives. They arrived just as the investigators finished their work and left.

**The Preliminary Report: "There is Reasonable Suspicion
to Believe That Mexican and USA Laws Have Been Violated"**

78.     Wal-Mart's leaders had agreed to consider a full investigation if the preliminary inquiry found Mr. Cicero's allegations credible. Back in Arkansas, Messrs. Halter and Ainley wrote confidential reports to Wal-Mart's top executives in December 2005, laying out all the evidence that corroborated Mr. Cicero, including the hundreds of gestor payments, the secret codes designed to disguise the gestor payments, the rewritten audits, the evasive responses from Wal-Mart de México executives, the donations for permits and finally, the evidence gestores were still being used.

79.     "There is reasonable suspicion," Mr. Halter concluded, "to believe that Mexican and USA laws have been violated." *See* Ex. C. There was simply "no defendable explanation" for the millions of dollars in gestor payments, he wrote. This information was reported to, among others, the Wal-Mart Audit Committee Chairman Hernandez, CEO Scott, General Counsel Mars and, through these three individuals, to the entire Wal-Mart Board.

80.     Mr. Halter submitted an "action plan" for a deeper investigation that would plumb the depths of corruption and culpability at Wal-Mart de México. Among other things, he urged "that all efforts be concentrated on the reconstruction of Cicero's computer history."

81.     Mr. Cicero, meanwhile, was still offering help. In November 2005, when Mr. Halter's team was in Mexico, Mr. Cicero offered his services as a paid consultant. In December 2005 he wrote to Ms. Munich. He volunteered to share specifics on still more stores, and he promised to show her documents.

82.     Mr. Halter proposed a thorough investigation of the two main gestores.  He had not tried to interview them in Mexico for fear of his safety.  Now Mr. Halter wanted Wal-Mart to hire private investigators to interview and monitor both gestores.  He also envisioned a round of adversarial interviews with Wal-Mart de México's senior executives.   He and his investigators argued that it was time to take the politically sensitive step of questioning Mr. Castro-Wright about his role in the gestor payments.

83.     By January 2006, the case had reached a critical juncture.  Wal-Mart's leaders were again weighing whether to approve a full investigation that would inevitably focus on a star executive already being publicly discussed as a potential successor to Mr. Scott.  Wal-Mart's ethics policy offered clear direction. "Never cover up or ignore an ethics problem," the policy states.

84.     The situation was bad enough that Wal-Mart's top procurement executives were summoned to Bentonville that winter for a dressing down.  Mr. Menzer, Wal-Mart's vice chairman, warned them that corruption was creating an unacceptable risk, particularly given the government's stepped-up enforcement of the FCPA.  "Times have changed," Mr. Menzer told them.

85.     As if to underscore the problem, Wal-Mart's leaders were confronted with new corruption allegations at Wal-Mart de México even as they pondered Mr. Halter's action plan.  In January, Messrs. Scott, Duke and Wal-Mart's Chairman, S. Robson Walton, received an anonymous e-mail saying Wal-Mart de México's top real estate executives were receiving kickbacks from construction companies.  "Please you must do something," the e-mail implored.

86.     Yet at the same time, records and interviews show, there were misgivings in Wal-Mart about the budding reach and power of Corporate Investigations.  In less than a year, Mr.

Lewis's beefed-up team had doubled its caseload, to roughly 400 cases a year.  Some executives grumbled that Mr. Lewis acted as if he still worked for the F.B.I., where he had once supervised major investigations.  They accused him and his investigators of being overbearing, disruptive and naïve about the moral ambiguities of doing business abroad.  They argued that Corporate Investigations should focus more on quietly "neutralizing" problems than on turning corrupt employees over to law enforcement.

87.     Wal-Mart's leaders had just witnessed the downside of bringing employee issues to law enforcement: in early 2005, the Company went to the F.B.I. with evidence that the disgraced former vice chairman, Mr. Thomas M. Coughlin, had embezzled hundreds of thousands of dollars.  The decision produced months of embarrassing publicity, especially when Mr. Coughlin claimed he had used the money to pay off union spies for Wal-Mart.

88.     Meanwhile, Wal-Mart de México executives were continuing to complain about the investigation.

89.     In January 2006, after reviewing a preliminary version of the report, Ms. Munich advised Mr. Mars of the need to conduct an extensive investigation to root out wrongdoing, stating that "the needed follow-up investigation should extend beyond the specific transactions contained in this draft report to other potentially suspect transactions not yet identified."   In addition to Mr. Mars, Ms. Munich sent a copy of her email to Martin Weinstein, a partner at Wal-Mart's external law firm, Willkie Farr & Gallagher.  *See* Ex. I.

90.     Despite Ms. Munich's efforts, it was clear that there was no interest at Wal-Mart de México in making a good faith effort to fix the corruption problem.  Ms. Munich submitted her resignation, effective February 1, 2006.  In one of her final acts, she drafted a memo that argued for expanding the Mexico investigation and giving equal respect to Mexican and United

States laws.  "The bribery of government officials," she noted, "is a criminal offense in Mexico."

91.     Ms. Munich also warned against allowing implicated Wal-Mart de México executives to interfere with the investigation.  Wal-Mart de México's executives had already tried to insert themselves in the case.  Just before Christmas, records show, Mr. Solórzano, the Wal-Mart de México chief executive, held a video conference with Messrs. Mars, Senser and Stucky to discuss his team's "hypothesis" that Mr. Cicero had stolen gestor payments.

92.     "Given the serious nature of the allegations, and the need to preserve the integrity of the investigation," Ms. Munich wrote, "it would seem more prudent to develop a follow-up plan of action, independent of Wal-Mart de México management participation."

## Scott Assigns Responsibility for the Investigation to One of the Accused Wrongdoers

93.     Mr. Scott called a meeting for February 3, 2006, to discuss revamping Wal-Mart's internal investigations and to resolve the question of what to do about Mr. Cicero's allegations. In the days before the meeting, records show, Mr. Senser ordered his staff to compile data showing the effectiveness of Wal-Mart's Corporate Investigations.  He assembled statistics showing that the unit had referred relatively few cases to law enforcement agencies.  He circulated copies of an e-mail in which Mr. Rodríguezmacedo said he had been treated "very respectfully and cordially" by Mr. Senser's investigators.

94.     Along with Mr. Scott, the meeting included Messrs. Hyde, Mars and Stucky.  The meeting brought the grievances against Wal-Mart Corporate Investigations into the open.  Mr. Senser described the complaints in Mr. Lewis's performance evaluation, completed shortly after the meeting.  Wal-Mart's leaders viewed Mr. Lewis's investigators as "overly aggressive," he wrote.  They did not care for Mr. Lewis's "law enforcement approach," and the fact that Mr.

Scott convened a meeting to express these concerns only underscored "the importance placed on these topics by senior executives."

95.     By meeting's end, Mr. Senser had been ordered to work with Mr. Mars and others to develop a "modified protocol" for internal investigations.  Mr. Scott said he wanted it done fast, and within 24 hours Mr. Senser produced a new protocol, a highly bureaucratic process that gave senior Wal-Mart executives -- ***including executives at Wal-Mart de México being investigated*** -- more control over internal investigations.  The policy included multiple "case reviews."  It also required senior executives to conduct a "cost-benefit analysis" before signing off on a full-blown investigation.

96.     Under the new protocol, Mr. Lewis and his team would only investigate "significant" allegations, like those involving potential crimes or top executives.  Lesser allegations would be left to the affected business unit to investigate.

97.     Four days after Mr. Scott's meeting, with the new protocol drafted, Wal-Mart's executives began to transfer control of the Wal-Mart de México bribery investigation to one of its earliest targets, Mr. Rodríguezmacedo.  This transfer was clearly inappropriate.  As Ms. Munich pointed out in January 18, 2006 email to, *inter alia*, Messrs. Mars, Weinstein, and Ainley, the "Wisdom of assigning any investigative role to management of the business unit being investigated escapes me.  Given the serious nature of the allegations, and the need to preserve the integrity of the investigation, it would seem more prudent to develop a follow-up plan of action independent of WALMEX management."  *See* Ex. D.

98.     Mr. Mars first sent Mr. Halter's report to Mr. Rodríguezmacedo.  Then he arranged to ship Mr. Halter's investigative files that revealed criminal activity from the U.S. to Mexico.  In an e-mail, he sought Mr. Senser's advice on how to send the files in "a secure

manner."  Mr. Senser recommended FedEx.  "There is very good control on those shipments, and while governments do compromise them if they are looking for something in particular, there is no reason for them to think that this shipment is out of the ordinary," he wrote.  "The key," he added, "is being careful about how you communicate the details of the shipment to José Luis."  Mr. Senser advised Mars to use encrypted e-mail.  *See* Ex. E.

99.     When contacted by *The New York Times*, Wal-Mart's spokesman, Mr. Tovar, said Wal-Mart could not discuss Mr. Scott's meeting or the decision to transfer the Wal-Mart de México corruption case to Mr. Rodríguezmacedo.  "At this point," he said, "we don't have a full explanation of what happened.  Unfortunately, we realize that until the investigation is concluded, there will be some unanswered questions."

100.    Wal-Mart's executives, however, had clear guidance in 2006 about the propriety of letting a target of an investigation run it.  On the same day Mr. Senser was putting the finishing touches on the new investigations protocol, Wal-Mart's ethics office sent him a booklet of "best practices" for internal investigations.  It had been put together by lawyers and executives who supervised investigations at Fortune 500 companies, and stated that: "[i]nvestigations should be conducted by individuals who do not have any vested interest in the potential outcomes of the investigation."

101.    Moreover, the transfer of the Wal-Mart de México investigation to Wal-Mart de México violated even the "modified protocol" for investigations.  Under the new protocol, Corporate Investigations was still supposed to handle "significant" allegations -- including those involving potential crimes and senior executives.  When Mr. Senser asked his deputies to list all investigations that met this threshold, they came up with 31 cases.  At the top of the list: Wal-Mart de México and the corruption in Mexico.

102.    After the meeting with Mr. Scott, Mr. Senser had told Mr. Lewis in his performance evaluation that his "highest priority" should be to eliminate "the perceptions that investigators are being too aggressive."  He wanted Mr. Lewis to "earn the trust of" his "clients" - Wal-Mart's leaders.  He wanted him to head off "adversarial interactions."

**The Final Report is Written By One of the Targets of the Investigation**

103.    For those who had investigated Mr. Cicero's allegations, the preliminary inquiry had been just that -- preliminary.  In memos and meetings, they had argued that their findings clearly justified a full-blown investigation.  Mr. Castro-Wright's precise role had yet to be determined.  Mr. Halter had never been permitted to question him, nor had Mr. Castro-Wright's computer files been examined, records and interviews show.  At the very least, a complete investigation would take months.

104.    Mr. Rodríguezmacedo, the man now in charge and one of the targets of the investigation, saw it differently.  He wrapped up the case in a few weeks, with little additional investigation.

105.    "There is no evidence or clear indication," his report concluded, "of bribes paid to Mexican government authorities with the purpose of wrongfully securing any licenses or permits."  That conclusion, his report explained, was largely based on the denials of his fellow executives.  Not one "mentioned having ordered or given bribes to government authorities," he wrote.

106.    His report, a mere six pages long, neglected to note that he had been implicated in the same criminal conduct.  That was not, however, the only omission.  While his report conceded that Wal-Mart de México executives had authorized years of payments to gestores, it

never explained what these executives expected the gestores to do with the millions of dollars they received to "facilitate" permits.

107.   He was also silent on the evidence that Wal-Mart de México had doled out donations to get permits.  Nor did he address evidence that he and other Wal-Mart de México executives had suppressed or rewritten audits that would have alerted Wal-Mart senior executives to improper payments.

108.   Instead, the bulk of Mr. Rodríguezmacedo's report attacked the integrity of his accuser.  Mr. Cicero, he wrote, made Wal-Mart de México's executives think they would "run the risk of having permits denied if the gestores were not used."  But this was merely a ruse: in all likelihood, he argued, Wal-Mart de México paid millions for "services never rendered."  The gestores simply pocketed the money, he suggested, and Mr. Cicero "may have benefited," too.

109.   Mr. Rodríguezmacedo, however, offered no direct proof.  Indeed, as his report made clear, it was less an allegation than a hypothesis built on two highly circumstantial pillars.

110.   First, he said he had consulted with Jesús Zamora-Pierce, a "prestigious independent counsel" who had written books on fraud.  Mr. Zamora, he wrote, "feels the conduct displayed by Sergio Cicero is typical of someone engaging in fraud.  It is not uncommon in Mexico for lawyers to recommend the use of gestores to facilitate permit obtainment, when in reality it is nothing more than a means of engaging in fraud."

111.   Second, Mr. Rodriguezmacedo said he had done a statistical analysis that found Wal-Mart de México won permits even faster after Mr. Cicero left.  The validity of his analysis was impossible to assess; he did not include his statistics in the report.

112.   In building a case against Mr. Cicero, Mr. Rodríguezmacedo's report included several false statements.  He described Mr. Cicero's "dismissal" when records showed he had

resigned.  He also wrote that Kroll's investigation of Mr. Cicero concluded that he "had a considerable increase in his standard of living during the time in which payments were made to the gestores."  The Kroll report, however, made no such assertion.

113.    His report promised a series of corrective steps aimed at putting the entire matter to rest.  Wal-Mart de México would no longer use gestores.  There would be a renewed commitment to Wal-Mart's anticorruption policy.  He did not recommend any disciplinary action against his colleagues.

114.    There was, however, one person he hoped to punish.  Wal-Mart de México, he wrote, would scour Mr. Cicero's records and determine "if any legal action may be taken against him."  Mr. Rodríguezmacedo submitted a draft of his report to Bentonville.

115.    In an e-mail, Mr. Lewis told his superiors that he found the report "lacking."  It was not clear what evidence supported the report's conclusions, he wrote.  "More importantly," he wrote, "if one agrees that Sergio defrauded the company and I am one of them, the question becomes, how was he able to get away with almost $10 million and why was nothing done after it was discovered?"

116.    Mr. Rodríguezmacedo responded by adding a paragraph to the end of his report: They had decided not to pursue "criminal actions" against Mr. Cicero because "we did not have a strong case."

117.    "At the risk of being cynical," Mr. Lewis wrote in response, "that report is exactly the same as the previous which I indicated was truly lacking."  *See* Ex. F.

118.    On May 10, 2006, Mr. Rodríguezmacedo was told by senior Wal-Mart executives, to put his report "into final form, thus concluding this investigation."

***The New York Times* Tells Wal-Mart it is Investigating
Mr. Cicero's Claims and the Cover Up Unravels**

119.    For many years Wal-Mart and Wal-Mart de México were able to keep the bribes

and subsequent whitewashing concealed.  The wrongdoers kept their jobs and, in many cases,

were promoted.  This was not, however, the end of the story.

***The New York Times* Breaks the Story**

120.    On April 21, 2012 (Saturday), after months of investigation, *The New York Times*

published an article by Pulitzer Prize winning journalist David Barstow entitled *Wal-Mart

Hushed Up a Vast Mexican Bribery Case*.  As discussed above, the *New York Times* article was

based on, among other things, 15 hours of interviews with Mr. Cicero, and the review of

hundreds of internal documents.

121.    On the first two days of trading after publication of *The New York Times* article,

Wal-Mart de México ADRs was pummeled, falling $5.24 -- from a close of $43.06 on Friday,

April 20, 2012, to a close of $37.82 on Monday, April 23, 2012 (a drop of 12.2%) and $36.20

on Tuesday, April 24, 2012 (a further drop of 4.3%).

**The Mexico Success Story Has An Ominous Side**

122.    Wal-Mart's operations are organized into three divisions:  Wal-Mart Stores U.S.,

Sam's Club, and Wal-Mart International.  During years 2005-2006, the International segment of

Wal-Mart's business grew as the domestic segment plateaued.  For example, Wal-Mart's March

31, 2005 10-K states:  "Our International segment consists of retail operations in eight countries

and Puerto Rico.  This segment generated 19.7% of our fiscal 2005 sales."  The March 31, 2006

10-K states:  "the International segment [grew to] 20.1% of our fiscal 2006 sales."  And the

March 27, 2007 10-K stated:  "our International segment generated 22.3% of our fiscal 2007 net

sales."  Moreover, Mexico accounted for one-fourth of the sales of Wal-Mart's International segment.

123.    The most successful foreign country in its International segment by far was Mexico.  Wal-Mart's 2005 Annual Report listed the number of segment stores and other operations in each of the countries in which the International segment operates.  As the below list shows, Mexico alone accounted for over one-third of the locations in Wal-Mart's fifteen-country international division.

## Fiscal 2005 End of Year Store Count

| Country | Discount | Supercenters | Sam's Clubs | Neighborhood Markets |
|---|---|---|---|---|
| Argentina | 0 | 11 | 0 | 0 |
| Brazil | 118 | 17 | 12 | 2 |
| Canada | 256 | 0 | 6 | 0 |
| China | 0 | 38 | 3 | 2 |
| South Korea | 0 | 16 | 0 | 0 |
| *Mexico* | *529* | *89* | *61* | *0* |
| United Kingdom | 263 | 19 | 0 | 0 |
| Puerto Rico | 9 | 4 | 9 | 32 |

124.    Wal-Mart de México was widely viewed as a highly successful business operation that stunned rivals with its rapid growth and success.  Indeed, in its own 2006 Annual Report, Wal-Mart de México states:

> [D]uring 2006 we broke a new record in both investment and the number of Grand Openings – an investment of $839 Million dollars and the opening of 120 new units from all our business formats.

125.    The success story of Wal-Mart de México was a matter of public knowledge and commentary in the 2005-2006 era.  It was not without its detractors, however, prompting

headlines describing Wal-Mart's entry into the Mexico market as the "Goliath"[1] or "Leviathan"[2] that has "invade[d],"[3] "trounc[ed] the locals,"[4] "transform[ed] the Mexican market,"[5] and was decried as a "threat to sovereignty."[6]

### Statement of Ethics, the Anti-Corruption Policy of Wal-Mart de México

126.     The Wal-Mart de México website (http://www.walmex.mx/en/financial-information/annual.html) presents an "Investor Relations" page that contains a section concerning corporate governance.  This "Investor Relations" page represents that Wal-Mart de México adhered to the Mexican Stock Exchange ("MSE") "Code of Best Practices" which states that Wal-Mart de México was required to:  "Encourage the stating of corporate ethics by the Company . . . .  Through its dissemination and also full compliance with company-established policies and procedures, such as the "Statement of Ethics", the "Anti-corruption Policy of Walmart de México y Centroamérica", and by including clauses regarding ethical compliance and environmental protection in agreements executed with our suppliers, and by informing and training our associates in matters pertaining to laws, policies and procedures that must be followed, promoting compliance with the same, and the involvement of Internal Audit."

---

[1]     The Economist, "Mexico's retail Goliath."  *Business Latin America*. March 2, 2002: 4.

[2]     *Miami Herald, International Edition*.   "Wal-Mart leviathan squeezes competition." February 2, 2004.

[3]     Weiner, Tim.  "Wal-Mart invades, and Mexico gladly surrenders."  *New York Times*. Sec. A 19 December 6, 2003.

[4]     Smith, Geri. "Mexico: war of the superstores.  Wal-Mart is trouncing the locals, but they're not giving up."  *Business Week*. Sept. 23, 2002: 60.

[5]     Luhnow, David. "Crossover success: How NAFTA helped Wal-Mart reshape the Mexican market."  *Wall Street Journal*, sec. 1. August 31, 2001.

[6]     González Amador, Roberto.   "Riesgo para la soberanía, el poder de Wal-Mart en el Mercado mexicano." *La Jornada*. P.22 July 8, 2004.

127.    Wal-Mart de México's 2004 Annual Report stated in relevant part:

> "***For Wal-Mart de Mexico, honesty and integrity continue being absolutely non-negotiable core values, and we permanently oversee that these permeate all our activities*** . . . .  Wal-Mart de Mexico has an area of corporate compliance charged with communicating and fostering compliance with our ethical behavior policies and corporate governance, as well as strict adherence to the statutes which govern our Company." [Emphasis added].

128.    Wal-Mart de México's 2005 Annual Report quotes Eduardo Solorzano, President and Chief Executive Officer, as stating:

> "Ladies and Gentlemen, we reiterate our commitment to Mexico and we thank you for the trust you have placed in each and every one of us who are part of Wal-Mart de Mexico; we shall continue working and making your investment grow, ***always mindful of the highest ethical standards and the best practices for corporate governance***." [Emphasis added].

129.    Wal-Mart de México's 2005 Annual Report repeated the following representation that appeared in the 2004 Wal-Mart de México Annual Report:

> "***For Wal-Mart de Mexico, honesty and integrity continue being absolutely non-negotiable core values, and we permanently ensure that these permeate all our activities*** . . . .  Wal-Mart de Mexico has an area of corporate compliance charged with communicating and fostering compliance with our ethical behavior policies and corporate governance, as well as strict adherence to the statutes which govern our Company." [Emphasis added].

130.    Wal-Mart de México's 2006 Annual Report stated in relevant part:

> "The structure and responsibilities of the Board of Directors, our Code of Ethics and in general all the activities performed by our Company follow the best practices of good corporate governance."

131.    As in previous Annual Reports, Wal-Mart de México's 2007 Annual Report stated:

> "For Wal-Mart de Mexico, honesty and integrity continue being absolutely nonnegotiable core values, and we constantly oversee that these permeate all of our activities . . . .  Wal-Mart de Mexico

31

has an area of Corporate Compliance charged with communicating and fostering observance of our ethical behavior policies and corporate governance, as well as strict adherence to the statutes governing our Company."

132.   Wal-Mart de México's 2008 Annual Report stated in relevant part:

"At Wal-Mart de Mexico, we follow the most rigorous principles of corporate governance and transparency, which serve as constant guides to align our Company with new best practices trends.  We have a Board of Directors that, with the support of the Executive, Audit, and Corporate Practices Committees, periodically reviews Company results and keeps a close watch on our control mechanisms and sound practices in all Company activities, and the proper use of assets.   This is how we further strengthen the confidence of our shareholders."

133.   Wal-Mart de México's 2008 Annual Report further stated:

"For Wal-Mart de Mexico, honesty and integrity continue being non-negotiable core values, and we always ensure that they permeate and govern all our activities . . . .  Wal-Mart de Mexico's Ethics and Compliance area, which reports to the Legal Vice President, is charged with communicating and fostering observance of our ethical behavior policies and corporate governance, and strict adherence to the statutes governing our Company."

134.   Wal-Mart de México's 2009 Annual Report stated in relevant part: "For Walmart de México, honesty and integrity continue being non-negotiable core values, and we always ensure that they permeate and govern all our activities."

135.   Wal-Mart de México's 2010 Annual Report contained a substantially identical representation and  stated in relevant part:

For Walmart de México y Centroamérica, honesty and integrity continue being non-negotiable core values, and we always ensure that they permeate and govern all our activities.

The following are some of the primary points covered in our Code of Ethics […]   No gifts and gratuities […]  Inappropriate behavior […]  Financial integrity […]  Anticorruption..

Walmart de México y Centroamérica's Ethics and Compliance area, which reports to the Senior Vice President of Legal, Compliance and Corporate Governance, and in charge of promoting a culture of compliance, ethical commitment, corporate governance, as well as strict adherence to the statutes governing our Company. The Audit Committee periodically receives reports from this area.

Each year we reply and send to the Mexican Stock Exchange the Code of Corporate Best Practices, available at the institution's website.

## THE MATERIALLY FALSE AND MISLEADING STATEMENTS

136.    On December 8, 2011, Wal-Mart de México's parent company (Defendant Wal-Mart) filed its Form 10-Q with the SEC for the third quarter of fiscal year 2012, which ended October 31, 2012 ("Wal-Mart's 3Q 2012 Form 10-Q") (Wal-Mart's 2012 fiscal year ran from February 1, 2011 through January 31, 2012), which included the following statement:

*During fiscal 2012*, the Company began conducting a voluntary internal review of its policies, procedures and internal controls pertaining to its global anti-corruption compliance program. *As a result of information obtained during that review and from other sources, the Company has begun an internal investigation* into whether certain matters, including permitting, licensing and inspections, were in compliance with the U.S. Foreign Corrupt Practices Act. The Company *has engaged* outside counsel and other advisors to assist in the review of these matters and *has implemented, and is continuing to implement, appropriate remedial measures*. The Company *has voluntarily disclosed its internal investigation to the U.S. Department of Justice and the Securities and Exchange Commission*. We cannot reasonably estimate the potential liability, if any, related to these matters.

However, based on the facts currently known, we do not believe that these matters will have a material adverse effect on our business, financial condition, results of operations or cash flows. [Emphasis added].

137.    The message Wal-Mart (Wal-Mart de México's parent and controlling majority shareholder) delivered was clear:

    (a)    ***sometime after February 1, 2011***, Wal-Mart obtained information related to "whether certain matters, including permitting, licensing and inspections, were in compliance with the U.S. Foreign Corrupt Practices Act";

    (b)    Wal-Mart was so proactive in protecting against foreign corruption, it had uncovered the suspected corruption itself through Wal-Mart's own "voluntary internal review of its policies, procedures and internal controls pertaining to its global anticorruption compliance program";

    (c)    Wal-Mart was so virtuous, and so true to its assurances, that upon learning of the suspected corruption it promptly and proactively (i) engaged outside counsel to conduct an internal investigation; and (ii) implemented appropriate remedial measures; and

    (d)    Wal-Mart was so virtuous, and so true to its assurances, that upon learning of the suspected corruption it promptly and proactively disclosed its internal investigation to the Department of Justice ("DOJ") and to the SEC.

138.    However, despite representing in its 3Q 2012 Form 10-Q that Wal-Mart had uncovered the suspected corruption "[d]uring fiscal 2012," Wal-Mart had actually learned of the suspected corruption during calendar year 2005, as demonstrated by the following email that Mike Duke (President and CEO of Wal-Mart) received over six years before he signed the Wal-Mart 3Q 2012 Form 10-Q:

-----Original Message-----
From:   Thomas Mars
Sent:   Sat Oct 15 17:58:07 2005
To:     Mike Duke
Cc:     Tom Hyde - Executive
Subject:     IMPORTANT: WALMEX Memo

Mike:

The attached memorandum summarizes an interview conducted earlier this month with a former
WALMEX in-house lawyer. The lawyer was terminated in September 2004 after 28 years with the
company. The lawyer asserts in some detail alleged corruption by various WALMEX associates, including
senior people.

You'll want to read this. I'm available to discuss next steps.

PS: Welcome to Wal-Mart International.

139.    As is apparent, far from shock at such allegations from a former in-house lawyer,
Wal-Mart's then-General Counsel, Thomas Mars, concluded his email jokingly with the
message, "Welcome to Wal-Mart International."  *See* Ex. G.  The memorandum Mr. Duke
received along with this email provided pages of details concerning the suspected corruption at
Wal-Mart de México.  Mr. Duke received a similar email two weeks later in late October 2005,
which included details of corruption related to Wal-Mart de México's building of a store at
Teotihuacán in Mexico City, Mexico.  The specific allegations set forth in the late October 2005
email were recently corroborated by other witnesses and documents, as described in David
Barstow and Alexandra Xanic von Bertrab, *The Bribery Aisle: How Wal-Mart Used Payoffs to
Get Its Way in Mexico*, *N.Y. Times*, Dec. 17, 2012.

140.    Despite representing in its 3Q 2012 Form 10-Q that Wal-Mart had uncovered the
suspected corruption at Wal-Mart de México through Wal-Mart's own proactive "voluntary
internal review of its policies, procedures and internal controls pertaining to its global anti-
corruption compliance program," Wal-Mart did not uncover the suspected corruption at Wal-
Mart de México.  Just the opposite.  Wal-Mart (along with Wal-Mart de México as more fully

described *infra*) covered up the suspected corruption at Wal-Mart de México after a former in-house lawyer had brought it to Wal-Mart's attention over six years earlier.  Upon information and belief, the only information Wal-Mart and Wal-Mart de México actually uncovered "[d]uring fiscal 2012" was that the *N.Y. Times* had learned of, and was actively investigating, the suspected corruption at Wal-Mart de México.  Rather than come clean, however, Wal-Mart and Wal-Mart de México concealed their awareness of *The New York Times*' investigation.  In addition, Wal-Mart used its 3Q 2012 Form 10-Q to rewrite history and mislead the public by painting a picture that bore no resemblance to the reality that *The New York Times* would reveal less than five (5) months later with its first article on this topic published on April 21, 2012.  Despite representing in its 3Q 2012 Form 10-Q that upon learning of the suspected corruption, Wal-Mart engaged outside counsel to conduct an internal investigation, in truth, after Wal-Mart had learned of the suspected corruption at Wal-Mart de México, one of the ways Wal-Mart covered it up was to reject a proposed independent "Internal Investigation Work Plan" from outside counsel.  Another way Wal-Mart covered up the suspected corruption at Wal-Mart de México was to assign the "investigation" to the very office implicated in executing and/or concealing the corruption scheme: Wal-Mart de México's General Counsel's Office.  That decision defied the advice of Wal-Mart International's Vice President and General Counsel, Maritza Munich, who left Wal-Mart International shortly after expressing her strong disagreement:

-----Original Message-----
From:   Maritza Munich-Legal
Sent:   Wed Jan 18 16:04:31 2006
To:     Bob Ainley - AUDIT; Michael Fung; Ronald Halter; Tom Mars - Legal; Martin J. Weinstein
(mweinstein@willkie.com)
Subject:     WALMEX:  Examination of Real Estate Transactions

Further to the message below, and my communications of 1-16-06 and 1-17-06 to Bob, Michael and
Ron (forwarding email communications with Sergio Cicero prior to 7 October 2005 and emails from April
2005 related to the IAS report of WALMEX donations), following are additional comments to Ron Halter's
draft report of December 15, 2005:

                                            ***

    - The wisdom of assigning any investigative role to management of the business unit being
investigated escapes me.  Given the serious nature of the allegations, and the need to preserve the
integrity of the investigation, it would seem more prudent to develop a follow-up plan of action,
independent of WALMEX management participation, and that includes external legal advise and
professional, independent investigative resources.
*      Last paragraph
    - It is important to keep in mind that in his email to me of December 5, 2005, Sergio Cicero offers
to provide information about "other cases that were managed at that time under the same formula."
Accordingly, and as originally envisioned, the needed follow-up investigation should extend beyond the
specific transactions contained in this draft report to other potentially suspect transactions not yet
identified.


~Maritza
======================
MARITZA I. MUNICH
VP & General Counsel - International
WAL* MART STORES, INC.
(479) 277-2346

141.    Despite representing in its 3Q 2012 Form 10-Q that upon learning of the

suspected corruption, Wal-Mart implemented appropriate remedial measures, whatever

remedial measures it may have implemented in 2011 were obviously not implemented in 2005,

which is when Wal-Mart learned of the suspected corruption at Wal-Mart de México.

142.    Despite representing in its 3Q 2012 Form 10-Q that upon learning of the

suspected corruption, Wal-Mart disclosed its internal investigation to the DOJ and to the SEC,

Wal-Mart did nothing of the sort when it actually learned of the suspected corruption at Wal-

Mart de México in 2005.  Instead, Wal-Mart "closed" the matter in 2006, without engaging

outside counsel to conduct an internal investigation, without implementing whatever remedial

measures were implemented in 2011, and without referring the matter to the DOJ, the SEC, or any other law enforcement agency or third-party entity.  In fact, the closest Wal-Mart came to a law enforcement referral was the involvement of its own Director of Corporate Investigations, who was a former FBI Agent, who reviewed the implicated Wal-Mart de México General Counsel's Office inquiry and report, and found it to be "truly lacking":

| | |
|---|---|
| **From:** | Joe Lewis |
| **To:** | Ken Senser |
| **Cc:** | Joe Lewis |
| **Subject:** | RE: Gestores |
| **Date:** | Wednesday, May 10, 2006 11:34:16 AM |
| **Attachments:** | RE GestoresReport (Draft)English version.msg |

Ken,
At the risk of being cynical, that report is exactly the same as the previous which I indicated was truly lacking ( see attached). The added paragraph at the end does not change my assessment.

Joseph R. Lewis
Director of Corporate Investigations
Wal-Mart Stores, Inc.
1300 Southeast 8th Street
Bentonville, AR.  72716
(w) 479-204-3077

143.     Wal-Mart's 3Q 2012 Form 10-Q statement deceived the public by omitting the fact that Wal-Mart and Wal-Mart de México knew of the suspected corruption in 2005 and that Wal-Mart conducted an internal investigation in 2005-2006.   Wal-Mart's statement was misleading because it left the public with the impression that it first learned of the suspected corruption in fiscal year 2012, promptly began an investigation, and then referred the matter to the DOJ and SEC.

144.     In response to the December 8, 2011 misleading statement by Wal-Mart, Wal-Mart de México remained silent and did nothing to correct the misleading statement by Wal-Mart (its controlling shareholder) and the misleading impression it created.

## WAL-MART DE MÉXICO FALSE AND MISLEADING STATEMENTS

145.    In fiscal years 2006, 2007, 2008, 2009, 2010, 2011, Wal-Mart de México filed with the MSE quarterly and annual reports and issued press releases to the investor public regarding its operations and financial condition.  During fiscal years 2006, 2007, 2008, 2009, 2010, 2011, Wal-Mart de México failed to inform its shareholders (through its silence) that it (and many of the high ranking officers at Wal-Mart de México) were (a) implicated in the suspected corruption in 2005; (b) knew of the suspected corruption in 2005; and (c) Wal-Mart had conducted an internal investigation in 2005-2006 into the suspected corruption at Wal-Mart de México.

146.    At the beginning of the Class Period, on December 9, 2011, Wal-Mart de México issued a prelease entitled "Wal-Mart de México Y CentroAmérica is Part of the IPC Sustainable MSE Index."  Defendant Rank stated in relevant part:

> "We are very proud to be part of this new and important index.
> ***Walmart de México y Centroamérica is committed to act with
> integrity and in full compliance of the law***.

147.    In this press release, Wal-Mart de México failed to inform its shareholders (through its silence) that it (and many of the high ranking officers at Wal-Mart de México) were (a) implicated in the suspected corruption in 2005; (b) knew of the suspected corruption in 2005; and (c) Wal-Mart had conducted an internal investigation in 2005-2006 into the suspected corruption at Wal-Mart de México.  In addition, because Wal-Mart de México was the subsidiary implicated in the suspected corruption in 2005 and internal investigation in 2005-2006, Wal-Mart de México and Defendants Rank and Vega had a duty to its shareholders to correct the inaccurate and materially misleading statements made by Wal-Mart in the 3Q 2012

Form 10-Q filed with the SEC.  Further, Defendant Rank's statement that Wal-Mart de México was "in full compliance of the law" was false and misleading for the reasons stated above.

148.    On January 9, 2012, Wal-Mart de México issued a press release entitled *Walmart de México y CentroAmérica Reached Record Sales in 2011*.  In this press release, Wal-Mart de México failed to inform its shareholders (through its silence) that it (and many of the high ranking officers at Wal-Mart de México) were (a) implicated in the suspected corruption in 2005; (b) knew of the suspected corruption in 2005; and (c) Wal-Mart had conducted an internal investigation in 2005-2006 into the suspected corruption at Wal-Mart de México.  In addition, because Wal-Mart de México was the subsidiary implicated in the suspected corruption in 2005 and internal investigation in 2005-2006, Wal-Mart de México and Defendants Rank and Vega had a duty to its shareholders to correct the inaccurate and materially misleading statements made by Wal-Mart in the 3Q 2012 Form 10-Q filed with the SEC.

149.    On February 8, 2012, Wal-Mart de México issued a press release entitled *WalMart de México y CentroAmérica Reports January 2012 Sales*.  In this press release, Wal-Mart de México failed to inform its shareholders (through its silence) that it (and many of the high ranking officers at Wal-Mart de México) were (a) implicated in the suspected corruption in 2005; (b) knew of the suspected corruption in 2005; and (c) Wal-Mart had conducted an internal investigation in 2005-2006 into the suspected corruption at Wal-Mart de México.   In addition, because Wal-Mart de México was the subsidiary implicated in the suspected corruption in 2005 and internal investigation in 2005-2006, Wal-Mart de México and Defendants Rank and Vega had a duty to its shareholders to correct the inaccurate and materially misleading statements made by Wal-Mart in the 3Q 2012 Form 10-Q filed with the SEC.

150.    On February 20, 2012, Wal-Mart de México issued a press release entitled *WalMart de México y CentroAmérica Reports Results for the Fourth Quarter 2011*.  In this press release, Wal-Mart de México failed to inform its shareholders (through its silence) that it (and many of the high ranking officers at Wal-Mart de México) were (a) implicated in the suspected corruption in 2005; (b) knew of the suspected corruption in 2005; and (c) Wal-Mart had conducted an internal investigation in 2005-2006 into the suspected corruption at Wal-Mart de México.  In addition, because Wal-Mart de México was the subsidiary implicated in the suspected corruption in 2005 and internal investigation in 2005-2006, Wal-Mart de México and Defendants Rank and Vega had a duty to its shareholders to correct the inaccurate and materially misleading statements made by Wal-Mart in the 3Q 2012 Form 10-Q filed with the SEC.

151.    On February 20, 2012, Wal-Mart de México also conducted a webcast of its Fourth Quarter 2011 financial results.  At this Fourth Quarter 2011 financial webcast, Wal-Mart de México failed to inform its shareholders (through its silence) that it (and many of the high ranking officers at Wal-Mart de México) were (a) implicated in the suspected corruption in 2005; (b) knew of the suspected corruption in 2005; and (c) Wal-Mart had conducted an internal investigation in 2005-2006 into the suspected corruption at Wal-Mart de México.  In addition, because Wal-Mart de México was the subsidiary implicated in the suspected corruption in 2005 and internal investigation in 2005-2006, Wal-Mart de México and Defendants Rank and Vega had a duty to its shareholders to correct the inaccurate and materially misleading statements made by Wal-Mart in the 3Q 2012 Form 10-Q filed with the SEC.

152.    On February 20, 2012, Wal-Mart de México filed its 4Q 2011 financial results with the MSE.  These financial results were also posted on Wal-Mart de México website at

http://www.walmex.mx/assets/files/Informacion%20financiera/BMV/BMV/Eng/2012/WALME
X%20IV%20TRIM%202011%20ING.pdf.

153.    In the above 4Q 2011 filing with the MSE, Wal-Mart de México failed to inform

its shareholders (through its silence) that it (and many of the high ranking officers at Wal-Mart

de México) were (a) implicated in the suspected corruption in 2005; (b) knew of the suspected

corruption in 2005; and (c) Wal-Mart had conducted an internal investigation in 2005-2006 into

the suspected corruption at Wal-Mart de México.   In addition, because Wal-Mart de México

was the subsidiary implicated in the suspected corruption in 2005 and internal investigation in

2005-2006, Wal-Mart de México and Defendants Rank and Vega had a duty to its shareholders

to correct the inaccurate and materially misleading statements made by Wal-Mart in the 3Q

2012 Form 10-Q filed with the SEC.

154.    On February 20, 2012, after the markets closed, Defendant Vega issued a letter to

the investing public of Wal-Mart de México, which was included in Wal-Mart de México's

2011 Annual Report.  It stated in relevant part:

> *In the performance of our duties, we have maintained strict*
> *compliance not only with the Mexican Securities Market Law,*
> *but we have also considered the recommendations contained in*
> *the Company's Code of Corporate Best Practices and Code of*
> *Conduct*.  [Emphasis added].

155.    Defendant Vega's letter to the investing public of Wal-Mart de México failed to

inform Wal-Mart de México shareholders (through its silence) that Wal-Mart de México (and

many of the high ranking officers at Wal-Mart de México) were (a) implicated in the suspected

corruption in 2005; (b) knew of the suspected corruption in 2005; and (c) Wal-Mart had

conducted an internal investigation in 2005-2006 into the suspected corruption at Wal-Mart de

México.   In addition, because Wal-Mart de México was the subsidiary implicated in the

suspected corruption in 2005 and internal investigation in 2005-2006, Wal-Mart de México and Defendants Rank and Vega had a duty to its shareholders to correct the inaccurate and materially misleading statements made by Wal-Mart in the 3Q 2012 Form 10-Q filed with the SEC.

156.    On March 7, 2012, Wal-Mart de México issued a press release entitled *Wal-Mart de México y CentroAmérica Reports February 2012 Sales*.  In this press release, Wal-Mart de México failed to inform its shareholders (through its silence) that it (and many of the high ranking officers at Wal-Mart de México) were (a) implicated in the suspected corruption in 2005; (b) knew of the suspected corruption in 2005; and (c) Wal-Mart had conducted an internal investigation in 2005-2006 into the suspected corruption at Wal-Mart de México.  In addition, the fact that Wal-Mart de México was the subsidiary implicated in the suspected corruption in 2005 and internal investigation in 2005-2006, Wal-Mart de México and Defendants Rank and Vega had a duty to its shareholders to correct the inaccurate and materially misleading statements made by Wal-Mart in the 3Q 2012 Form 10-Q filed with the SEC.

157.    On March 12, 2012, Wal-Mart de México issued a press release entitled *Wal-Mart de México Informs on the Details of the Proposal That the Board of Directors will Submit for Approval at the Next Annual Shareholders' Meeting*.  In this press release, Wal-Mart de México failed to inform its shareholders (through its silence) that it (and many of the high ranking officers at Wal-Mart de México) were (a) implicated in the suspected corruption in 2005; (b) knew of the suspected corruption in 2005; and (c) Wal-Mart had conducted an internal investigation in 2005-2006 into the suspected corruption at Wal-Mart de México.  In addition, the fact that Wal-Mart de México was the subsidiary implicated in the suspected corruption in 2005 and internal investigation in 2005-2006, Wal-Mart de México and Defendants Rank and

Vega had a duty to its shareholders to correct the inaccurate and materially misleading statements made by Wal-Mart in the 3Q 2012 Form 10-Q filed with the SEC.

158.    On April 10, 2012, Wal-Mart de México issued a press release to the investing public entitled *Wal-Mart de México y CentroAmérica Reports March 2012 Sales*.  In this press release, Wal-Mart de México failed to inform its shareholders (through its silence) that it (and many of the high ranking officers at Wal-Mart de México) were (a) implicated in the suspected corruption in 2005; (b) knew of the suspected corruption in 2005; and (c) Wal-Mart had conducted an internal investigation in 2005-2006 into the suspected corruption at Wal-Mart de México.  In addition, the fact that Wal-Mart de México was the subsidiary implicated in the suspected corruption in 2005 and internal investigation in 2005-2006, Wal-Mart de México and Defendants Rank and Vega had a duty to its shareholders to correct the inaccurate and materially misleading statements made by Wal-Mart in the 3Q 2012 Form 10-Q filed with the SEC.

159.    On April 18, 2012, Wal-Mart de México issued its Annual Report for 2011.  In this 2011 Annual Report, Wal-Mart de México failed to inform its shareholders (through its silence) that it (and many of the high ranking officers at Wal-Mart de México) were (a) implicated in the suspected corruption in 2005; (b) knew of the suspected corruption in 2005; and (c) Wal-Mart had conducted an internal investigation in 2005-2006 into the suspected corruption at Wal-Mart de México.  In addition, the fact that Wal-Mart de México was the subsidiary implicated in the suspected corruption in 2005 and internal investigation in 2005-2006, Wal-Mart de México and Defendants Rank and Vega had a duty to its shareholders to correct the inaccurate and materially misleading statements made by Wal-Mart in the 3Q 2012 Form 10-Q filed with the SEC.

160.    The above statement deceived the Wal-Mart de México shareholders by omitting the fact that Wal-Mart de México knew of suspected corruption in 2005 and was subject to an internal investigation in 2005-2006 by its controlling shareholder and parent – Wal-Mart.

161.    Defendant Wal-Mart (Wal-Mart de México's controlling shareholder) also facilitated this deceit on the Wal-Mart de México shareholders by falsely stating in its December 8, 2011 SEC Form 10-Q quarterly report that "*during fiscal 2012*": Wal-Mart had begun conducting a "voluntary internal review" and had begun an "internal investigation" into whether permitting, licensing and inspections were in compliance with the FCPA; that Wal-Mart had engaged outside counsel and other advisors to assist in the review and had implemented remedial measures; that Wal-Mart had disclosed the internal investigation to the DOJ and SEC; and that Wal-Mart did not believe these matters would have a material adverse effect on Wal-Mart.  Wal-Mart's omission of the 2005 revelation of the suspected corruption and the 2005 and 2006 investigation rendered the statements in the Form 10-Q materially false and misleading.  Without any reference to the 2005 and 2006 events, a reasonable investor could have certainly been left with the impression that Wal-Mart only learned of the suspected corruption in fiscal year 2012, and that, upon learning of the suspected corruption at that time, Wal-Mart promptly began investigating and referred the matter to the DOJ and SEC.

162.    The disclosure of the 2005 and 2006 events would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. This conclusion is supported by the fact that just six months later, after the publication of *The New York Times* article, Wal-Mart recognized the materiality of the 2005 and 2006 events, as it disclosed them in its June 2012 Form 10-Q, reporting that it was investigating whether prior allegations of violations of the FCPA were appropriately handled by the company. This

conclusion is also supported by the similar drop in stock prices for both Wal-Mart de México ADRs and Wal-Mart common stock and, the significant expenses Wal-Mart de México and Wal-Mart incurred as a result of the alleged mishandling of the prior allegations, the criminal and congressional investigation of these matters, and public speculation about the possible financial penalties Wal-Mart could face for allegedly violating the FCPA.

163.     Defendants knew that the omission in their statements above were materially false and misleading.  The information that Wal-Mart de México consciously chose to omit include facts about when and how Wal-Mart and Wal-Mart de México first learned of the suspected corruption and how they first responded to these allegations.  It was only after the *New York Times* article was published that Defendants acknowledged half-heartedly that the suspected corruption was the subject of allegations in 2005 and that there were questions about how Wal-Mart and Wal-Mart de México handled these allegations in 2005-2006.

164.     For example, on April 23, 2012, Wal-Mart de México released the following regarding the corruption practices:

> Wal-Mart de México, S.A.B. de C.V. (WALMEX) announces to its shareholders as well as to the public in general, in addition to the comments made at our corporate website, the following:
>
> Walmart de México y Centroamérica (Walmex) is fully committed to complying with the laws of the countries where it operates, including any state or municipal regulations pertaining to the application for licenses and permits.
>
> The allegations in the recent New York Times article, if true, do not accurately reflect Walmart de México y Centroamérica´s culture.
>
> **<u>Last year</u>, Wal-Mart Stores, Inc. undertook a review of anti-corruption practices in all countries in which it operates. <u>Thereafter</u>, Wal-Mart Stores, Inc. <u>initiated</u> an independent investigation into the allegations described in the article, many of which are more than six years old**. Walmart de México y

Centroamérica is cooperating with this investigation. Unfortunately, we realize that, at this point, there are some unanswered questions. We wish we could say more but we will not jeopardize the integrity of the investigation.

Walmart de México y Centroamérica expects all of our associates to comply with corporate anti-corruption policies and laws and uphold the highest standards of conduct.

We cannot reasonably estimate the potential liability, if any, related to these matters. However, based on the facts currently known, we do not believe that these matters will have an adverse effect on our business, financial condition, results of operations or cash flows.

Over the years the company has strived to provide adequate training and direction to its associates to foster ethically consistent conduct throughout the organization. Further, we have taken a number of actions to establish stronger anti-corruption compliance. We enhanced compliance measures including, robust policies and procedures, internal controls, training, and auditing procedures, and we have issue escalation and remediation protocols. In addition, the company is continually engaged in reviewing and improving compliance with its corporate policies.

We will continue to be committed improving the quality of life for families in Mexico and Central America and the communities in which we operate.

165.    The above press release still created the overall impression that the last thing Wal-Mart de México investors had to fear was that Defendants had covered up the suspected corruption for years as it gave the impression that in 2011 Wal-Mart "undertook a review of anti-corruption practices in all countries" and then "after[wards]" "initiated an independent investigation into the allegations described in the article, many of which are more than six years old." This is still false and misleading as a reasonable investor could be left with the impression that Wal-Mart and Wal-Mart de México only learned of the suspected corruption in fiscal year 2012, and that, upon learning of the suspected corruption at that time, Wal-Mart promptly began investigating.

166.    However, on the first two days of trading after publication of *The New York Times* article, Wal-Mart de México ADRs was pummeled, falling $5.24 -- from a close of $43.06 on Friday, April 20, 2012, to a close of $37.82 on Monday, April 23, 2012 (a drop of 12.2%) and $36.20 on Tuesday, April 24, 2012 (a further drop of 4.3).

## POST CLASS PERIOD

167.    On February 24, 2014, *Reuters* issued a press release entitled "Mexico's Walmex to open fewer stores in 2014, focus on remodeling."   The press release stated in relevant part:

> MONTERREY, Feb 24 (Reuters) – Mexico's Wal-Mart de Mexico said it will increase its business investment 7 percent this year but shift its focus to remodeling existing stores rather than opening new stores.
>
> Wal-Mart de Mexico, which has slowed store openings amid a U.S. Department of Justice bribery investigation, will spend 15 billion pesos ($1.1 billion) in 2014 but it will only increase its floor space by 5.2 percent, Chief Financial Officer Rafael Matute told analysts on Monday.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

168.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Wal-Mart de México's ADRs between December 8, 2011 through April 24, 2012, inclusive, seeking to pursue remedies under the Exchange Act.

169.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Wal-Mart de México or its transfer

agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

170.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

171.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

172.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Wal-Mart de México; and

(c)    whether the members of the Class have sustained damages and, if so, the proper measure of damages.

173.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**LOSS CAUSATION**

174.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

175.    During the Class Period, Plaintiff and the Class purchased ADRs of Wal-Mart de México at artificially inflated prices and were damaged thereby.  The price of Wal-Mart de México's ADRs significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

176.    As a result of Defendants' scheme, Wal-Mart de México ADRs were overvalued throughout the Class Period.  *The New York Times*' revelation on April 21, 2012 of the facts and circumstances Defendants had misrepresented and concealed exposed both Defendants' scheme and the overvaluation of Wal-Mart de México ADRs from the scheme.  One measure of that inflated value was Wal-Mart de México's ADR price, which fell $5.24 per share to close at $37.82 per share on April 23, 2012, the first trading day after the publication of *The New York Times* article, a decline of over 12% on volume of 200,294,800 shares (in excess of the normal trading volume).  Wal-Mart de México ADRs continued to drop on April 24, 2012, to close at $36.20 per share on volume of 94,544,500 shares, as the market continued to process the implications of Defendants' scheme, the failure to timely disclose the scheme and their wrongful course of conduct.  The revelation of Defendants' scheme revealed that investors had paid more for Wal-Mart de México ADRs than they would have paid but for the scheme.

177.    The market's reaction mirrored the reactions of analysts, journalists, and academics.  On April 23, 2012, *Forbes* reported that, "[a]fter a decade of carefully encouraging companies to report misbehavior early, the Justice Department may be under pressure to make an example of Wal-Mart."  The article referred to an analysis that showed SEC and DOJ

penalties for FCPA violations are usually about 1% to 2% of annual sales, which would amount to $4.5 billion for Wal-Mart.  The article also explained that "[t]he greater impact will be on Wal-Mart's Mexican growth.  A slowdown in new store openings could mean a 5% decrease in growth, a $1.3 billion loss, according to the UBS analysis."

178.    Also on April 23, 2012, *Reuters* reported that "[a]llegations that Wal-Mart Stores Inc. stymied an internal investigation into extensive bribery at its Mexican subsidiary are likely to lead to years of regulatory scrutiny and could eventually cost some executives their jobs." According to Michael Koehler, a professor at Butler University and FCPA expert, "'Because of Wal-Mart's inaction for a very long time, it's likely its exposure is only going to increase.'" Deutsche Bank retail analyst said that if the allegations are proven true, "'[i]t would put a broadside in the growth engine of the company.'"  "'Unlike prior PR stories in recent years, this will be a material distraction for Wal-Mart on multiple fronts.'"

179.    On April 24, 2012, the *Los Angeles Times* reported that, according to BMO Capital Markets analyst Wayne Hood, "[t]he bribery allegations 'will be used against the company by activists and companies when it attempts to open stores in the U.S. and abroad, and could make it more difficult to attract management talent in international markets.'"

180.    On April 26, 2012, *The Wall Street Journal*'s MarketWatch reported that UBS analyst Robert Carroll, citing research by three professors, estimated Wal-Mart's investigation and legal fees would amount to $2.76 billion.  Upon information and belief, Wal-Mart de México will bear a proportion of these investigative costs and legal fees.

181.    On April 30, 2012, the *New York Times* reported that in the wake of the *New York Times*' revelation of the facts Defendants had concealed, a Wal-Mart building permit in Los Angeles was "getting a once-over."  In New York, the City Council is investigating a possible

land deal with the retailer's developer in Brooklyn.  A state senator in California is pushing for a formal audit of a proposed Wal-Mart in San Diego.  And in Boston and its suburbs, residents are pressuring politicians to disclose whether they have received contributions from the company." According to Dorian T. Warren, a political science professor at Columbia who is writing a book about Wal-Mart, "'[o]vernight, the environment has shifted in terms of Wal-Mart's strategy in big cities, in winning over local politicians.'"

182.   On January 10, 2013, after lawmakers received and released several Wal-Mart emails from the 2005 to 2006 time period, Congressmen Elijah E. Cummings and Henry A. Waxman wrote:

# Congress of the United States
## House of Representatives
### Washington, DC 20515

January 10, 2013

Mr. Michael T. Duke
Chief Executive Officer
Wal-Mart Stores, Inc.
702 SW 8th Street
Bentonville, AR 72716

Dear Mr. Duke:

We are writing regarding new allegations that Wal-Mart systematically bribed officials throughout Mexico in order to evade zoning, environmental, and permitting laws at the company's Bodega Aurrera store in Teotihuacan, Mexico. We are concerned that your company's public statements that the company was unaware of the allegations appear to be inconsistent with documents we have obtained through our investigation.  Contrary to Wal-Mart's public statements, the documents appear to show that you were personally advised of the allegations in October 2005.

\*\*\*

Elijah E. Cummings
Ranking Member
Committee on Oversight and
Government Reform

Henry A. Waxman
Ranking Member
Committee on Energy and
Commerce

cc:    The Honorable Darrell E. Issa, Chairman
       Committee on Oversight and Government Reform

       The Honorable Fred Upton, Chairman
       Committee on Energy and Commerce

183.    As can be seen, relying on many of the same documents described above, Ranking Members of key Congressional Committees have already observed that, "Contrary to Wal-Mart's public statements, the documents appear to show that you were personally advised of the allegations in October 2005."

### SCIENTER ALLEGATIONS

184.    Defendants acted with scienter because they: (i) knew that the public statements issued or disseminated were materially false and misleading and/or contained material omissions; (ii) knew that such statements would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

185.    As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Wal-Mart de México, their control over, receipt and/or modification of Wal-Mart de México's allegedly materially misleading statements and omissions, and/or their position within Wal-Mart de México which made them privy to confidential information concerning Wal-Mart de México, participated in the fraudulent scheme alleged herein.

186.    Further, Defendant Wal-Mart acted with scienter as it owned approximately 70% of the outstanding ADRs of Wal-Mart de México and knew its omission in its December 2011 Form 10-Q that the suspected Wal-Mart de México corruption had been revealed in 2005 and investigated in 2005 and 2006 was materially misleading.  This is supported by Plaintiff's allegations that Duke, in an email from a top Walmart lawyer in October 2005, had been given a detailed description of the suspected corruption allegations; that top executives at Walmart and Walmart International, including Duke, rejected calls for a legitimate independent investigation and effectively shut down the investigation by assigning it to Walmart de Mexico's General Counsel's Office, the very office implicated in the corruption scheme; and that Walmart recognized the materiality of the 2005 and 2006 events in its June 2012 Form 10-Q, when it

disclosed that it was investigating whether prior allegations of violations of the FCPA were appropriately handled.

**Applicability of Presumption of Reliance:**
**Fraud On The Market Doctrine**

187.     At all relevant times, the market for Wal-Mart de México's ADRs was an efficient market for the following reasons, among others:

(a)     Wal-Mart de México's ADRs trades over-the-counter (OTC) with trading volume in the hundreds of thousands and millions of shares throughout the Class Period;

(b)     Wal-Mart de México regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services and publication of similar materials on Wal-Mart de México's corporate webpage available to any investor with an internet connection; and

(c)     Wal-Mart de México was followed by several securities analysts during the Class Period who periodically issued reports which were publicly available and entered the public marketplace. *See* Wal-Mart de México web page at http://www.walmex.mx/en/walmex-share/analyst-coverage.html.

188.     As a result of the foregoing, the market for Wal-Mart de México's ADRs promptly digested current information regarding Wal-Mart de México from all publicly-available sources including statements made by Defendant Wal-Mart and reflected such information in the price of Wal-Mart de México's ADRs.  Under these circumstances, all purchasers of Wal-Mart de México's ADRs during the Class Period suffered similar injury

55

through their purchase of Wal-Mart de México's ADRs at artificially inflated prices.  Therefore, a presumption of reliance applies.

## FIRST CLAIM

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

189.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

190.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Wal-Mart de México's ADRs at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

191.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Wal-Mart de México's ADRs in an effort to maintain artificially high market prices for Wal-Mart de México ADRs in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

192.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about Wal-Mart de México's financial well-being, business relationships, and prospects, as specified herein.

193.   Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Wal-Mart de México's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Wal-Mart de México and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Wal-Mart de México's ADRs during the Class Period.

194.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of supporting the artificially inflated price of Wal-Mart de México's ADRs.

195.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Wal-Mart de México's ADRs was artificially inflated during the Class Period.   In ignorance of the fact that market prices of Wal-Mart de México's ADRs were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of

the market in which the ADRs trades, and/or in the absence of material, adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Wal-Mart de México's ADRs during the Class Period at artificially high prices and were damaged thereby.

196.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

197.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of Wal-Mart de México ADRs during the Class Period.

**SECOND CLAIM**

**Violation of Section 20(a) of the Exchange Act**
**Against Defendants Rank, Vega and Wal-Mart**

198.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

199.    Defendants Rank, Vega and Wal-Mart acted as controlling persons of Wal-Mart de México within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of Defendants Rank and Vega's high-level position, and Defendant Wal-Mart's controlling interest in Wal-Mart de México, and their awareness of Wal-Mart de México's operations and/or intimate knowledge of the false statements described herein that were disseminated to the investing public, Defendants Rank, Vega, and Wal-Mart had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Wal-Mart de México, including the content and dissemination of the various statements which Plaintiff contends are false and misleading whether by omission or misrepresentation.

Defendants Rank, Vega, and Wal-Mart were provided with or had unlimited access to Wal-Mart de México's internal controls, and the financial condition of Wal-Mart de México, issued the statements that Plaintiff alleges are materially false and misleading whether by omission or misrepresentation, and/or had the ability to cause the statements to be corrected shortly after these statements were issued but failed to do so.

200.    In particular, Defendants Rank, Vega, and Wal-Mart had direct and supervisory involvement in the day-to-day operations of Wal-Mart de México and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

201.    As set forth above, Defendants Rank, Vega and Wal-Mart violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, Defendants Rank, Vega and Wal-Mart are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of the wrongful conduct of Defendants Rank, Vega and Wal-Mart, Plaintiff and other members of the Class suffered damages in connection with their purchases of Wal-Mart de México's ADRs during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding damages in favor of Plaintiff and the other Class members against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  December 8, 2014

**GAINEY McKENNA & EGLESTON**


By:  */s/ Thomas J. McKenna*
     Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY  10016
Telephone: 212-983-1300
Facsimile: 212-983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Lead Counsel for Plaintiff and the Putative Class*