### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL FOGEL, Individually And On Behalf Of All Others Similarly Situated,<br><br>       Plaintiff,<br><br> vs.<br><br>WAL-MART DE MÉXICO SAB De CV, ERNESTO VEGA, SCOT RANK, and WAL-MART STORES, INC.,<br><br>       Defendants. | **Civil Action: 1:13-cv-02282-KPF**<br><br><br>**SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |

   Lead Plaintiff Michael Fogel ("Plaintiff"), individually and on behalf of all persons similarly and situated, by his undersigned attorneys, for his second amended complaint ("Complaint") against Defendants (defined below) alleges the following based upon personal knowledge as to his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants through their filings with the Mexican Stock Exchange ("MSE"), the United States Securities and Exchange Commission ("SEC"), wire and press releases published by and regarding Wal-Mart de México SAB De CV ("Wal-Mex"), securities analysts' reports and advisories about Wal-Mex and Wal-Mart Stores, Inc. ("Wal-Mart"), and information readily obtainable from public sources.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.  NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers (the "Class") of American Depositary Shares ("ADRs") of Wal-Mex, who purchased or otherwise acquired Wal-Mex's ADRs between December 8, 2011 through April 24, 2012, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## II.      JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated under Section 10(b) of the Exchange Act (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1331.

4.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  The Company issued ADRs that traded Over-the-Counter ("OTC").

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III.      PARTIES

### A.      Plaintiff

6.      *Lead Plaintiff Michael Fogel* ("Plaintiff") purchased ADRs at artificially inflated prices during the Class Period and has been damaged thereby.  *See* D.I. 6-1.

### B.      Defendants

#### (1)      Wal-Mex

7.      **Defendant Wal-Mex** owns and operates a network of retail stores in México and Central America.  Wal-Mex operates discount stores, hypermarkets, membership self-service wholesale stores, supermarkets, bank branches, and restaurants, and engages in real estate development and management activities.  It also operates discount stores, supermarkets, discount warehouse stores, hypermarkets, and membership self-service wholesale stores in Guatemala, El Salvador, Honduras, Nicaragua, and Costa Rica.

    **(2)**  <u>**Vega**</u>

8.      **Defendant Ernesto Vega** ("Vega") held the following executive positions at Wal-Mex:

-   <u>**In 2004**</u>, Vega was a member of the Board of Directors of Wal-Mex (the "Wal-Mex Board") and a member of the Wal-Mex Audit Committee (defined below). *See* Wal-Mex 2004 Annual Report attached hereto as Exhibit (hereinafter, "Ex.") A;

-   <u>**In 2005**</u>, Vega was the Chairman of the Wal-Mex Board and the Chairman of the Wal-Mex Audit Committee.  *See* Wal-Mex 2005 Annual Report attached hereto as Ex. B;

-   <u>**In 2006**</u>, Vega was the Chairman of the Wal-Mex Board, a member of the Wal-Mex Audit Committee, and a member of the Wal-Mex Corporate Practice Committee (defined below).  *See* Wal-Mex 2006 Annual Report attached hereto as Ex. C;

-   <u>**In 2007**</u>, Vega was the Chairman of the Wal-Mex Board, a member of the Wal-Mex Audit Committee, and a member of the Wal-Mex Corporate Practice Committee.  *See* Wal-Mex 2007 Annual Report attached hereto as Ex. D;

- **In 2008**, Vega was the Chairman of the Wal-Mex Board, a member of the Wal-Mex Audit Committee, and a member of the Wal-Mex Corporate Practices Committee.  *See* Wal-Mex 2008 Annual Report attached hereto as Ex. E;

- **In 2009**, Vega was a member of the Wal-Mex Board, a member of the Wal-Mex Audit Committee, and a member of the Wal-Mex Corporate Practices Committee.  *See* Wal-Mex 2009 Annual Report attached hereto as Ex. F;

- **In 2010**, Vega was a member of the Wal-Mex Board, the Chairman of the Wal-Mex Audit Committee, and the Chairman of the Wal-Mex Corporate Practices Committee.  *See* Wal-Mex 2010 Annual Report attached hereto as Ex. G;

- **In 2011**, Vega was a member of the Wal-Mex Board, the Chairman of the Wal-Mex Audit Committee, and the Chairman of the Wal-Mex Corporate Practices Committee.  *See* Wal-Mex 2011 Annual Report attached hereto as Ex. H; and

- **In 2012**, Vega was an alternate member of the Wal-Mex Board, the Chairman of the Wal-Mex Audit Committee, and the Chairman of the Wal-Mex Corporate Practices Committee.  *See* Wal-Mex 2012 Annual Report attached hereto as Ex. I.

9.      Non-party Eduardo Juárez ("Juárez") reported to Vega who was the Chairman of the Audit Committee.  In 2005-2008, Juárez served as Vice President of Internal Audit of Wal-Mex.  Juárez was implicated in the bribery scheme:

> SC [Sergio Cicero] confirmed that the operation with irregular payments and handling through outside law firms for payments was directly known by Cesareo Fernández [***Chairman of the Board of Wal-Mex***], Eduardo Castro ***[President and Chief Executive Officer of Wal-Mex]*** and Eduardo Juarez [***Vice President of Internal Audit of Wal-Mex in 2005-2008***].

*See* Ex. J at p. 2 attached hereto (emphasis added).   As Chairman of the Wal-Mex Audit Committee, Vega knew or was reckless in not knowing that that the gestores[1] payments were bribes.  *See* the attachments to the January 10, 2013 letter from the United States Congress to Duke (Ex. HH) at 17 of 19 ("The President [Eduardo Solorzano], Real Estate Vice President [Xavier del Rio] and Audit Vice President [Juárez] knew of the payment mechanics and even received a detailed schedule of all of the payments performed.").

10.     Further, Vega was also a member of the Wal-Mex Board at the same time Cesareo Fernández was the Chairman of the Board of Wal-Mex.  Fernández was also implicated in the bribery scheme.  *See* Ex. J at 3 of 5 ("SC confirmed that the operation with irregular payments and handling through outside law firms for payments was directly known by Cesareo Fernández, Eduardo Castro and Eduardo Juarez."); Ex. L at 3 of 10 ("These amounts were delivered pursuant to the instructions of Javier [Xavier] del Rio with the knowledge of the President (depending on the time, either Cesareo Fernández or Eduardo Castro)").

　　　　　(3)     **Rank**

11.     ***Defendant Scot Rank*** ("Rank") held the following executive positions at Wal-Mex:

- **In 2000**, Rank joined Wal-Mex where he worked as Deputy Vice President for Bodega Aurrerá and where he was appointed Vice President six months later.  In 2003, Rank became Senior Vice President of Self-Service and oversaw *all* of the Bodega Aurrerá, Wal-Mart Supercenter and Superama units at Wal-Mex;

---

[1]     Gestores (pronounced hes-TORE-ehs) or middlemen are used in México to help companies perform a variety of tasks from obtaining residency permits and resolving tax issues to obtaining planning authorization.

- **In 2005**, Rank was the Executive Vice President, and Chief Operating Officer of Wal-Mex in charge of all six businesses comprising Wal-Mex: Bodega Aurrerá, Wal-Mart Supercenter, Superama, Sam's Club, Surburbia and Vips. *See* Wal-Mex 2005 Annual Report attached hereto as Ex. B;

- **In 2006**, Rank was the Executive Vice President and Chief Operating Officer of Wal-Mex in charge of the six businesses comprising Wal-Mex. *See* Wal-Mex 2006 Annual Report attached hereto as Ex. C;

- **In 2007**, Rank was the Executive Vice President and Chief Operating Officer of Wal-Mex in charge of the six businesses comprising Wal-Mex. *See* Wal-Mex 2007 Annual Report attached hereto as Ex. D;

- **In 2008**, Rank was the Executive Vice President and Chief Operating Officer of Wal-Mex in charge of the six businesses comprising Wal-Mex. *See* Wal-Mex 2008 Annual Report attached hereto as Ex. E.

- **In 2009**, Rank was the Executive Vice President and Chief Operating Officer of Wal-Mex in charge of the six businesses comprising Wal-Mex. Rank was also appointed a member of the Wal-Mex Executive Committee effective as of January 18, 2010. *See* Wal-Mex 2009 Annual Report attached hereto as Ex. F.

- **In 2010**, Rank was the Chief Executive Officer ("CEO") of Wal-Mex, a member of the Wal-Mex Board, and a member of the Wal-Mex Executive Committee. *See* Wal-Mex 2010 Annual Report attached hereto as Ex. G.

- **In 2011**, Rank was the CEO of Wal-Mex, a member of the Wal-Mex Board, a member of the Wal-Mex Executive Committee, and a member of the Wal-Mex

Social Responsibility Committee. *See* Wal-Mex 2011 Annual Report attached hereto as Ex. H;

- **In 2012**, Rank was the CEO of Wal-Mex, a member of the Wal-Mex Board, a member of the Wal-Mex Executive Committee, and a member of the Wal-Mex Social Responsibility Committee. *See* Wal-Mex 2012 Annual Report attached hereto as Ex. I.

### (4)   Wal-Mart

12.   ***Defendant Wal-Mart*** is the principal shareholder of Wal-Mex.  According to Wal-Mex's website ([http://www.walmex.mx/en/walmex-share/corporate-structure.html](http://www.walmex.mx/en/walmex-share/corporate-structure.html)), Wal-Mart owns 70% of Wal-Mex:



### (i)   Wal-Mart and Wal-Mex Connectivity

13.     Wal-Mart's operations are comprised of three (3) reportable segments: Wal-Mart U.S., Wal-Mart International and Sam's Club.  The Wal-Mart International segment consists of operations in 26 countries outside of the U.S., which includes Wal-Mex.

14.     Wal-Mex was created in 1997 and at that time Wal-Mart owned 51%.  As a result of stock buy-backs and a stock purchase in 2001, Wal-Mart now owns 70% of Wal-Mex stock with public shareholders owning the rest.

15.     Wal-Mart's Code of Ethics are provided to Wal-Mex's shareholders on Wal-Mex's website.  *See* Ex. V attached hereto.

16.     Pursuant to the Corporate Bylaws of Wal-Mex, "[t]he supreme authority for [Wal-Mex] is the General Shareholder Assembly, who shall hold either regular or special meetings." *See* Wal-Mex's 2011 Annual Report attached hereto as Ex. H, p. 55.  Further, "[s]hareholders who own twenty percent or more of the capital stock may judicially oppose the decisions reached by the Assembly."  *See id.* at p. 57.  Wal-Mart is the controlling shareholder of Wal-Mex (owning 70% of its ADRs), and therefore has "supreme authority" over decision making at Wal-Mex.  Further, Wal-Mart has the ability to designate at least a majority of the directors of Wal-Mex.

17.     Many of the executives at Wal-Mex report directly to Wal-Mart.  For example:

Our Company is built on the foundations of integrity and the highest of ethical standards, always ensuring strict adherence to applicable legislation. For many years we have worked on reinforcing our compliance program, and therefore we have recently decided to strengthen our organizational structure. ***An Executive Vice President and Chief Officer for Compliance, Real Estate and Corporate Affairs was appointed, in addition to the Director for Anticorruption, who reports directly to the Global Compliance Officer for Walmart Stores, Inc***. With these actions, we reiterate our ongoing commitment to having all our activities follow the highest of ethical standards and generate value for our stakeholders: customers, shareholders, associates, suppliers,

8

communities, and the environment. The structure and responsibilities of the Board of Directors, our Code of Ethics and, in general, all the activities performed by our Company follow corporate governance best practices.

*See* http://web_wmia12_up.s3.amazonaws.com/pdf/wm-governance.pdf (from Wal-Mex 2012

Financial and Social Responsibility Report) (emphasis added).

18.     Indeed, Wal-Mex and Wal-Mart are one company.  Many Wal-Mart executives

reside on Wal-Mex's Board and committees as indicated in the chart below:

| Name | Wal-Mex Senior Officer/Director | Wal-Mart Senior Officer/Director |
|---|---|---|
| Michael T. Duke | **2006 – 2008**: Chairman of the Wal-Mex Executive Committee; member of Wal-Mex Board since 2006. | **2005**: Executive Vice President, President and Chief Executive Officer of the Wal-Mart Stores Division.<br><br>**2006 – 2008**: Vice Chairman of Wal-Mart International.<br><br>**2009 – 2012**: President and Chief Executive Officer of Wal-Mart. |
| John B. Menzer | **2004**: Wal-Mex Executive Committee member; member of Wal-Mex Board since 2000.<br><br>**2005**: Chairman of the Wal-Mex Executive Committee. | **2005**: Executive Vice President, President and Chief Executive Officer of Wal-Mart International.<br><br>**2006 – 2007**: Vice Chairman of Wal-Mart. |
| Eduardo Castro-Wright | **July 2001 to December 2002**: Senior Vice President and Chief Operating Officer of Wal-Mex.<br><br>**December 2002 to February 2005**: President and Chief Executive Officer of Wal-Mex.<br><br>**2004**: Member of Wal-Mex Board since 2001. | **2005 – 2007**: Executive Vice President and Chief Operating Officer of Wal-Mart Stores Division.<br><br>**2009 – July 2012**: Vice Chairman of Wal-Mart. |
| M. Susan Chambers | **2006 – 2009**: Member of Wal-Mex Board since 2006. | **2008 – 2012**: Executive Vice President (People Division) of Wal-Mart. |

| Name | Wal-Mex Senior Officer/Director | Wal-Mart Senior Officer/Director |
|---|---|---|
| C. Doug McMillon | **2009 – 2012**: Wal-Mex Executive Committee member; member of Wal-Mex Board since 2009. | **2002 – 2009**: Executive Vice President, Merchandising and Replenishment of Sam's Club Division.<br><br>**2009 – 2012**: Executive Vice President, President and Chief Executive Officer of Wal-Mart International Division. |
| R. Lee Stucky | **2000 – 2008**: Member of Wal-Mex Board.<br><br>**2005**: Wal-Mex Executive Committee member. | **1981 – 1992**: Joined Wal-Mart and served in the Distribution and Transportation Division of Wal-Mart.<br><br>**1992 – 1993**: Director of Corporate Training and Development at Wal-Mart.<br><br>**1993 – 1998**: Vice President of International Logistics at the International Division of Wal-Mart.<br><br>**1999 – 2007**: Senior Vice President and Chief Administrative Officer (CAO) at Wal-Mart International. |
| Claire A. Watts | **2006**: Member of Wal-Mex Board. | **2006**: Executive Vice President for Product Development, Apparel and Home Merchandising for Wal-Mart. |
| John E. Fleming | **2006**: Member of Wal-Mex Board. | **2006**: Executive Vice President and Chief Merchandising Officer for Wal-Mart. |
| Craig R. Herkett | **2006**: Member of Wal-Mex Board since 2001. | **2000 – 2005**: COO of Wal-Mart.<br><br>**2005 – 2009**: President, CEO Americas, M&A, Strategy and Integration, Global Leadership Team and Global Sourcing at Wal-Mart. |
| Leslie Dach | **2008**: Member of Wal-Mex Board. | **2005**: Executive Vice President for |

| Name | Wal-Mex Senior Officer/Director | Wal-Mart Senior Officer/Director |
|---|---|---|
| | | Corporate Affairs and Government Relations at Wal-Mart. |
| Ann Bordelon | **2009**: Member of Wal-Mex Board. | **2003 – 2005**: Vice President ("VP") - Assistant Controller at Wal-Mart.<br><br>**2005 – 2007**: VP - Real Estate Finance at Wal-Mart.<br><br>**2007 – 2010**: Senior Vice President ("SVP") - Chief Audit Executive, Wal-Mart Internal Audit.<br><br>**2010 – 2013**: SVP - Chief Financial Officer, Sam's Club at Wal-Mart.<br><br>**2013 – 2014**: SVP - CFO Wal-Mart Asia at Wal-Mart.<br><br>**2014 – 2015**: SVP - Finance & Strategy - US operations Wal-Mart. |
| Wan Ling Martello | **2009**: Member of Wal-Mex Board since 2006. | **2005 – 2011**: SVP and Chief Financial Officer ("CFO") & Strategy, Wal-Mart International. |
| David Cheesewright | **2009**: Member of Wal-Mex Board. | **2004 -- 2005**: Chief Operating Officer ("COO") of Wal-Mart Canada<br><br>**2008 – 2011**: CEO of Wal-Mart Canada.<br><br>**2011 – 2013**: CEO of Wal-Mart's EMEA and Canada region.<br><br>**2013 – President**: CEO of Wal-Mart International. |
| Shelley Broader | **2010**: Member of Wal-Mex Board. | **2011 – 2012**: CEO and President at Wal-Mart Canada Corp.<br><br>**2014 – 2015**: President and CEO of Wal-Mart EMEA at Wal-Mart. |

| Name | Wal-Mex Senior Officer/Director | Wal-Mart Senior Officer/Director |
|---|---|---|
| Olga Gonzalez | **2010**: Member of Wal-Mex Board. | **2010 – 2011**: VP Internal Audit Services Latin America at Wal-Mart. |
| Kristin Oliver | **2010**: Member of Wal-Mex Board. | **2004 – 2006**: Assistant General Counsel at Wal-Mart.<br><br>**2006 – 2009**: Associate General Counsel at Wal-Mart.<br><br>**2008 – 2010**: VP at Wal-Mart.<br><br>**2010 – 2012**: SVP at Wal-Mart.<br><br>**2013 – Present**: Executive Vice President ("EVP") at Wal-Mart US People Division. |
| Cathy R. Smith | **2010**: Member of Wal-Mex Board. | **2010 – 2014**: EVP/CFO at Wal-Mart International. |
| John Lewis | **2005**: Member of Wal-Mex Board since 2004. | **2004 – Present**: Department Manager, Wal-Mart Canada. |
| Marc N. Rosen | **2005**: Alternate Director of Wal-Mex; Member of Wal-Mex Board since 2001. | **2006 – 2010**: SVP - Information Systems at Wal-Mart. |
| Jose Angel Gallegos | **1980 – 2011**: EVP and Chief Officer for Business Development, Realty Management and Corporate Integrity of Wal-Mex.<br><br>**2005**: Alternate Director of Wal-Mex. Board member since 2004. | **2007 – 2009**: SVP Human Resources International at Wal-Mart. |

19.     Although the corruption/bribery took place at Wal-Mex, Wal-Mart undertook the investigation. In an email, dated January 18, 2006, Maritza I. Munich ("Munich") who served as Vice President and General Counsel of Wal-Mart from 2003 to 2006 wrote to Ainley, Fung, Halter, Mars, and Weinstein (all Wal-Mart executives, and defined below) and stated "It would

be wise to mention that the ***work undertaken by the internal investigators was at the behest of Wal-Mart's counsel***." *See* Ex. K at 2 of 4 attached hereto (emphasis added).   Further, Wal-Mart expects to continue to incur costs (incremental to the $173 million of costs incurred in fiscal 2015) in conducting its on-going review and investigations and in responding to requests for information or subpoenas seeking documents, testimony and other information in connection with the government investigations and in defending the existing and any additional shareholder lawsuits and any governmental proceedings. *See* 2015 Wal-Mart Form 10-K, dated April 1, 2015.

20.     Further, Wal-Mart has spent $439 million in the past two years to investigate the possible payment of foreign bribes, making it one of the most expensive probes in U.S. history.

21.     Wal-Mart spent $282 million in the fiscal year ended January 31, 2014 and $157 million the previous year, and expenses will continue to rise, according to the Wal-Mart Annual Report filed March 21, 2014.

22.     According to Wal-Mex's 2014 Annual Report to the MSE, there is no indication that Wal-Mex has incurred any cost regarding the bribery/corruption that occurred at Wal-Mex. *See* Ex. MM attached hereto.

23.     Wal-Mex also issues Wal-Mart credit cards to their customers:

> Better serving our customers also means giving them payment means that increase their purchasing power. ***It is because of this that in addition to our Wal-Mart credit card***, we re-launched our Suburbia credit card also operated by BBVA Bancomer, launched a new card together with American Express aimed at our Sam's Club business members, and we extended our consumer credit program with GE Capital to our Suburbia apparel stores.

*See* Wal-Mex's 2005 Annual Report at p. 11 attached hereto as Ex. B (emphasis added).

24.     In Wal-Mex's 2005 Annual Report (Ex. B attached hereto), the "Investor Relations" for Wal-Mex had an email exchange at <u>Wal-Mart.com</u>.  This was repeated for years 2006 through 2012:[2]



---

[2]     *See also* Wal-Mex 2006 Annual Report (Ex. C attached hereto) at p. 53; Wal-Mex 2007 Annual Report (Ex. D attached hereto) at p.77; Wal-Mex 2008 Annual Report (Ex. E attached hereto) at p. 80; Wal-Mex 2009 Annual Report (Ex. F attached hereto) at p. 69; Wal-Mex 2010 Annual Report (Ex. G attached hereto) at p. 11; Wal-Mex 2011 Annual Report (Ex. H attached hereto) at pp. 24-25; and Wal-Mex 2012 Annual Report (Ex. I attached hereto) at p. 27.

25.     In 2005, the Wal-Mex Board was comprised of seven (7) directors and three (3) alternate directors -- a total of 10 directors, of which *six (6) of those members were also current high ranking officers of Wal-Mart*: Craig R. Herkett, John Lewis, John B. Menzer, Marc N. Rosen, R. Lee Stucky, and Jose Angel Gallegos.  *See* Wal-Mex 2005 Annual Report at p. 17 at Ex. B attached hereto.

26.     In 2006, the Wal-Mex Board was comprised of eleven (11) directors and four (4) alternate directors -- a total of 15 directors, of which *nine (9) of those members were also current high ranking officers of Wal-Mart*: Susan Chambers, Michael T. Duke, John Fleming, Craig R. Herkert, Lee Stucky, Claire Watts, Wan Ling Martello, Marc N. Rosen, and Jose Angel Gallegos.  *See* Wal-Mex 2006 Annual Report at p. 29 at Ex. C attached hereto.

27.     In 2007, the Wal-Mex Board was comprised of eleven (11) directors and four (4) alternate directors -- a total of 15 directors, of which *eight (8) of those members were also current high ranking officers of Wal-Mart*: Susan Chambers, Michael T. Duke, John Fleming, Craig R. Herket, Lee Stucky, Jose Angel Gallegos, Wan Ling Martello, and Marc N. Rosen. *See* Wal-Mex 2007 Annual Report at p. 51 at Ex. D attached hereto.

28.     In 2008, the Wal-Mex Board was comprised of eleven (11) members, of which *six (6) of those members were also current high ranking officers of Wal-Mart*: Susan Chambers, Leslie Dach, Michael T, Duke, John Fleming, Craig R. Herkett, and Lee Stucky. *See* Wal-Mex 2008 Annual Report at p. 47 at Ex. E attached hereto.

29.     In 2009, the Wal-Mex Board was comprised of eleven (11) members, of which *five (5) of those members were also current high ranking officers of Wal-Mart*: David Cheesewright, Ann Bordelon, Doug McMillon, Susan Chambers, and Wan Ling Martello.  *See* Wal-Mex 2009 Annual Report at pp. 38-39 at Ex. F attached hereto.

30.     In 2010, <u>the Wal-Mex Board was comprised of</u> eleven (11) members, of which ***five (5) of those members were also current high ranking officers of Wal-Mart***: Shelley Broader, Olga Gonzalez, Doug McMillon, Kristin Oliver, and Cathy R. Smith.  *See* Wal-Mex 2010 Annual Report at p. 33 at Ex. G attached hereto.

31.     In 2011, <u>the Wal-Mex Board was comprised of</u> eleven (11) members, of which ***five (5) of those members were also current high ranking officers of Wal-Mart***: Shelley Broader, Olga Gonzalez, Doug McMillon, Kristin Oliver, and Cathy R. Smith.  *See* Wal-Mex 2011 Annual Report at p. 48 at Ex. H attached hereto.

32.     In 2012, <u>the Wal-Mex Board was comprised of</u> eleven (11) members, of which ***three (3) of those members were also current high ranking officers of Wal-Mart***: Doug McMillon, Kristin Oliver, and Cathy R. Smith.  *See* Wal-Mex 2012 Annual Report at p. 52 at Ex. I attached hereto.

## IV.    <u>NON-PARTIES</u>

33.     ***Non-party Bob Ainley*** ("Ainley") served as Wal-Mart's Director of International Audit Services from 2000 to 2006.  In October 2006 to the present, Ainley served as Senior Director Finance Integration at Wal-Mart International.

34.     ***Non-party Eduardo Castro-Wright*** ("Castro-Wright") held the following executive positions at Wal-Mex and Wal-Mart:

- From July 2001 to December 2002, Castro-Wright served as Senior Vice President and COO of Wal-Mex.

- From December 2002 to February 2005, Castro-Wright served as President and CEO of Wal-Mex.  He also was a member of the Wal-Mex Board at

the same time Vega was a member.  He was also a member of the Wal-Mex Executive Committee.

- From February 2005 to September 2005, Castro-Wright served as the Executive Vice President and COO of the Wal-Mart Stores Division.

- In 2006-2008, Castro-Wright served as the Executive Vice President, President and CEO of the Wal-Mart Stores Division U.S.

- In 2009-2010, Castro-Wright served as the Vice Chairman of Wal-Mart, responsible for the Wal-Mart U.S. Division.

- In 2011, Castro-Wright served as the Vice Chairman, Wal-Mart, responsible for Global eCommerce and Global Sourcing.

- On September 23, 2011, Castro-Wright formally notified Wal-Mart of his intent to retire as Vice Chairman of Wal-Mart effective on the close of business on July 1, 2012.

35.     ***Non-party Sergio Cicero*** ("Cicero") served as the Director of Legal at Wal-Mex and resigned from Wal-Mex in 2004 after nearly a decade in Wal-Mex's real estate department. Cicero helped organize years of payoffs/bribes.  Cicero described personally dispatching two trusted outside lawyers to deliver envelopes of cash to government officials.  They targeted mayors and city council members, obscure urban planners, low-level bureaucrats who issued permits — anyone with the power to thwart Wal-Mex's and Wal-Mart's growth.  The bribes bought zoning approvals, reductions in environmental impact fees and the allegiance of neighborhood leaders.

36.     ***Non-party Scott Draper*** ("Draper") served as Wal-Mart's VP Internal Audit from 2004 to 2008.  From 2008 to the present, Draper served as VP Finance at Wal-Mart.

37. ***Non-party Michael T. Dukes*** ("Dukes") held the following executive positions at Wal-Mex and Wal-Mart:

- In 2003-2005, Duke served as the Executive Vice President and President and CEO of the Wal-Mart Stores Division.

- From 2006-2008, Duke served as the Chairman of the Wal-Mex Executive Committee and a member of the Wal-Mex Board.

- In 2006-2008, Duke served as the Vice Chairman, Responsible for Wal-Mart International.

- In 2009-2012, Duke served as the President and CEO of Wal-Mart.

38. ***Non-party Michael Fung*** ("Fung") served as Wal-Mart's SVP of Internal Audit Services from 2001 to 2012.

39. ***Non-party Ronald Halter*** ("Halter") served as Wal-Mart's Special Investigator. In Exhibit JJ attached hereto Halter describes the results of the November 2005 preliminary internal investigation over allegations of bribery at Wal-Mex.

40. ***Non-party Craig Herket*** ("Herket") served as the COO of Wal-Mart from 2000 to 2005. From 2005 through 2009, Herket served as President, CEO Americas, M&A, Strategy and Integration, Global Leadership Team and Global Sourcing at Wal-Mart.

41. ***Non-party Thomas D. Hyde*** ("Hyde") served as Wal-Mart's Executive Vice President of Legal Compliance Ethics and Corporate Secretary from June 2005 to August 1, 2010.

42. ***Non-party Eduardo Juárez*** ("Juárez") held the following executive positions at Wal-Mex:

- In 2005-2008, Juárez served as Vice President of Internal Audit of Wal-Mex.  In 2005, Juárez reported to Vega who was the Chairman of the Wal-Mex Audit Committee.  And, in 2006-2008, Juárez reported to Vega who was a member of the Wal-Mex Audit Committee.

- Juárez was also implicated in the corruption/bribery at Wal-Mex.  *See* Email, dated October 13, 2005 from Torres-Landa to Munich, Pons entitled "CONFIDENTIAL – ATTORNEY CLIENT PRIVILEGED INFORMATION": The Comptroller Eduardo Juárez received on a monthly basis an extract prepared by SC [Sergio Cicero] of the individual sites expenditures and accounting codes. Two additional copies in closed envelopes were delivered to Javier [Xavier] del Rio one of which was labeled to be delivered to the President [of Wal-Mex]." "***The President [Eduardo Solorzano], Real Estate Vice President [Xavier del Rio] and Audit Vice President [Eduardo Juárez] knew of the payment mechanics and even received a detailed schedule of all payments performed***." *See* Ex. L at 4 of 10 attached hereto (emphasis added).

43.    ***Non-party Joseph R. Lewis*** ("Lewis") served as Wal-Mart's Director of Corporate Investigation from 2004 to February 2012.

44.    ***Non-party Tom Mars*** ("Mars") served as Wal-Mart's Executive Vice President from 2002 to 2009.  From February 2009 through March 2013, Mars also served as the Executive Vice President and Chief Administrative Officer ("CAO") at Wal-Mart.

45.    ***Non-party Alberto Morales*** ("Morales") served as VP and General Counsel at Wal-Mart.

46. ***Non-party Maritza I. Munich*** ("Munich") served as VP and General Counsel at Wal-Mart from 2003 to 2006.

47. ***Non-party Jorge Resendiz*** ("Resendiz") served as in-house attorney at Wal-Mex.

48. ***Non-party Xavier del Rio*** ("del Rio") served as SVP of Real Estate at Wal-Mex from 2005 to 2009. ___**Del Rio reported to Rank**___. Del Rio was also implicated in the corruption/bribery at Wal-Mex. *See* Email, dated November 18, 2005 from Ainely to Fung, Lewis, Munich, Senser, Halter, Veira and Draper entitled "Confidential": "He stated they had found and written in the draft where they saw monies flowing to government agencies in several small amounts ranging from MX$10 to MX$30 thousand pesos. This was organized by JR [Xavier del Rio sometimes referred to as Javier del Rio or "JR"] in Real Estate Legal.") (Ex. M attached hereto); *see also* Email, dated October 13, 2005 from Torres-Landa to Munich, Pons entitled "CONFIDENTIAL – ATTORNEY CLIENT PRIVILEGED INFORMATION":

> **Teotihuacán Site**:
>
> During 2002 and 2003, and given the pressure to open new sites, the State of Mexico was confirmed as a strategic area of growth.
>
> The main problem in this State had to do with zoning licenses and how those could impact the ability to open new sites.
>
> ***At the instruction of Javier del Rio***, and given that a periodic global review was underway at the State level, SC and an outside firm arranged for the State plans to specifically foresee changes of zoning in those places were [sic] a new site was envisioned to be opened.
>
> The purpose was to have areas qualified from the beginning to avoid having to apply for zoning changes that would be costly and time consuming.

*One such sites that were adjusted was a placed in the area near the Teotihuacán pyramids to open a Bodega Aurrerá*[3].

With the zoning state license in place, negotiations to conclude a Lease Agreement with the owner were conducted.

The Municipal operating permits were complicated because in this particular area in addition to the Major, the Municipal Council and the neighbors also participate in the decision.

*To secure the approval from the municipal Council and with the advice reporting at that time to José Luis Rodriquez, Mex$1,2500,000.00 were delivered to 7 of the 11 Municipal County members*.

The neighbors were convinced without any contribution, but just accepting to perform some local community works.

*The National Institute of Anthropology and History (INAH) asked for an official donation of Mex$400,000.00, but the INAH's President received an irregular payment of Mex$150,000.00 to give approval for the corresponding construction site given its proximity to the archeological site*.

The construction was underway when in August 2004 the Municipal President alerted the company about the problems with some public/street market representatives.  The problem exploited [sic] because these groups were under estimated.

While the noise generated by those groups faded with time, the potential of that problem gaining strength again is there.

**Chamapa Distribution Center**

Again in this case the instructions to secure the electricity supply required at the site (in spite of limitations for prior applicants) was given by *Javier del Rio*.

\*      \*      \*

*Given the lack of availability of power Mex$1,500,000.00 were paid* to obtain the required capacity from the power supply company (Luz y Fuerza del Centro).

---

[3]     Rank was in charge of the Bodega Aurrerá units.  In 2003, Rank became Senior Vice President of Self-Service and oversaw all Bodega Aurrerá, Wal-Mart and Superama units at Wal-Mex, *see* paragraph 11 above.

21

> *The payments were divided in 2 in order to try to ensure that the required supply was going to be confirmed by the power company.  The same method using an external office was used for cash deliveries.  The company acted in tandem with the law firm to get everything in place*.

*     *     *

> <u>*The President, Real Estate Vice President and the Audit Vice President knew of the payment mechanics and even received a detailed schedule of all of the payments performed*</u>.

Ex. L attached hereto (emphasis added).

- In 2010-2011, de Rio was Senior Vice President, People Division, Mexico and Central America of Wal-Mex.

- In 2011, del Rio was also appointed as a member of the Social Responsibility Committee even though he was one of the parties implicated in the corruption/bribery at Wal-Mex.

49.    ***Non-party Jose Luis Rodriquezmacedo*** ("Rodriquezmacedo") served as Senior Vice President, General Counsel of Wal-Mex from 2005-2009.

- In 2010-2011, Rodriquezmacedo held the position at Wal-Mex as SVP, Legal and Corporate Relations where he answered to Rank who was then CEO of Wal-Mex.

- In 2011, Rodriquezmacedo was appointed as a member of the Wal-Mex Social Responsibility Committee even though he was one of the parties implicated in the corruption/bribery at Wal-Mex.

- In 2012, Rodriquezmacedo held the position at Wal-Mex as SVP, Special Projects.

- On April 20, 2012, a day before *The New York Times* article was published, Rodriguezmacedo was reassigned to a SVP position within Wal-Mex. A year later, he left Wal-Mex.

50. **Non-party H. Lee Scott** ("Scott") served as director of Wal-Mart since 1999. He was Wal-Mart's President and CEO from January 2000 through January 31, 2009. He continued as executive officer of Wal-Mart and as Chairman of the Wal-Mart Board's Executive Committee until his retirement on January 31, 2011.

51. **Non-party Ken Senser** ("Senser") served as Wal-Mart's Vice President Global Security.

52. **Non-party Eduardo Solorzano** ("Solorzano") served as President and CEO Latin America at Wal-Mart between January 2010 and February 2013 and served as Chairman of the Wal-Mex Board from 2010 to March 2014.

53. **Non-party R. Lee Stucky** ("Stucky") joined Wal-Mart in 1981, serving in the Distribution and Transportation Division for his first 11 years, and then serving for 2 years as the Director of Corporate Training and Development. In 1993, Stucky joined the International Division of Wal-Mart where he served as VP of International Logistics, and in 1999 was promoted to SVP and CAO for Wal-Mart International. Stucky retired from Wal-Mart in 2007.

- Stucky was also a Wal-Mex Board member (***during the same time he was an executive officer at Wal-Mart***) from 2000-2008.

- Stucky was also a Wal-Mex Audit Committee member in 2005 at the same time Vega was the Chairman of the Wal-Mex Audit Committee. Stucky reported to Vega.

- Stucky was also aware of Wal-Mart's investigation regarding the corruption/bribery at Wal-Mex as far back as November 1, 2005 when he was a member of the Wal-Mex Executive Committee and answered to Vega who was the Chairman of the Wal-Mex Audit Committee. *See* Email dated November 1, 2005 from Munich to Duke, Herkert, Hyde, Mars, Stucky, Fung, Senser, Weinstein entitled "Confidential" at Ex. J attached hereto. *See also* Email, dated February 8, 2006 from Rodriquezmacedo to Mars and Stucky entitled "Mexico Project" at Ex. O attached hereto.

54.     ***Non-party Juan Francisco Torres-Landa*** ("Torres-Landa") was a lawyer in Mexico City hired by Munich to investigate the bribery.

55.     ***Non-party Julio Viera*** ("Viera") served as Wal-Mart's Regional Director International Audit from 2005 to October 2006.  From October 2006 through February 2009, Viera served as Senior Director International Audit at Wal-Mart.  From February 2009 through March 2012, Viera served as Senior Director Financial Shared Services at Wal-Mart.  From March 2012 through April 2015, Viera served as Senior Director Global Shared Services - Global Process Owner Finance at Wal-Mart.  From May 2015 to the present, Viera serves as Senior Director Global Controls and Governance at Wal-Mart.

56.     ***Non-party Willkie Farr & Gallagher, LLP*** ("Willkie Farr") was hired by Wal-Mart to investigate the corruption/bribery at Wal-Mex.

- ***Non-party Martin J. Weinstein, Esq.*** ("Weinstein") of Willkie Farr co-drafted the memo "WalMex: Internal Investigation Work Plan", dated November 1, 2005 (attached hereto as Ex. N);

- ***Non-party Robert J. Meyer, Esq.*** ("Meyer") of Willkie Farr co-drafted the memo "WalMex: Internal Investigation Work Plan", dated November 1, 2005; and

- ***Non-party Daryl A. Kreml, Esq.*** ("Kreml") of Willkie Farr co-drafted the memo "WalMex: Internal Investigation Work Plan", dated November 1, 2005.

## V.   **WAL-MEX COMMITTEES**

### A.   **The Wal-Mex Audit Committee**

57.   The Wal-Mex Audit Committee consists of three (3) members.  The Wal-Mex Audit Committee selects the Independent Auditor for Wal-Mex and establish its fees, ensures that internal controls are appropriate and that Wal-Mex is in full compliance with all applicable accounting and legal regulations.

58.   Additionally, the Wal-Mex Audit Committee must review any and all related-party operations in which Wal-Mex engages.

59.   Moreover, the Wal-Mex Audit Committee has the authority to review financial statements to ensure they fully reflect the financial situation of Wal-Mex.  There is a procedure in place to receive, keep a record of, and reply to complaints regarding accounting practices and controls, in addition to those involving auditing matters.  Likewise, there is a procedure that guarantees the anonymity of any person filing a complaint regarding accounting issues including the way payments and expenses are recorded in Wal-Mex's accounting records.

60.   The Wal-Mex Audit Committee has the necessary authority and resources to retain lawyers and any other type of outside advisors required to assist in the performance of its duties.

61.   Other practices of the Wal-Mex Audit Committee are as follows:

- All Audit Committee members are independent directors.

- All Audit Committee members are experts in the field of finance.

- Independent auditors do not provide consultancy services for the Company.

- The independent audit firm partner in charge of auditing Wal-Mex is changed periodically.

- The Audit Committee receives periodic reports from the areas of Internal Audit Services, Legal and Corporate Compliance.

62.     The following were members of the Wal-Mex Audit Committee from 2005-2012:

| Year | The Wal-Mex Audit Committee Members |
|------|-------------------------------------|
| 2005 | **Ernesto Vega** (Chairman)<br>Jesus Reyes-Heroles<br>**R. Lee Stucky**[4] |
| 2006 | Jesus Reyes-Heroles (Chairman)<br>Blanca Treviño<br>**Ernesto Vega** |
| 2007 | Blanca Treviño (Chairperson)<br>Martha Miller<br>**Ernesto Vega** |
| 2008 | Blanca Treviño (Chairwoman)<br>Martha Miller<br>**Ernesto Vega** |
| 2009 | Martha Miller<br>Blanca Treviño<br>**Ernesto Vega** |
| 2010 | Antonio Echebarrena<br>Blanca Treviño<br>**Ernesto Vega** |
| 2011 | **Ernesto Vega** (Chairman)<br>Adolfo Cerezo<br>Antonio Echebarrena<br>Blanca Treviño |

---

[4]     Stucky was also SVP and CAO of Wal-Mart International at the same time he served as a Wal-Mex Board member and a member of the Wal-Mex Audit Committee, *see* paragraph 18 above.

| Year | The Wal-Mex Audit Committee Members |
|------|-------------------------------------|
| 2012 | Adolfo Cerezo (Chairman) |
|      | Blanca Treviño |
|      | **Ernesto Vega** |

B.     **The Wal-Mex Executive Committee**

63.     The Wal-Mex Executive Committee consists of three (3) members.  Among other duties, it is charged with overseeing the strategic planning for Wal-Mex, evaluating executives and establishing their compensation.

64.     The following were members of the Wal-Mex Executive Committee from 2005-2012:

| Year | The Wal-Mex Executive Committee Members |
|------|------------------------------------------|
| 2005 | John B. Menzer (Chairman)[5] |
|      | Eduardo Solorzano |
|      | Craig Herkert[6] |
| 2006 | Michael T. Duke (Chairman)[7] |
|      | Eduardo Solorzano |
|      | Craig Herkert |
| 2007 | Michael T. Duke (Chairman) |
|      | Craig Herkert |
|      | Eduardo Solorzano |
| 2008 | Michael T. Duke (Chairman) |
|      | Craig R. Herkert |
|      | Eduardo Solórzano |
| 2009 | Doug McMillon[8] |

---

[5]     During 2005, Menzer was also Executive Vice President and President and CEO of Wal-Mart International, *see* paragraph 18 above.

[6]     From 2000 – 2005, Herket was the COO of Wal-Mart, and from 2005 – 2009, he was also Wal-Mart President, CEO Americas, M&A, Strategy and Integration, Global Leadership Team and Global Sourcing, *see* paragraph 18 above.

[7]     During 2006 – 2008, Duke was also Vice Chairman of Wal-Mart International, *see* paragraph 18 above.

[8]     From 2009 – 2012, McMillon was Executive Vice President, President and CEO of Wal-Mart International Division.  From 2005 to 2009, McMillon served as Executive Vice President, President and CEO of Sam's Club Division.  From August 2002 to August 2005, McMillon

| Year | The Wal-Mex Executive Committee Members |
|---|---|
| | **Scot Rank**<br>Eduardo Solórzano |
| 2010 | Doug McMillon<br>**Scot Rank**<br>Eduardo Solórzano |
| 2011 | Doug McMillon (Chairman)<br>**Scot Rank**<br>Eduardo Solórzano |
| 2012 | Doug McMillon<br>Enrique Ostalé<br>**Scot Rank** |

C.      **The Wal-Mex Corporate Practices Committee**

65.     The purpose of the Wal-Mex Corporate Practices Committee is to reduce the potential risk of conducting transactions that could compromise Company assets, or that could favor a specific group of shareholders.  The primary responsibilities are:

- Calling shareholder meetings and have the order of business for the meeting include all points deemed necessary;

- Approving policies governing the use and possession of Company assets;

- Assisting the Wal-Mex Board in producing reports on accounting practices; and

- Authorizing related-party transactions, total compensation for the CEO and all policies regarding total compensation for top management.

66.     The following were members of the Wal-Mex Corporate Practices Committee from 2006-2012:

| Year | The Wal-Mex Corporate Practices Committee Members |
|---|---|
| 2006 | Jesus Reyes-Heroles (Chairman)<br>Blanca Treviño<br>**Ernesto Vega** |

served as Executive Vice President, Merchandising and Replenishment of Sam's Club Division, *see* paragraph 18 above.

| Year | The Wal-Mex Corporate Practices Committee Members |
|---|---|
| 2007 | Blanca Treviño (Chairperson)<br>Martha Miller<br>**Ernesto Vega** |
| 2008 | Blanca Treviño (Chairwoman)<br>Martha Miller<br>**Ernesto Vega** |
| 2009 | Martha Miller<br>Blanca Treviño<br>**Ernesto Vega** |
| 2010 | Antonio Echebarrena<br>Blanca Treviño<br>**Ernesto Vega** |
| 2011 | **Ernesto Vega (Chairman)**<br>Adolfo Cerezo<br>Antonio Echebarrena<br>Blanca Treviño |
| 2012 | Adolfo Cerezo (Chairman)<br>Blanca Treviño<br>**Ernesto Vega** |

### D.     The Wal-Mex Social Responsibility Committee

67.     The primary responsibilities of the Wal-Mex Social Responsibility Committee are:

- Participating in designing the strategy for corporate social responsibility and overseeing its implementation and performance;

- Analyzing areas of opportunity and pinpointing areas for improvement regarding processes aimed at detecting the risks, needs, and concerns of Wal-Mex stakeholders;

- Defining the strategy for social responsibility, approving the action plan, and establish metrics with clearly defined indicators for each business format; and

- Overseeing and following through on the performance of social corporate responsibility, ensuring full compliance with all legislation in force.

68.     The following were members of the Wal-Mex Social Responsibility Committee from 2011-2012:

| Year | The Wal-Mex Social Responsibility Committee Members |
|---|---|
| 2011 | **Xavier [Javier] del Río**<br>Xavier Ezeta<br>Luis Gómez<br>Mónica Loaiza<br>Rafael Matute<br>Gian Carlo Nucci<br>**Scot Rank**<br>José Luis Rodríguezmacedo<br>Farley Sequeira |
| 2012 | Karina Awad<br>Renzo Casillo<br>Luis Gómez<br>Mónica Loaiza<br>Rafael Matute<br>**Scot Rank**<br>Alberto Sepúlveda<br>Farley Sequeira<br>Javier Soní<br>Simona Visztová |

## VI.    VEGA'S AND RANK'S KNOWLEDGE OF THE BRIBERY

### A.    Vega's Knowledge Of The Bribery

69.     Juárez (Vice President of Internal Audit of Wal-Mex in 2005-2008) was implicated in the bribery scheme (*see* Ex. L attached hereto)[9], and Juárez reported to Vega and Rank.

70.     Vega knew or was reckless in not knowing that bribery was taking place at Wal-Mex as he was the Senior Officer (the Chairman of the Audit Committee) to whom Juárez reported at Wal-Mex.

---

[9]     *See* Ex. L at 4 of 10 ("The comptroller Eduardo Juárez received on a monthly basis an extract prepared by SC of the individual sites expenditures and accounting codes.   Two additional copies in closed envelopes were delivered to Javier del Rio on of which was labeled to be delivered to the President."), *see* paragraphs 9 and 42 above.

71.     Stucky was aware of Wal-Mart's investigation regarding the corruption/bribery at Wal-Mex as far back as November 1, 2005 when he was a member of the Wal-Mex Audit Committee and answered to Vega who was the Chairman of the Wal-Mex Audit Committee. *See* Email dated November 1, 2005 from Munich to Duke, Herkert, Hyde, Mars, ***Stucky***, Fung, Senser, Weinstein entitled "Confidential" at Ex. J attached hereto.  *See also* Email, dated February 8, 2006 from Rodriquezmacedo to Mars and ***Stucky*** entitled "Mexico Project" at Ex. O attached hereto.

### B.     Rank's Knowledge of the Bribery

72.     From 2005 through 2010, Rank was the Executive Vice President and COO of Wal-Mex in charge of all six businesses within Wal-Mex which included ***all of the Bodega Aurrerá***, Wal-Mart and Superama units.

73.     During the period of 2005 through 2010, Rank, as the Executive Vice President and COO of Wal-Mex, was the executive driving the opening of new Wal-Mex stores. The Bodega Aurrerá units (of which Rank was in charge) had the biggest increase in store openings in Mexico from 2005 through 2012.  For example:

- **In 2005**, Bodega Aurrerá had the greatest number of store openings (42 in total).  *See* Wal-Mex 2005 Annual Report attached hereto as Ex. B at p. 6;

- **In 2006**, Bodega Aurrerá store openings increased from 203 to 258 units (55 units).  *See* Wal-Mex 2014 Annual Report attached hereto as Ex. P, p. 14);

- **In 2007**, Bodega Aurrerá store openings increased from 258 to 313 units (55 units) (*id.*);

- **In 2008**, Bodega Aurrerá store openings increased from 313 to 442 units (129 units) (*id.*);

- **In 2009**, Bodega Aurrerá store openings increased from 442 to 684 units (242 units) (*id.*);

- **In 2010**, Bodega Aurrerá store opening increased from 684 to 899 units (215 units) (*id.*);

- **In 2011**, Bodega Aurrerá store openings increased from 899 to 1204 units (305 units) (*id.*); and

- **In 2012**, Bodega Aurrerá store openings increased from 1204 to 1423 units (219 units) (*id.*).

74.    Wal-Mex's store openings decreased significantly after 2012 as a direct result of the U.S. Department of Justice bribery investigation.

75.    Further, in an October 13, 2005 email from Torres-Landa to Munich regarding the de-briefing of Cicero, Rodriquezmacedo (***who reported to Rank***) was implicated in the bribery:

> Some payments were handled crossing costs from one site to the other in order to avoid dedicating too many resources to one site where its budget was nearing its limits.
>
> The incorporation of Jose Luis Rodriquez Macedo [sic] was something SC [Sergio Cicero] resented because nobody really approached SC to let him know that this position was going to be occupied by somebody else different from him.  SC only received an email addressed to the entire company.  ***SC's reporting relationship changed at some point and he began reporting directly to Rodriquezmacedo rather than to Javier*** [also spelled Xavier] del Rio [Senior Vice President, Real Estate of Wal-Mex].  ***SC informed Rodriquezmacedo of the irregular payments***.  Rodriquezmacedo refused to co-sign with SC the invoices SC submitted for payments to law firms, insisting that SC sign then and submit them.  SC refused to be the only one signing these invoices as his practice with Javier [sic] del Rio had always been that both SC and Mr. de Rio would sign and submit them for payment.

*See* Exhibit J at 4 of 5 attached hereto (emphasis added); *see also* Ex. M ("He [a former associate at Wal-Mex] stated that the FCPA report sent out in December did not match the draft. The report went to EC [Castro-Wright] and JLR [Rodriquezmacedo].  He told me that JLR rewrote the report to take significant information out.  He stated they had found and written in the draft where they saw monies flowing to government agencies in several small amounts ranging from MX$10 to MX$30 thousand pesos.  This was organized by JR [del Rio] in Real Estate Legal.").

76.     Further, Juárez (VP of Internal Audit of Wal-Mex in 2005-2008) was implicated in the bribery scheme (*see* Ex. L at 4 of 10 attached hereto), and Juárez reported to Rank and Vega.

77.     Del Rio reported to Rank.  Del Rio was also implicated in the corruption/bribery at Wal-Mex.  *See* Email, dated November 18, 2005 from Ainely to Fung, Lewis, Munich, Senser, Halter, Veira and Draper entitled "Confidential": "He stated they had found and written in the draft where they saw monies flowing to government agencies in several small amounts ranging from MX$10 to MX$30 thousand pesos.  ***This was organized by JR [Xavier del Rio sometimes referred to as Javier del Rio] in Real Estate Legal.***").  Ex. M (emphasis added). *See also* Email, dated October 13, 2005 from Torres-Landa to Munich, Pons entitled "CONFIDENTIAL – ATTORNEY CLIENT PRIVILEGED INFORMATION: "Contributions for improvement of proceedings in the Federal District: "A total contribution of Mex$2 million (net amount) was delivered in 8 partial payments during the end of 2003 and part of 2004. ***These amounts were delivered pursuant to the instructions of Javier del Rio with knowledge of the President (depending on the time, either Cesáreo Fernández or Eduardo Castro).*** […]

*SC [Sergio Cicero] claims having one such code accounting catalogue of payments signed by Mr. Javier del Rio*." Ex. HH at 12 of 19 (emphasis added).

78.     "Javier del Rio used to be in Bodega Aurrerá before taking up his position in the area of Real Estate Development." *See* Ex. J at 3 of 5.  Del Rio reported to Rank.  In 2000, Rank joined Wal-Mex where he worked as Deputy Vice President for Bodega Aurrerá and where he was appointed Vice President six months later.  In 2003, Rank became SVP of Self-Service and oversaw *all* of the Bodega Aurrerá, Wal-Mart and Superama units at Wal-Mex.

79.     Rank (who oversaw *all* of the Bodega Aurrerá and their openings) knew or was reckless in not knowing that bribery was taking place at Wal-Mex and that del Rio (who reported to Rank) had authorized a bribe (among many others) in the area near the Teotihuacan pyramids:

- One of such sites that were adjusted was placed in the area near the Teotihuacan pyramids to open a Bodega Aurrerá.
- With the zoning state license in place, negotiations to conclude a Lease Agreement with the owner were conducted.
- The Municipal operating permits were complicated because in this particular area in addition to the Major, the Municipal Council and the neighbors also participate in the decision.
- *To secure the approval from the Municipal Council and with the active reporting at that time to Jose Luis Rodriguez, Mex $1,250,000.00 were delivered to 7 of the 11 Municipal County members*.

*See* Ex. L at 4 of 10 (emphasis added).

## VII.    FRAUDULENT SCHEME

### A.      Wal-Mex Corruption

80.     According to Javier Oliva, a political scientist at National Autonomous University of Mexico ("UNAM"), the payment of corporate bribes within México began to increase after

the North American Free Trade Agreement came into force in México in 1994.  As Mr. Oliva told *Reuters*: "Foreign companies in the main started to look for ways of speeding up official procedures.  Regrettably, this [corruption] is how it works in much of Mexico."  David Graham, "Wal-Mart Probe Lifts Lid on Culture of Bribery in Mexico", *Reuters* (Apr. 23, 2012) (available at http://www.reuters.com/article/us-walmart-mexico-idUSBRE83M01820120423).

81.     A study by anti-corruption watchdog Transparencia Mexicana, the local arm of Transparency International ("TI"), showed Mexicans in 2010 paid a bribe to deal with more than one in 10 items of official paperwork or access to public services.  Illicit payments cover everything from connecting a telephone line to obtaining a driver's license, and average around 165 pesos.  *See id.*  According to TI's director, Eduardo Bohorquez, that figure leaps when big corporations try to operate in México's capital and 31 different states, each of which has its own set of rules on how to set up a business or lease property.  *See id.*

82.     Many bribes are paid through "gestores" or middlemen, who are used in México to help companies perform a variety of tasks, from obtaining residency permits and resolving tax issues to obtaining planning authorization.  Gestores often play starring roles in México's public corruption scandals, operating in the shadows, dangling payoffs to officials of every rank.

83.     Wal-Mex executives were keenly aware of the laws in México against bribing government officials.  Nevertheless, they chose to violate Méxican law in the interest of expediency.  As former Wal-Mex real estate attorney Cicero told *The New York Times*:

> [T]he payments [were] for a specific strategic purpose.  The idea, he said, was to build hundreds of new stores so fast that competitors would not have time to react.  Bribes, he explained, accelerated growth.  They got zoning maps changed.  They made environmental objections vanish.  Permits that typically took

months to process magically materialized in days.  "What we were
buying was time," he said.

*The New York Times* article, dated April 21, 2012 (hereinafter "*New York Times* article")
attached hereto as Ex. Q

> ### B.      The Red Flags at Wal-Mex and Wal-Mart

84.      According to *The New York Times* article, in 2003, Kroll Inc. ("Kroll"), a leading
investigative firm, conducted a confidential investigation for Wal-Mart.  Kroll discovered that
Wal-Mex had systematically increased its sales by helping favored high-volume customers
evade sales taxes.

85.      A draft of Kroll's report, obtained by *The New York Times*, concluded that top
Wal-Mex executives had failed to enforce their own anticorruption policies, ignored internal
audits that raised red flags and even disregarded local press accounts asserting that Wal-Mex
was "carrying out a tax fraud."  Wal-Mart, on behalf of Wal-Mex, ultimately paid $34.3 million
in back taxes.  The fact that Wal-Mart paid for Wal-Mex's tax fraud is more evidence that Wal-
Mex and Wal-Mart are one and the same.

86.      Wal-Mart then asked Kroll to evaluate Wal-Mex's internal audit and antifraud
units.  Kroll wrote another report that branded the units "ineffective."  Many employees accused
of wrongdoing were not even questioned; some "received a promotion shortly after the
suspicions of fraudulent activities had surfaced."

> ### C.      Wal-Mex's Bribery Practices Are Revealed

87.      The following conduct allegations are based in large part on *The New York Times*
article.  *The New York Times* article was based on, among other things, 15 hours of interviews
with Cicero, a former Wal-Mex executive and Mexican lawyer who had retired in 2004 after

nearly a decade in Wal-Mex's real estate department, and the review of hundreds of internal Wal-Mex and Wal-Mart documents.

88.     On September 21, 2005, Cicero sent an e-mail to Munich, then-General Counsel of Wal-Mart International, telling her he had information about "irregularities" authorized "by the highest levels" at Wal-Mex.  "I hope to meet you soon," he wrote.

89.     Munich was familiar with the challenges of avoiding corruption in Latin America. Before joining Wal-Mart in 2003, she had spent 12 years in México and elsewhere in Latin America as a lawyer for Procter & Gamble.

90.     At Wal-Mart in 2004, Munich pushed the Wal-Mart Board of Directors (the "Wal-Mart Board") to adopt a strict anti-corruption policy that prohibited all employees from "offering anything of value to a government official on behalf of Wal-Mart."  It required every employee to report the first sign of corruption, and it bound Wal-Mart's agents to the same exacting standards.

91.     Munich reacted quickly to Cicero's e-mail.  Within days, she hired Torres-Landa, a prominent Harvard-trained lawyer in México City, to debrief Cicero.  The two men met three times in October 2005, with Munich flying in from Bentonville, Arkansas (where Wal-Mart's corporate headquarters are located) for the third debriefing.  *See* Ex. J attached hereto.

92.     During hours of questioning, Torres-Landa's notes show, Cicero described how Wal-Mex had perfected the art of bribery, then bolstered it with fraudulent accounting.  *See* Ex. L attached hereto.  Cicero implicated many of Wal-Mex's leaders, including its Board Chairman, its General Counsel, its Chief Auditor and its top Real Estate Executive.

93.     One of Wal-Mex's top executive's, Castro-Wright, a native of Ecuador who was recruited from Honeywell International, Inc. in 2001 to become Wal-Mart's Chief Operating Officer in Mexico, was implicated in the bribery/corruption.  *Id.*

94.     Cicero said that while bribes were occasionally paid before Castro-Wright's arrival, their use soared after Castro-Wright ascended to the top job of Wal-Mex Chief Executive Officer in 2002.  Cicero described how Wal-Mex's leaders had set "very aggressive growth goals," which required opening new stores "in record times."  Wal-Mex executives, he said, were under pressure to do "whatever was necessary" to obtain permits to open new stores. *See* Ex. Q attached hereto.

95.     In an interview with *The New York Times*, Cicero said Castro-Wright had encouraged the bribery payments for a specific strategic purpose.  The idea, he said, was to build hundreds of new stores so fast that competitors would not have time to react.  Bribes, he explained, accelerated growth.  They got zoning maps changed.  They made environmental objections vanish.  Permits that typically took months to process magically materialized in days. "What we were buying was time," Cicero said.  *See* Ex. Q attached hereto.

96.     Wal-Mex's stunning growth made Castro-Wright a rising star at Wal-Mart.  In early 2005, when he was promoted to a senior position in the United States, CEO Duke, as head of Wal-Mart International, would cite his "outstanding results" in México.

97.     Cicero's allegations were all the more startling because he implicated himself.  He spent hours explaining to Torres-Landa the mechanics of how he had helped funnel bribes through gestores.

98.     Cicero told Torres-Landa it was his job to recruit the gestores.  He worked closely with them, sharing strategies on whom to bribe.  He also approved Wal-Mex's payments to the

gestores.  Each payment covered the bribe and the gestore's fee, typically six percent of the bribe.

99.     It was all carefully documented through a system of codes.

100.     The gestores submitted invoices with descriptions of their services.  Wal-Mex employees then added the codes to the invoices.  The codes identified the specific "irregular act" performed, Cicero explained to Torres-Landa.  One code, for example, indicated a bribe to speed up a permit.  Others described bribes to obtain confidential information or eliminate fines. *See* Ex. Q attached hereto.

101.     Each month, Castro-Wright and other top Wal-Mex executives "received a detailed schedule of all of the payments performed," he said, according to the lawyer's notes. *Id.*

102.     Torres-Landa explored Cicero's motives for coming forward.

103.     Cicero said he resigned in September 2004 because he felt underappreciated.  He described the "pressure and stress" of participating in years of corruption, of contending with "greedy" officials who jacked up bribe demands.  *Id.*

104.     As he told *The New York Times*, "I thought I deserved a medal at least."  *Id.*

105.     The breaking point came in early 2004, when he was passed over for the job of General Counsel of Wal-Mex.  This snub, Torres-Landa wrote, "generated significant anger with respect to the lack of recognition for his work."  Cicero said he began to assemble a record of bribes he had helped orchestrate to "protect him in case of any complaint or investigation," Torres-Landa wrote.  *Id.*

106.     "We did not detect on his part any express statement about wishing to sell the information," Torres-Landa stated.  *Id.*

107.    According to people involved in Wal-Mart's investigation, Cicero's account of criminality at the top of Wal-Mex was impossible to dismiss.  He had clearly been in a position to witness the events he described.  Nor was this the first indication of corruption at Wal-Mex. As discussed above, there was the 2003 Kroll investigation.

108.    None of these findings of corruption within Wal-Mex, though, had slowed Castro-Wright's rise.  Just days before Cicero's first debriefing, Castro-Wright was promoted again. He was put in charge of all Wal-Mart stores in the United States, one of the most prominent jobs at Wal-Mart.  He also joined Wal-Mart's Executive Committee, Wal-Mart's inner sanctum of leadership.

D.    **The Preliminary Inquiry: "FYI.  It is Not Looking Good**"[10]

109.    Halter, one of Wal-Mart's new "special investigators," was assigned to lead the preliminary inquiry into Cicero's allegations.   Halter had been with Wal-Mart only a few months, but he was a seasoned criminal investigator, having spent twenty-one (21) years at the Federal Bureau of Investigations (FBI), and he spoke Spanish.

110.    Halter also had help.  Ainley, a senior Wal-Mart auditor, was sent to México along with several Spanish-speaking auditors.

111.    On November 12, 2005, Halter's team got to work at Wal-Mex's corporate headquarters in México City.  The team gained access to a database of Wal-Mex payments and began searching the payment description field for the word "gestoria."

112.    ***By day's end, they had found 441 gestor payments***.  Each was a potential bribe, ***and yet they had searched back only to 2003***.

113.    Cicero had said his main gestores were Pablo Alegria Con Alonso and Jose Manuel Aguirre Juarez, obscure México City lawyers with small practices who were friends of

---

[10]    *See* Ex. KK attached hereto.

his from law school.  Sure enough, Halter's team found that nearly half the payments were to Alegria and Aguirre.  These two lawyers alone, Wal-Mex's records showed, had received $8.5 million in payments.  Records showed Wal-Mex routinely paid its gestores tens of thousands of dollars per permit.

114.    Halter's team confirmed detail after detail from Cicero's debriefings.  Cicero had given specifics -- names, dates, bribe amounts -- for several new stores.  In almost every case, investigators found documents confirming major elements of his account.  And just as Cicero had described, investigators found codes at the bottom of invoices from the gestores.  Notably, the documentation did not look anything like what you would find in legitimate billing records from a legitimate law firm.  Lewis sent a terse progress report to his boss, Senser, Wal-Mart VP for Global Security, Aviation and Travel: "FYI.  It is not looking good."  *See* Ex. R attached hereto.

115.    Hours later, Halter's team found clear confirmation that Castro-Wright and other top executives at Wal-Mex were well aware of the gestor payments.  ***In March 2004***, the team discovered, the executives had been sent an internal Wal-Mex audit that raised red flags about the gestor payments.  The audit documented how Wal-Mex's two primary gestores had been paid millions to make "facilitating payments" for new store permits all over México.  *See* Ex. Q attached hereto.

116.    The audit did not delve into how the money had been used to "facilitate" permits.  But it showed the payments rising rapidly, roughly in line with Wal-Mex's accelerating growth and new store openings.  The audit recommended notifying Wal-Mart's senior executives in Arkansas of the payments.

117.     The recommendation, records showed, was removed by Wal-Mex's chief auditor (*Vega was the Chairman of the Wal-Mex Audit Committee in 2004*), whom Cicero had identified as one of the executives who knew about the bribes.  The author of the gestor audit, meanwhile, "was fired not long after the audit was completed," Halter wrote.

118.     Ainley arranged to meet the fired auditor at his hotel.  *See* Ex. M attached hereto. The auditor described several examples of payments to government officials.  And, the auditor singled out Rodríguezmacedo, the general counsel of Wal-Mex.  The auditor also stated that "they [Wal-Mex] deleted his file when he was asked to leave" (*id.*), and thus destroyed evidence.

119.     Rodríguezmacedo, he said, deleted "significant information" from an audit of Wal-Mex's compliance with the Foreign Corrupt Practices Act ("FCPA").  The original audit had described how Wal-Mex gave gift cards to government officials in towns where it was building stores.  "These were only given out until the construction was complete, at which time the payments ceased," Ainley wrote.  *See* Ex. M attached hereto.

120.     Investigators were also struck by Castro-Wright's response to the gestores audit. It had been shown to him immediately, Wal-Mex's chief auditor had told them.  Yet, rather than expressing alarm, he had appeared worried about becoming too dependent on too few gestores. In an e-mail, Rodríguezmacedo instructed Cicero to write up a plan to "diversify" the gestores used to "facilitate" permits, and that "Eduardo Castro wants us to implement this plan as soon as possible."  *See* Ex. Q attached hereto.

121.     Cicero did as directed.   The plan, which authorized paying gestores up to $280,000 to "facilitate" a single permit, was approved with a minor change.  Rodríguezmacedo

did not want the plan to mention "gestores."  He wanted them called "external service providers."

122.    Halter's team made one last discovery -- a finding that suggested the corruption might be far more extensive than even Cicero had described.

123.    In going through Wal-Mex's database of payments, Wal-Mart investigators noticed **Wal-Mex was making hefty "contributions" and "donations" directly to governments all over Mexico -- _nearly $16 million in all since 2003_**.  "Some of the payment descriptions indicate that the donation is being made for the issuance of a license," Ainley wrote in one report. *See* Ex. Q attached hereto.

124.    The Wal-Mart investigators also found a document in which a Wal-Mex real estate executive had openly acknowledged that "these payments were performed to facilitate obtaining the licenses or permits" for new stores.  Sometimes, Cicero told *The New York Times*, donations were used hand-in-hand with gestores payments to get permits. *Id.*

125.    Records show that Halter's findings were quickly elevated to the attention of the most senior executives at Wal-Mart.  The substantial evidence that Wal-Mex, the most profitable subsidiary of Wal-Mart and the showcase of its profitability model, was extensively bribing Méxican officials was a highly material, flagrant violation of the law.  Accordingly, within days of arriving in México, Halter began making reports to Jose Luis Hernandez, the Chairman of Wal-Mart's Audit Committee, and the "Bentonville management," which, upon information and belief, included Wal-Mart's CEO, Scott and Mars (Wal-Mart's General Counsel from 2002 to 2009).  Hernandez, as Chairman of the Wal-Mart Audit Committee, was in turn obligated to share Halter's reports with the other members of the Wal-Mart Audit Committee, who also received reports from Mars on the subject.  In turn, the Wal-Mart Audit

43

Committee was obligated, under the Wal-Mart Audit Committee Charter, to report the matter to the full Wal-Mart Board so that it could consider how to respond to this significant matter.

### E.  Wal-Mex Executives Blame The Whistleblower And Refuse To Cooperate With The Wal-Mart Investigation

126.    When Halter's team became ready to interview executives at Wal-Mex, the first target was Rodríguezmacedo.  Before joining Wal-Mex in January 2004, Rodríguezmacedo had been a lawyer for Citigroup in México.  Urbane and smooth, with impeccable English, he quickly won fans at Wal-Mart's corporate headquarters.  When Wal-Mart invited executives from its foreign subsidiaries to attend several days of discussion about the fine points of the FCPA, Rodríguezmacedo was asked to lead one of the sessions.  It was called "Overcoming Challenges in Government Dealings."

127.    Yet, Cicero had identified him as a participant in the bribery scheme.  In his debriefings, Cicero described how Rodríguezmacedo had passed along specific payoff instructions from Castro-Wright.  In an interview with *The New York Times*, Cicero said he and Rodríguezmacedo had discussed the use of gestores shortly after Rodríguezmacedo was hired. "He said, 'Don't worry.  Keep it on its way.'"  *See* Ex. Q attached hereto.

128.    Halter's team hoped Rodríguezmacedo would shed light on how two outside lawyers came to be paid $8.5 million to "facilitate" permits.  Rodríguezmacedo, however, responded with evasive hostility.  When Wal-Mart investigators asked him for the gestores' billing records, he said he did not have time to track them down.  They got similar receptions from other executives at Wal-Mex.

129.    Only after Wal-Mart investigators complained to higher authorities within Wal-Mart were the Wal-Mex executives more forthcoming.  Led by Rodríguezmacedo, they responded with an attack on Cicero's credibility.  The gestores audit, they told investigators,

44

had raised doubts about Cicero, since he had approved most of the payments.  They began to suspect he was somehow benefiting, so they asked Kroll to investigate.  It was then, they asserted, that Kroll discovered Cicero's wife was a law partner of one of the gestores.

130.    Cicero was fired, they said, because he had failed to disclose that fact.  They produced a copy of a "preliminary" report from Kroll and e-mails showing the undisclosed conflict had been reported to Wal-Mart's headquarters.

131.    Based on this behavior, Rodríguezmacedo argued, the gestores payments were in all likelihood a "ruse" by Cicero to defraud Wal-Mex.  Cicero and the gestores, he contended, probably kept every last peso of the "facilitating payments."

132.    According to Rodríguezmacedo, bribes could not have been paid if the money was stolen first.

133.    Indeed, there were several flaws in this argument by Rodríguezmacedo.  For example, even if Rodríguezmacedo's account were true, it did not explain why Wal-Mex's executives had authorized gestores payments in the first place, or why they made "donations" to get permits to open new stores.

134.    Wal-Mart investigators also wondered why a trained lawyer who had supposedly gotten away with stealing a small fortune from Wal-Mart would now deliberately draw the Company's full attention by implicating himself in a series of fictional bribes.  Moreover, if Wal-Mex's executives truly believed they had been victimized, why hadn't they taken legal action against Cicero, much less reported the "theft" to Wal-Mart?

135.    Moreover, there was another problem.  Documents contradicted most of the Wal-Mex executives' assertions about Cicero.  Records showed Cicero had not been fired, but had resigned with severance benefits and a $25,000 bonus.  In fact, in a 2004 e-mail to Munich,

Rodríguezmacedo himself described how he had "negotiated" Cicero's "departure." The same e-mail said Cicero had not even been confronted about the supposed undisclosed conflict involving his wife. In fact, in an interview with *The New York Times*, Cicero flatly denied that his wife had ever worked with either gestor. The e-mail also assured Munich there was no hint of financial wrongdoing. "We see it merely as an undisclosed conflict of interest," Rodríguezmacedo wrote. *See* Ex. Q attached hereto.

136. There were other discrepancies. Rodríguezmacedo said Wal-Mex had stopped using gestores after Cicero's departure. This was false. As Cicero was being debriefed in October 2005, Wal-Mex real estate executives made a request to pay a gestor $14,000 to get a construction permit, Wal-Mex internal records showed. *Id.*

137. The persistent questions and document requests from Halter's team provoked a backlash from Wal-Mex's executives. After a week of work, Halter and other members of the team were summoned by Solórzano, the new CEO of Wal-Mex who replaced Castro-Wright upon Castro-Wright's promotion.

138. Solórzano angrily chastised the investigators for being too secretive and accusatory. He took offense that his executives were being told at the start of interviews that they had the right not to answer questions -- as if they were being read their rights.

139. Halter viewed the complaints as an effort to sidetrack his investigators. "I find this ludicrous and a copout for the larger concerns about what has been going on," he wrote. *See* Ex. Q attached hereto.

140. Nevertheless, Herkert, the chief executive for Latin America for Wal-Mart, was notified about the complaints. Three days later, he and his boss, Duke, flew to México City. Although the trip had long been planned -- Duke toured several stores -- they also used the

opportunity to reassure Wal-Mex's unhappy executives.  They arrived just as the investigators finished their work and left.

      **F.**      **The Preliminary Report: "There is Reasonable Suspicion**
                    **to Believe That Mexican and USA Laws Have Been Violated"**

141.    Wal-Mart's leaders had agreed to consider a full investigation if the preliminary inquiry found Cicero's allegations credible.  Back in Arkansas, Halter and Ainley wrote confidential reports to Wal-Mart's top executives in December 2005, laying out all the evidence that corroborated Cicero, including the hundreds of gestores payments, the codes designed to document the gestores payments, the rewritten audits, the evasive responses from Wal-Mex executives, the donations for permits and finally, the evidence gestores were still being used.

142.    "There is reasonable suspicion," Halter concluded, "to believe that Mexican and USA laws have been violated."  *See* Ex. S attached hereto.  There was simply "no defendable explanation" for the millions of dollars in gestores payments, he wrote.  This information was reported to, among others, the Wal-Mart Audit Committee Chairman Hernandez of Wal-Mart, CEO Scott of Wal-Mart, General Counsel Mars of Wal-Mart and, through these three individuals, to the entire Wal-Mart Board.

143.    Halter submitted an "action plan" for a deeper investigation that would plumb the depths of corruption and culpability at Wal-Mex.  Among other things, he urged "that all efforts be concentrated on the reconstruction of Cicero's computer history."

144.    Cicero, meanwhile, was still offering help.  In November 2005, when Halter's team was in México, Cicero offered his services as a paid consultant.  In December 2005, he wrote to Munich.  He volunteered to share specifics on still more stores, and he promised to show her documents.

145.    Halter proposed a thorough investigation of the two main gestores.  He had not tried to interview them in México for fear of his safety.  Now Halter wanted Wal-Mart to hire private investigators to interview and monitor both gestores.  He also envisioned a round of adversarial interviews with Wal-Mex's senior executives.  He and his investigators argued that it was time to take the politically sensitive step of questioning Castro-Wright about his role in the gestores payments.

146.    By January 2006, the case had reached a critical juncture.  Wal-Mart's leaders were again weighing whether to approve a full investigation that would inevitably focus on a star executive already being publicly discussed as a potential successor to Scott.  Wal-Mart's ethics policy offered clear direction. "Never cover up or ignore an ethics problem," the policy states.  *See* Ex. Q attached hereto.

147.    The situation was bad enough that Wal-Mart's top procurement executives were summoned to Bentonville that winter for a dressing down.  Menzer, Wal-Mart's Vice Chairman, warned them that corruption was creating an unacceptable risk to both Wal-Mex and Wal-Mart, particularly given the U.S. government's stepped-up enforcement of the FCPA.  "Times have changed," Menzer told them.

148.    As if to underscore the problem, Wal-Mart's leaders were confronted with the corruption allegations at Wal-Mex even as they pondered Halter's action plan.  ***In January, Scott, Duke and Wal-Mart's Chairman, S. Robson Walton, received an anonymous e-mail saying Wal-Mex's top real estate executives were receiving kickbacks from construction companies. "Please you must do something***," the e-mail implored.

149.    Yet at the same time, records and interviews show, there were misgivings in Wal-Mart about the budding reach and power of Corporate Investigations.  In less than a year,

Lewis's beefed-up team had doubled its caseload, to roughly 400 cases a year.  Some executives grumbled that Lewis acted as if he still worked for the FBI, where he had once supervised major investigations.  They accused him and his investigators of being overbearing, disruptive and naïve about the moral ambiguities of doing business abroad.  They argued that Corporate Investigations should focus more on quietly "neutralizing" problems than on turning corrupt employees over to law enforcement.

150.     Wal-Mart's leaders had just witnessed the downside of bringing employee issues to law enforcement: in early 2005, Wal-Mart went to the FBI with evidence that the disgraced former Vice Chairman, Thomas M. Coughlin, had embezzled hundreds of thousands of dollars. The decision produced months of embarrassing publicity, especially when Coughlin claimed he had used the money to pay off union spies for Wal-Mart.

151.     Meanwhile, Wal-Mex executives were continuing to complain about the investigation.

152.     In January 2006, after reviewing a preliminary version of the report, Munich advised Mars of the need to conduct an extensive investigation to root out wrongdoing, stating that "the needed follow-up investigation should extend beyond the specific transactions contained in this draft report to other potentially suspect transactions not yet identified."  In addition to Mars, Munich sent a copy of her email to Martin Weinstein, a partner at Wal-Mart's external law firm, Willkie Farr & Gallagher.  *See* Ex. K attached hereto.

153.     Despite Munich's efforts, it was clear that there was no interest at Wal-Mart or Wal-Mex in making a good faith effort to fix the corruption problem.  Munich submitted her resignation, effective February 1, 2006.  In one of her final acts, she drafted a memo that argued for expanding the México investigation and giving equal respect to Méxican and United States

laws.  "The bribery of government officials," she noted, "is a criminal offense in Mexico."  *See* Ex. K attached hereto.

154.    Munich also warned against allowing implicated Wal-Mex executives to interfere with the Wal-Mart investigation.  Wal-Mex's executives had already tried to insert themselves in the case.  Just before Christmas, records show, Solórzano, the Wal-Mex CEO, held a video conference with Mars, Senser and Stucky to discuss his team's "hypothesis" that Cicero had stolen gestores payments.

155.    "Given the serious nature of the allegations, and the need to preserve the integrity of the investigation," Munich wrote, "it would seem more prudent [for Wal-Mart] to develop a follow-up plan of action, independent of Wal-Mart de México management participation."  *See* Ex. K attached hereto.

### G.    Scott Assigns Responsibility For The Investigation To One Of The Accused Wrongdoers

156.    Scott called a meeting for February 3, 2006, to discuss revamping Wal-Mart's internal investigations and to resolve the question of what to do about Cicero's allegations.  In the days before the meeting, records show, Senser ordered his staff to compile data showing the effectiveness of Wal-Mart's Corporate Investigations.  He assembled statistics showing that the unit had referred relatively few cases to law enforcement agencies.  He circulated copies of an e-mail in which Rodríguezmacedo said he had been treated "very respectfully and cordially" by Senser's investigators.  *See* Ex. Q attached hereto.

157.    Along with Scott, the meeting included Hyde, Mars and Stucky.  The meeting brought the grievances against Wal-Mart Corporate Investigations into the open.  Senser described the complaints in Joseph R. Lewis's, Wal-Mart's director of corporate investigation, performance evaluation, completed shortly after the meeting.  Wal-Mart's leaders viewed

Lewis's investigators as "overly aggressive," he wrote.  They did not care for Lewis's "law enforcement approach," and the fact that Scott convened a meeting to express these concerns only underscored "the importance placed on these topics by senior executives."

158.    By meeting's end, Senser had been ordered to work with Mars and others to develop a "modified protocol" for internal investigations.  Scott said he wanted it done fast, and within 24 hours Senser produced a new protocol, a highly bureaucratic process that gave senior Wal-Mart executives -- ***including executives at Wal-Mex being investigated*** -- more control over internal investigations.  The policy included multiple "case reviews."  It also required senior executives to conduct a "cost-benefit analysis" before signing off on a full-blown investigation.  *Id.*

159.    Under the new protocol, Lewis and his team would only investigate "significant" allegations, like those involving potential crimes or top executives.  Lesser allegations would be left to the affected business unit to investigate.

160.    Four days after Scott's meeting, with the new protocol drafted, Wal-Mart's executives began to transfer control of the Wal-Mex bribery investigation to one of its earliest targets, Rodríguezmacedo.  This transfer was clearly inappropriate.  As Munich pointed out in January 18, 2006 email to, *inter alia*, Mars, Weinstein, and Ainley, the "Wisdom of assigning any investigative role to management of the business unit being investigated escapes me.  Given the serious nature of the allegations, and the need to preserve the integrity of the investigation, it would seem more prudent to develop a follow-up plan of action independent of WALMEX management."  *See* Ex. K attached hereto.

161.    Mars first sent Halter's report to Rodríguezmacedo.  Then he arranged to ship Halter's investigative files that revealed criminal activity from the U.S. to Mexico.  In an e-

mail, he sought Senser's advice on how to send the files in "a secure manner."  Senser recommended FedEx.  "There is very good control on those shipments, and while governments do compromise them if they are looking for something in particular, there is no reason for them to think that this shipment is out of the ordinary," he wrote.  "The key," he added, "is being careful about how you communicate the details of the shipment to José Luis."  Senser advised Mars to use encrypted e-mail.  *See* Ex. T attached hereto.

162.    When contacted by *The New York Times*, Wal-Mart's spokesman, David Tovar, said Wal-Mart could not discuss Scott's meeting or the decision to transfer the Wal-Mex corruption case to Rodríguezmacedo.  "At this point," he said, "we don't have a full explanation of what happened.  Unfortunately, we realize that until the investigation is concluded, there will be some unanswered questions."

163.    Wal-Mart's executives, however, had clear guidance in 2006 about the propriety of letting a target of an investigation run it.  On the same day, Senser was putting the finishing touches on the new investigations protocol, Wal-Mart's ethics office sent him a booklet of "best practices" for internal investigations.  It had been put together by lawyers and executives who supervised investigations at Fortune 500 companies, and stated that: "[i]nvestigations should be conducted by individuals who do not have any vested interest in the potential outcomes of the investigation."  *See* Ex. Q attached hereto.

164.    Moreover, the transfer of the Wal-Mex investigation to Wal-Mex violated even the "modified protocol" for investigations.   *Id.*   Under the new protocol, Corporate Investigations was still supposed to handle "significant" allegations -- including those involving potential crimes and senior executives.  When Senser asked his deputies to list all investigations

that met this threshold, they came up with 31 cases.  At the top of the list: Wal-Mex and the corruption in México.

165.    After the meeting with Scott, Senser had told Lewis in his performance evaluation that his "highest priority" should be to eliminate "the perceptions that investigators are being too aggressive."  He wanted Lewis to "earn the trust of" his "clients" -- Wal-Mart's leaders.  He wanted him to head off "adversarial interactions."  *See* Ex. Q attached hereto.

### H.    The Final Report Is Written By One Of The Targets Of The Investigation

166.    Rodríguezmacedo, the man now in charge and one of the targets of the investigation, saw it differently.  He wrapped up the case in a few weeks, with little additional investigation.

167.    "There is no evidence or clear indication," his report concluded, "of bribes paid to Mexican government authorities with the purpose of wrongfully securing any licenses or permits."  That conclusion, his report explained, was largely based on the denials of his fellow executives.  Not one "mentioned having ordered or given bribes to government authorities," he wrote.  *See* Ex. Q attached hereto.

168.    His report, a mere six pages long, neglected to note that he had been implicated in the same criminal conduct.  That was not, however, the only omission.  While his report conceded that Wal-Mex executives had authorized years of payments to gestores, it never explained what these executives expected the gestores to do with the millions of dollars they received to "facilitate" permits to open new stores.

169.    He was also silent on the evidence that Wal-Mex had doled out donations to get permits to open new stores.  Nor did he address evidence that he and other Wal-Mex executives

had suppressed or rewritten audits that would have alerted Wal-Mart senior executives to improper payments.

170.    Instead, the bulk of Rodríguezmacedo's report attacked the integrity of his accuser.  Cicero, he wrote, made Wal-Mex's executives think they would "run the risk of having permits denied if the gestores were not used."  But this was merely a ruse: in all likelihood, he argued, Wal-Mex paid millions for "services never rendered."  The gestores simply pocketed the money, he suggested, and Cicero "may have benefited," too.

171.    Rodríguezmacedo, however, offered no direct proof.  Indeed, as his report made clear, it was less an allegation than a hypothesis built on two highly circumstantial pillars.

172.    First, he said he had consulted with Jesús Zamora-Pierce, a "prestigious independent counsel" who had written books on fraud.  Mr. Zamora, he wrote, "feels the conduct displayed by Sergio Cicero is typical of someone engaging in fraud.  It is not uncommon in Mexico for lawyers to recommend the use of gestores to facilitate permit obtainment, when in reality it is nothing more than a means of engaging in fraud."

173.    Second, Rodríguezmacedo said he had done a statistical analysis that found Wal-Mex won permits to open new stores even faster after Cicero left.  The validity of his analysis was impossible to assess; he did not include his statistics in the report.

174.    In building a case against Cicero, Rodríguezmacedo's report included several false statements.  He described Cicero's "dismissal" when records showed he had resigned.  He also wrote that Kroll's investigation of Cicero concluded that he "had a considerable increase in his standard of living during the time in which payments were made to the gestores."  The Kroll report, however, made no such assertion.

175.    His report promised a renewed commitment by Wal-Mex to Wal-Mart's anticorruption policy.  He did not recommend any disciplinary action against his colleagues.

176.    There was, however, one person he hoped to punish.  Wal-Mex, he wrote, would scour Cicero's records and determine "if any legal action may be taken against him." Rodríguezmacedo submitted a draft of his report to Bentonville.

177.    In an e-mail, Lewis told his superiors that he found the report "lacking."  It was not clear what evidence supported the report's conclusions, he wrote.  "More importantly," he wrote, "if one agrees that Sergio defrauded the company and I am one of them, the question becomes, how was he able to get away with almost $10 million and why was nothing done after it was discovered?"

178.    Rodríguezmacedo responded by adding a paragraph to the end of his report: They had decided not to pursue "criminal actions" against Cicero because "we did not have a strong case."

179.    "At the risk of being cynical," Lewis wrote in response, "that report is exactly the same as the previous which I indicated was truly lacking."  *See* Ex. U attached hereto.

180.    On May 10, 2006, Rodríguezmacedo was told by senior Wal-Mart executives, to put his report "into final form, thus concluding this investigation."

I.    ***The New York Times* Breaks the Story**

181.    On April 21, 2012 (Saturday), after months of investigation, *The New York Times* published an article by Pulitzer Prize winning journalist David Barstow entitled *Wal-Mart Hushed Up a Vast Mexican Bribery Case*.  As discussed above, *The New York Times* article was based on, among other things, 15 hours of interviews with Cicero, and the review of hundreds of internal documents.   *See* Ex. Q attached hereto.  Further, before the April 21, 2012 *New York*

*Times* article was published, *The New York Times* told Wal-Mart that it was investigating Cicero's claims.

182.     On the first two days of trading after publication of *The New York Times* article, Wal-Mex ADRs were pummeled, falling $5.24 -- from a close of $43.06 on Friday, April 20, 2012, to a close of $37.82 on Monday, April 23, 2012 (a drop of 12.2%) and $36.20 on Tuesday, April 24, 2012 (a further drop of 4.3%).

### J.     The Mexico Success Story Has An Ominous Side

183.     Wal-Mart's operations are organized into three divisions:  Wal-Mart Stores U.S., Sam's Club, and Wal-Mart International.  During years 2005-2006, the International segment of Wal-Mart's business grew as the domestic segment plateaued.  For example, Wal-Mart's March 31, 2005 10-K states: "Our International segment consists of retail operations in eight countries and Puerto Rico.  This segment generated 19.7% of our fiscal 2005 sales."  The March 31, 2006 10-K states: "the International segment [grew to] 20.1% of our fiscal 2006 sales."  And the March 27, 2007 Form 10-K stated: "our International segment generated 22.3% of our fiscal 2007 net sales."  Moreover, México accounted for one-fourth of the sales of Wal-Mart's International segment.

184.     The most successful foreign country in its International segment by far was México.  Wal-Mart's 2005 Annual Report listed the number of segment stores and other operations in each of the countries in which the International segment operates.  As the below list shows, México alone accounted for over one-third of the locations in Wal-Mart's fifteen-country international division.

**Fiscal 2005 End of Year Store Count**

| Country | Discount | Supercenters | Sam's Clubs | Neighborhood Markets |
|---|---|---|---|---|
| Argentina | 0 | 11 | 0 | 0 |
| Brazil | 118 | 17 | 12 | 2 |
| Canada | 256 | 0 | 6 | 0 |
| China | 0 | 38 | 3 | 2 |
| South Korea | 0 | 16 | 0 | 0 |
| *Mexico* | *529* | *89* | *61* | *0* |
| United Kingdom | 263 | 19 | 0 | 0 |
| Puerto Rico | 9 | 4 | 9 | 32 |

185.    Wal-Mex was widely viewed as a highly successful business operation that stunned rivals with its rapid growth and success.  Indeed, in its own 2006 Annual Report, Wal-Mex states:

> [D]uring 2006 we broke a new record in both investment and the number of Grand Openings - an investment of $839 Million dollars and the opening of 120 new units from all our business formats.

186.    In Wal-Mart's 2010 Annual Report, as a result of the continued bribery and corruption, the most successful foreign country in Wal-Mart's International segment continued to be México:

**INTERNATIONAL SEGMENT**
**UNIT COUNT AND SQUARE FOOTAGE** [1]

| (In thousands) | Argentina | | Brazil | | Canada | | Central America | | Chile | | China | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fiscal Year | Unit Count | Square Footage | Unit Count | Square Footage | Unit Count | Square Footage | Unit Count | Square Footage | Unit Count | Square Footage | Unit Count | Square Footage |
| Balance Forward | 11 | 2,175 | 149 | 11,393 | 262 | 29,953 | — | — | — | — | 43 | 7,550 |
| 2006 | 11 | 2,175 | 295 | 23,225 | 278 | 31,730 | — | — | — | — | 56 | 10,261 |
| 2007 | 13 | 2,427 | 299 | 23,789 | 289 | 33,591 | 413 | 7,128 | — | — | 73 | 13,583 |
| 2008 | 21 | 3,789 | 313 | 24,958 | 305 | 36,590 | 457 | 7,822 | — | — | 202 | 36,391 |
| 2009 | 28 | 4,301 | 349 | 26,594 | 318 | 39,501 | 502 | 8,277 | 197 | 9,564 | 225 | 39,973 |
| 2010 | 43 | 5,185 | 434 | 28,695 | 317 | 40,225 | 519 | 8,441 | 252 | 10,437 | 279 | 49,401 |

| | Japan[2] | | India | | Mexico | | Puerto Rico | | United Kingdom | | Total International | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fiscal Year | Unit Count | Square Footage | Unit Count | Square Footage | Unit Count | Square Footage | Unit Count | Square Footage | Unit Count | Square Footage | Unit Count | Square Footage |
| Balance Forward | — | — | — | — | 679 | 39,133 | 54 | 3,596 | 282 | 23,328 | 1,480 | 117,128 |
| 2006 | 375 | 26,725 | — | — | 774 | 44,655 | 54 | 3,774 | 315 | 25,532 | 2,158 | 168,077 |
| 2007 | 369 | 26,887 | — | — | 889 | 50,401 | 54 | 3,829 | 335 | 26,800 | 2,734 | 188,435 |
| 2008 | 371 | 24,532 | — | — | 1,023 | 56,804 | 54 | 3,829 | 352 | 27,868 | 3,098 | 222,583 |
| 2009 | 371 | 24,478 | — | — | 1,201 | 63,067 | 56 | 4,037 | 358 | 29,011 | 3,605 | 248,803 |
| 2010 | 371 | 24,258 | 1 | 50 | 1,469 | 69,067 | 56 | 4,082 | 371 | 30,053 | 4,112 | 269,894 |

\*          \*          \*

| Country | Supermarkets | Discount Stores | Supercenters | Hypermarkets | Other | Total |
|---|---|---|---|---|---|---|
| Argentina | — | — | 24 | — | 19 | 43 |
| Brazil(2) | 157 | — | 45 | 65 | 167 | 434 |
| Canada | — | 233 | 84 | — | — | 317 |
| Chile | 47 | 110 | — | 93 | 2 | 252 |
| China | — | — | 167 | 104 | 8 | 279 |
| Costa Rica | 25 | 127 | — | 6 | 12 | 170 |
| El Salvador | 25 | 50 | — | 2 | — | 77 |
| Guatemala | 28 | 113 | — | 7 | 16 | 164 |
| Honduras | 7 | 39 | — | 1 | 6 | 53 |
| India | — | — | — | — | 1 | 1 |
| Japan | 259 | — | — | 111 | 1 | 371 |
| Mexico(3) | 202 | 246 | 169 | — | 852 | 1,469 |
| Nicaragua | 7 | 48 | — | — | — | 55 |
| Puerto Rico | 30 | 7 | — | 8 | 11 | 56 |
| United Kingdom | 57 | — | 29 | 261 | 24 | 371 |
| **Grand Total** | **844** | **973** | **526** | **650** | **1,119** | **4,112** |

187.    The success story of Wal-Mex was a matter of public knowledge and commentary.  It was not without its detractors, however, prompting headlines describing Wal-Mart's entry into the México market as the "Goliath"[11] or "Leviathan"[12] that has "invade[d],"[13] "trounc[ed] the locals,"[14] "transform[ed] the Mexican market,"[15] and was decried as a "threat to sovereignty."[16]

---

[11]    *The Economist*, "Mexico's retail Goliath." *Business Latin America*, dated March 2, 2002.

[12]    "Wal-Mart leviathan squeezes competition." *Miami Herald, International Edition*, dated February 2, 2004.

[13]    Weiner, Tim.  "Wal-Mart invades, and Mexico gladly surrenders." *The New York Times*, dated December 6, 2003.

[14]    Smith, Geri. "Mexico: war of the superstores.  Wal-Mart is trouncing the locals, but they're not giving up." *Business Week.*, dated Sept. 23, 2002.

[15]    Luhnow, David. "Crossover success: How NAFTA helped Wal-Mart reshape the Mexican market." *Wall Street Journal*, dated August 31, 2001.

[16]    González Amador, Roberto.   "Riesgo para la soberanía, el poder de Wal-Mart en el Mercado mexicano." *La Jornada*, dated July 8, 2004.

K.      **Statement of Ethics, the Anti-Corruption Policy of Wal-Mex**

188.     The      Wal-Mex      website      (http://www.walmex.mx/en/financial-information/annual.html) presents an "Investor Relations" page that contains a section concerning corporate governance.  This "Investor Relations" page represents that Wal-Mex adhered to the Mexican Stock Exchange ("MSE") "Code of Best Practices" which states that Wal-Mex was required to: "Encourage the stating of corporate ethics by the Company . . . . Through its dissemination and also full compliance with company-established policies and procedures, such as the 'Statement of Ethics', the 'Anti-corruption Policy of Walmart de México y Centroamérica', and by including clauses regarding ethical compliance and environmental protection in agreements executed with our suppliers, and by informing and training our associates in matters pertaining to laws, policies and procedures that must be followed, promoting compliance with the same, and the involvement of Internal Audit."

## VIII.   THE MATERIALLY FALSE AND MISLEADING STATEMENTS

A.      **Pre-Class Period False And Misleading Statements Regarding The Concrete Steps That Wal-Mex Had Taken To Ensure The Integrity Of Its Compliance With Its Code For Corporate Best Practices And Code Of Ethics**

189.     Wal-Mex's 2004 Annual Report stated in relevant part:

> "For Wal-Mart de Mexico, honesty and integrity continue being absolutely non-negotiable core values, and we permanently oversee that these permeate all our activities . . . .  Wal-Mart de Mexico has an area of corporate compliance charged with communicating and fostering compliance with our ethical behavior policies and corporate governance, as well as strict adherence to the statutes which govern our Company."

                          *      *      *

> ***In addition to the Mexican Securities Market Law, we have taken into account the recommendations set forth in the Corporate Best Practices Code and in the Ethics Code for Wal-Mart in the***

59

*performance of our duties.  **As part of the surveillance process, the Committee meets regularly in sessions with the Administration, and Independent and Internal Auditors**.*

The Committee evaluated the performance of the Independent Auditors, who have the responsibility of rendering an opinion on the reasonability of Company's financial statements and their compliance with Generally Accepted Accounting Principles in Mexico. It was decided that the partners of Mancera, S.C. (a member firm of Ernst & Young Global) comply with the needs for professional quality and independence of criteria and solvency action as required.

Accordingly, the retaining of their services was suggested with the purpose to examine and issue the report on the financial statements of Wal-Mart de Mexico, S.A. de C.V. and its Subsidiaries as of December 31, 2004.

*We were informed in detail on the goals, programs, and work performed by Independent and Internal Auditors, as well as on their findings and regularization programs.*

During this year, special attention was given to review the internal control processes.  ***In our opinion, the controls fulfill the required effectiveness so the Company can operate within an overall atmosphere of control***.

***We were apprised of the Company's legal situation and of the control processes related to compliance with the Ethics Code, and there are no comments thereto***.

Based on the work performed, we recommend the Board of Directors submit to the Shareholders' Meeting for their approval the financial statements for the fiscal year ended on December 31, 2004 of Wal-Mart de Mexico, S.A. de C.V. and its Subsidiaries.

*See* Wal-Mex's 2004 Annual Report (Ex. A) at pp. 19, 20 (emphasis added).

190.    Wal-Mex's 2005 Annual Report quotes Eduardo Solorzano, President and CEO, and Vega as stating:

"Ladies and Gentlemen, we reiterate our commitment to Mexico and we thank you for the trust you have placed in each and every one of us who are part of Wal-Mart de Mexico; we shall continue working and making your investment grow, always mindful of the

highest ethical standards and the best practices for corporate governance."

\* \* \*

*In compliance with Article 14 of the Mexican Securities Market Law and the rules and regulations of the Board of Directors, on behalf of the Audit Committee, I submit my report on the activities carried out during the year ended December 31, 2005.*

*During the course of our work, in addition to the Mexican Securities Market Law, we have taken into account the recommendations set forth in the Corporate Best Practices Code and in the Ethics Code for Wal-Mart de Mexico. As part our surveillance process, the Committee met regularly with Company's Management, as well as with the External and Internal Auditors. In addition, we attended Real Estate, Treasury and Ethics Committee Meetings, as well as meetings to review financial results.*

The Committee evaluated the performance of the Independent Auditors, who are required to issue an opinion on the reasonability of Company's financial statements and their compliance with Accounting Principles Generally Accepted in Mexico. It was agreed that the partners of Mancera S.C. (a member firm of Ernst &Young Global) meet the requirements for professional quality and independence of criteria and solvency. Accordingly, it was recommended that their services be retained to conduct the corresponding examination and issue the report on the financial statements of Wal-Mart de Mexico, S.A. de C.V. and its Subsidiaries as of December 31, 2005.

*We received detailed reports on the objectives, programs and development of the audit work, both internal and external, as well as on the findings and regularization programs. Therefore, in our opinion, the effectiveness requirements are met to allow for the Company to operate within an environment of control.*

*We were informed of the Company's legal situation and the control system in place for compliance with the Code of Ethics, regarding which there is nothing to report.*

*See* Wal-Mex's 2005 Annual Report (Ex. B) at pp. 5, 20 (emphasis added).

191.   Wal-Mex's 2006 Annual Report stated in relevant part:

"For Wal-Mart de Mexico, honesty and integrity continue being absolutely non-negotiable core values, and we permanently ensure that these permeate all our activities . . . . Wal-Mart de Mexico has an area of corporate compliance charged with communicating and fostering compliance with our ethical behavior policies and corporate governance, as well as strict adherence to the statutes which govern our Company."

\*       \*       \*

In compliance with article 43 of the Mexican Securities Market Law in effect and the rules and regulations of the Board of Directors, this is to inform you of the operations carried out during the year ended on December 31, 2006.

***In carrying out our work, we have adhered not only to the Mexican Securities Market Law but also to the recommendations contained in the Company's Code for Better Corporate Practices and the Ethics Code***.

In order to comply with our supervision process, we performed the following:

a)      ***We analyzed the status of the internal control system and were thoroughly informed on the internal and external audit work programs and developments and of the main matters subject to improvements, as well as of follow up on preventive and corrective measures in place.  In our opinion, the Company complies with the effectiveness required to operate under a general control environment***.

b)      We evaluated the performance of the external auditors, who are responsible for issuing an opinion on the reasonability of the entity's financial statements and their compliance with Mexican financial reporting standards, and we consider that the partners of Mancera, S.C. (a member of Ernst & Young Global) comply with the necessary requirements of professional quality and intellectual and economic independence, and therefore recommended their appointment to examine and issue a report on the financial statements of Wal-Mart de Mexico, S.A.B. de C.V. and Subsidiaries at December 31, 2006.

c)      ***We were informed of the accounting policies approved in 2006 and of the fact there were no changes affecting the figures contained in the financial statements and we***

> *followed up on the implementation of the provisions of the new Securities Market Law.*

> d)   In 2006, we attended a number of meetings to review the entity's financial statements, followed up on the annual investment plan, investigated on the development of current lawsuits and litigations, and verified compliance with the applicable legal standards and provisions with satisfactory results.

*See* Wal-Mex's 2006 Annual Report (Ex. C) at pp. 29, 34 (emphasis added).

192.   Wal-Mex's 2007 Annual Report stated in relevant part:

> "The structure and responsibilities of the Board of Directors, our Code of Ethics and in general all the activities performed by our Company follow the best practices of good corporate governance."

> \*       \*       \*

> In compliance with Article 43 of the Mexican Securities Market law in effect and the rules and regulations of the Board of Directors, this is to inform you of the operations carried out in regards to the year ended on December 31, 2007.

> *In carrying our work, we have adhered not only to the Mexican Securities Market Law but also to the recommendations contained in the Company's Code for Better Corporate Practices and the Code of Ethics.*

> In order to comply with our supervision process, we performed the following:

> I.   As concerns Corporate Practices:

> a)   We were informed of:

> 1.   The process to assess the performance of relevant executives. There are no observations to report.

> 2.   Processes followed during the fiscal year to conduct operations with related parties, and the comprehensive compensation packages for the CEO and other relevant executives listed under Note 6 of the company's

financial statements. There are no observations to report.

b)     The Board of Directors did not grant waivers to any board member, relevant executive or others in the chain of command for any privilege listed under article 28, section III, paragraph f) of the Mexican Securities Market law.

II.     Related to Audit:

a)     ***We analyzed the status of the internal control system, and were informed in detail of the programs and work done by Internal and Independent audit, as well as the main aspects requiring improvement and follow-up on implemented preventive and corrective measures. <u>Therefore it is our opinion that all effectiveness requirements are being met to ensure that the Company operates within a general environment of control</u>***.

b)     We evaluated the performance of the independent auditors, who are responsible for rendering an opinion on the reasonability of the company's financial statements and the compliance with the Mexican Financial Reporting Standards. We conclude that the partners of Mancera, S.C. (a member of Ernst & Young Global) meet the necessary professional skills, as well as independence in all intellectual and economic actions required, and therefore we recommend their appointment to examine and issue an opinion on the financial statements of Wal-Mart de Mexico, S. A. B. de C.V. and Subsidiaries, as of December 31, 2007.

c)     We attended a number of meetings to review the company's quarterly financial statements and recommended the release of the financial information. We followed up on the investment plan for the year; we were informed of on-going legal proceedings to which the company is a party thereof; and verified compliance with the corresponding standards and legal provisions. Results were satisfactory.

d)      We were informed of accounting policies approved in 2007, finding no changes that would affect figures in the financial statements.

e)      We followed up on the decisions reached at Shareholders' and Board Meetings.

***Based on the work performed, and on the report of independent auditors, <u>it is our opinion that accounting and reporting policies and criteria followed by the Company are adequate and sufficient and have been applied consistently, as a result of which, the information presented by the CEO reasonably reflects the financial position and results of the company</u>***.

In light of the above, we recommend that the Board of Directors submit the financial statements for Wal-Mart de Mexico, S.A.B. de C.V. and Subsidiaries for the year ended December 31, 2007 to the Company's Shareholders' Assembly for approval.

*See* Wal-Mex's 2007 Annual Report (Ex. D) at pp. 48, 56 (emphasis added).

193.    Wal-Mex's 2008 Annual Report stated in relevant part:

"For Wal-Mart de Mexico, honesty and integrity continue being absolutely nonnegotiable core values, and we constantly oversee that these permeate all of our activities . . . . Wal-Mart de Mexico has an area of Corporate Compliance charged with communicating and fostering observance of our ethical behavior policies and corporate governance, as well as strict adherence to the statutes governing our Company."

                    *       *       *

(a)     ***We analyzed the status of the internal control system, and we were informed in detail of the programs and work done by Internal and Independent Audit, as well as the main aspects requiring improvement and follow up on implemented preventive and corrective measures. <u>Therefore it is our opinion that all effectiveness requirements are being met to ensure that the Company operates within a general environment of control</u>***.

(b)     We evaluated the performance of the independent auditors, who are responsible for rendering an opinion on the reasonability of the company's financial statements and the compliance with the Mexican Financial Reporting

Standards. We conclude that the partners of Mancera, S.C. (a member of Ernst & Young Global) meet the necessary professional skills, as well as independence in all intellectual and economic actions required, and therefore we recommend their appointment to examine and issue an opinion on the financial statements of Wal-Mart de Mexico, S.A.B. de C.V. and Subsidiaries, as of December 31, 2008.

(c)     We attended a number of meetings to review the company's quarterly and annual financial statements and recommended release of the financial information. We followed up on the investment plan of the year; we were informed of on-going legal proceedings to which the Company is a party thereof, and verified compliance with the corresponding standards and applicable regulations. Results were satisfactory.

(d)     We were informed of accounting policies approved in 2008, finding no changes that would affect figures in the financial statements.


*          *          *


*In carrying out our duties, we have adhered not only to the Mexican Securities Market law but also to the recommendations contained in the Company's Code for Better Corporate Practices and the Code of Ethics*.

See Wal-Mex's 2008 Annual Report (Ex. E) at pp. 45, 54 (emphasis added).

194.    Wal-Mex's 2009 Annual Report stated in relevant part:

For Walmart de México y Centroamérica, honesty and integrity continue being non-negotiable core values, and we always ensure that they permeate and govern all our activities.

The following are some of the primary points covered in our Code of Ethics […]   No gifts and gratuities […]   Inappropriate behavior […]  Financial integrity […]  Anticorruption.

Walmart de México y Centroamérica's Ethics and Compliance area, which reports to the Senior Vice President of Legal, Compliance and Corporate Governance, and in charge of

promoting a culture of compliance, ethical commitment, corporate governance, as well as strict adherence to the statutes governing our Company.  The Audit Committee periodically receives reports from this area.

Each year we reply and send to the Mexican Stock Exchange the Code of Corporate Best Practices, available at the institution's website.

*        *        *

In keeping with Article 43 of the Securities Market Law in effect, and the internal regulation approved by the Board of Directors, we wish to inform you of the activities undertaken during the year ended on December 31, 2009.

***In carrying out our work, we have adhered not only to the Mexican Securities Market law but also to the recommendations contained in the Company's Code for Better Corporate Practices and the Code of Ethics***.

In order to comply with our supervision process, we performed the following:

I.      As concerns Corporate Practices:

   a)      We were informed of:

      1.      The process to assess the performance of relevant executives.

      2.      Processes followed during the year to conduct operations with related parties, and the comprehensive compensation packages for the CEO and other relevant executives listed under Note 7 of the Company's financial statements.  There are no observations to report.

   b)      During extraordinary meetings, we advised the Board on the following matters:

      1.      On November 23rd, 2009, approval for the acquisition of Walmart Centroamérica, taking into account that negotiations, operation terms and conditions were agreed

67

upon as per market conditions, and that the operation is beneficial for all Wal-Mart de México, S.A.B. de C.V. shareholders.

2.   On December 17th, 2009, Scot Rank was appointed Chief Executive Officer as of January 18, 2010.

c)   The Board of Directors granted no waivers to any board member, relevant executive nor anyone else in the chain of command for any privilege listed under article 28, section III, paragraph f) of the Mexican Securities Market Law.

II.   Related to Audit:

a)   ***We analyzed the status of the internal control system, and we were informed in detail of the programs and work done by Internal and Independent Audit, as well as the main aspects requiring improvement and follow-up on implemented preventive and corrective measures. <u>Therefore it is our opinion that all effectiveness requirements are being met to ensure that the Company operates within a general environment of control</u>***.

b)   We evaluated the performance of the independent auditors, who are responsible for rendering an opinion on the reasonability of the Company's financial statements and the compliance with the Mexican Financial Reporting Standards. We conclude that the partners of Mancera, S.C. (a member of Ernst & Young Global) meet the necessary professional skills, as well as independence in all intellectual and economic actions required, and therefore we recommend their appointment to examine and issue an opinion on the financial statements of Wal-Mart de México, S.A.B. de C.V. and Subsidiaries, as of December 31, 2009.

b)   We attended a number of meetings to review the Company's quarterly and annual financial statements and recommended to release the financial information.

> d)      *We followed up on the investment plan of the year; we were informed of ongoing legal proceedings to which the Company is a party thereof, and verified compliance with the corresponding standards and legal provisions. Results were satisfactory*.
>
> e)      <u>*We were informed of accounting policies approved in 2009, finding no changes that would affect figures in the financial statements*</u>.
>
> f)      We followed up on the decisions reached at Shareholders' and Board Meetings.
>
> *Based on the work performed, and on the report of independent auditors, it is our opinion that accounting and reporting policies and criteria followed by the Company are adequate and sufficient and have been applied consistently, as a result of which, the information presented by the CEO reasonably reflects the financial position and results of the Company*.
>
> In light of the above, we recommend that the Board of Directors submit the financial statements for Wal-Mart de México, S.A.B. de C.V. and Subsidiaries for the year ended December 31, 2009 to the Company's Shareholders' Assembly for approval.

*See* Wal-Mex's 2009 Annual Report (Ex. F) at pp. 37, 46 (emphasis added).

195.   Wal-Mex's 2010 Annual Report stated in relevant part:

> For Walmart de México y Centroamérica, honesty and integrity continue being non-negotiable core values, and we always ensure that they permeate and govern all our activities.
>
> The following are some of the primary points covered in our Code of Ethics:
>
> • Open-door policy
> • Supplier relations
> • Non-discrimination
> • Conflicts of interest
> • *No gifts and gratuities*
> • Privileged information
> • Health, safety and the environment
> • *Inappropriate behavior*
> • No repercussions
> • Financial investments

- Fair trade practices
- ***Financial integrity***
- ***Anticorruption***
- ***No political involvement***
- International trade

Walmart de México y Centroamérica's Ethics and Compliance area, which reports to the Senior Vice President of Legal and Corporate Relations, is charged with communicating and fostering observance of our ethical behavior policies and corporate governance, and strict adherence to the statutes governing our Company. The Audit Committee periodically receives reports from this area.

Each year we reply and send to the Mexican Stock Exchange the Code of Corporate Best Practices, which is available on the institution's website.

*     *     *

In accordance to Article 43 of the Securities Market Law in effect, and the internal regulation approved by the Board of Directors, we wish to inform you of the activities undertaken during the year ended on December 31, 2010.

***In the performance of our duties, <u>we have maintained strict compliance not only with the Mexican Securities Market Law, but we have also considered the recommendations contained in the Company's Code for Corporate Best Practices and the Code of Ethics</u>***.

With the purpose of complying with our supervisory process, during the last year the Audit Committee has held five meetings to analyze the overview of the most relevant issues related to Accounting, Legal, Operations, and Ethics of the Company, complemented by our involvement in the Treasury, Real Estate, Ethics, and Walmart de México Foundation Committees, and in the Year-Beginning and Year-End Meetings, emphasizing the following:

I.      As to Corporate Practices:

a)      We were informed on:

1.      The performance assessment processes for relevant executives and the authorization of

70

the replacement plan, with no observations noted.

2.   Processes followed during the year to conduct transactions with related parties, which are mentioned by the management in Note 11 of the Company's Financial Statements, with no observations noted.

3.   Processes to determine the comprehensive compensation packages for the CEO and other relevant executives listed under Note 11 of the Company's Financial Statements. There were no observations noted.

b)   The Board of Directors did not grant any waivers to board members, relevant executives nor anyone else in the chain of command for privilege whatsoever specified under Article 28, Section III, Paragraph f) of the Security Markets Law.

II.   As to Audit:

a)   ***We analyzed the status of the internal control system and were informed in detail of the Internal and Independent Audit programs and work development, as well as the main aspects requiring improvement, and follow-up on preventive and corrective measures deployed. <u>Therefore, our opinion is that all effectiveness requirements have been properly met for the Company to operate under a general control environmen</u>t.***

b)   We evaluated the performance of the independent auditors who are in charge of rendering an opinion on the reasonability of the Company's Financial Statements and their compliance with Mexican Financial Information Standards. We therefore consider that the partners at Mancera, S.C. (a member of Ernst & Young Global) meet the necessary requirements of professional qualification and independence for intellectual and financial action and thus, we recommend  their appointment to examine and issue an opinion on the Financial Statements for Wal-Mart de México, S. A. B. de C.V. and Subsidiaries as of December 31, 2010.

c) We attended several meetings to review the quarterly and annual financial statements for the Company and recommended the release of such financial information.

d) We followed up on Walmart Mexico's operations and accounting integration with Central America.

e) We were informed on the approved accounting policies throughout 2010, finding no changes that would have any material effect on the figures reported in the Financial Statements.

f) We followed up on the agreements reached at Shareholders and Board meetings.

***Based on the work performed and the report from the independent auditors, it is our opinion that the accounting and reporting policies and criteria followed by the Company are adequate and sufficient and have been consistently applied and as a result, the information submitted by the CEO reasonably reflects the financial position and results of the Company.***

Therefore, we recommend that the Board of Directors submit the Financial Statements for Wal-Mart de México, S.A.B. de C.V. and Subsidiaries, for the year ended on December 31, 2010 to the Shareholders' Meeting for their approval.

*See* Wal-Mex's 2010 Annual Report (Ex. G) at pp. 34-35, 53 (emphasis added).

**B. Class Period False and Misleading Statements Regarding The Concrete Steps That Wal-Mex Had Taken To Ensure The Integrity Of Its Compliance With Its Code For Corporate Best Practices And Code Of Ethics**

196. On April 18, 2012, Wal-Mex filed its 2011 Annual Report with the MSE. The Wal-Mex 2011 Annual Report stated in relevant part:

For Walmart de México y Centroamérica, honesty and integrity continue being non-negotiable core values, and we always ensure that they permeate and govern all our activities.

The following are some of the primary points covered in our Code of Ethics:

- Open-door policy
- Supplier relations
- Non-discrimination
- Conflicts of interest
- ***No gifts and gratuities***
- Privileged information
- Health, safety and the environment
- ***Inappropriate behavior***
- Harassment
- Sexual harassment
- No repercussions
- Fair trade practices
- ***Financial integrity***
- ***Anticorruption***
- International trade

Walmart de México y Centroamérica's Ethics and Compliance area, which reports to the Senior Vice President of Legal, Compliance and Corporate Governance, and in charge of promoting a culture of compliance, ethical commitment, corporate governance, as well as strict adherence to the statutes governing our Company. The Audit Committee periodically receives reports from this area.

Each year we reply and send to the Mexican Stock Exchange the Code of Corporate Best Practices, available at the institution's website

*       *       *

In accordance to Article 43 of the Securities Market Law in effect and the internal regulations approved by the Board of Directors, we wish to inform you of the activities undertaken during the year ended on December 31, 2011.

***In the performance of our duties, we have maintained strict compliance not only with the Mexican Securities Market Law, but we have also considered the recommendations contained in the Company's Code for Corporate Best Practices and Code of Ethics.***

With the purpose of complying with our supervisory process, the Audit and Corporate Practices Committees held four meetings during the last year to examine a general overview of the most relevant issues in terms of company's Accounting, Legal, Operations and Ethics, supplemented by our involvement in the quarterly results analysis meetings and the Treasury, Real Estate and Ethics Committees, with emphasis on the following:

I.      As to Corporate Practices:

        a)      We were informed of:

                1.      Performance assessment processes for relevant executives and the authorized replacement plan, with no observations noted.

                2.      Processes followed during the year to conduct transactions with related parties and relevant transfer price study, concepts which are mentioned by management in Note 11 of the Company's Financial Statements, with no observations noted.

                4.      Processes to determine comprehensive compensation packages for the CEO and other relevant executives listed under Note 11 of the Company's Financial Statements, no observations were noted.

        b)      The Board of Directors did not grant any waivers to board members, relevant executives or any other person with any of the authorities specified under Article 28, Section III, Paragraph f) of the Security Markets Law.

III.    As to Audit:

        a)      ***We analyzed the status of the internal control system and were informed in detail of the Internal and Independent Audit programs and work development, as well as the main aspects requiring improvement and follow-up on implemented preventive and corrective measures. Therefore, <u>our opinion is that all effectiveness requirements</u>***

***have been properly met for the Company to
operate under a general control environment***.

b)      We evaluated the performance of the independent
auditors who are responsible for rendering an
opinion on the reasonability of the Company's
Financial Statements and their compliance with
Mexican Financial Information Standards. We,
therefore, consider that the partners at Mancera,
S.C. (a member of Ernst & Young Global) meet the
necessary requirements of professional qualification
and independence for intellectual and financial
action and thus, we recommend their appointment
to examine and issue an opinion on the Financial
Statements for Wal-Mart de México, S. A. B. de
C.V. and Subsidiaries as of December 31, 2011. No
additional or supplementary services for this
concept were provided during 2011.

c)      We attended several meetings to review the
company's quarterly and annual financial
statements and recommended the release of such
financial information.

d)      ***We were informed of the approved accounting
policies during year 2011 with no changes found
which would have any material effect on the
Financial Statements figures***.

e)      Concerning item g) of the above mentioned article,
we were informed of the International Financial
Information Standards adoption process in effect
starting January 1, 2012 with no observations noted.

f)      We followed up on the agreements reached at
Shareholders' and Board meetings.

***Based on work performed and a report from the independent
auditors, it is our opinion that the accounting and reporting
policies, and criteria followed by the Company are adequate and
sufficient and have been consistently applied. As a result, the
information submitted by the CEO reasonably reflects the
Company's financial position and results***.

Therefore, we recommend that the Board of Directors submit for
approval the Financial Statements of Wal-Mart de México, S.A.B.

de C.V. and Subsidiaries for the year ended on December 31, 2011
before the Shareholders' Meeting.

*See* Wal-Mex's 2011 Annual Report (Ex. H) at pp. 50, 68 (emphasis added).

197.    These pre-class period and Class Period statements regarding Wal-Mex's
compliance with its "Code of Ethics" and the "Code of Corporate Best Practices" were false and
misleading as these statements were made repeatedly in an effort to reassure the investing
public that in a country -- such as México -- where bribery and corruption is rampant, Wal-
Mex's ethics and integrity were sound and complied with.  Moreover, Defendants Wal-Mex,
Rank and Vega made affirmative representations that Wal-Mex was in compliance with its
"Code of Ethics" and "Corporate Best Practice" when in fact it was not because they knew or
were reckless in not knowing about the bribery scheme in 2005, knew or were reckless in not
knowing that they were not incompliance of the FCPA before and during the Class Period,
rejected calls for a legitimate investigation regarding these FCPA violations, and failed to report
these criminal acts to the DOJ, SEC and their Méxican counterparts.  Thus, a reasonable
investor would rely on these statements as reflective of the true state of affairs at Wal-Mex
when in fact they were not.

198.    Further, the above-reference statements in paragraph 196 made by Vega and Wal-
Mex go beyond generalized expressions of commitment to high corporate standards, and
address concrete steps that Wal-Mex had taken to ensure the integrity of its compliance with its
"Code of Ethics" and "Code of Corporate Best Practices."   A reasonable investor would
interpret Wal-Mex's statements about its allegedly elaborate internal controls regarding its
compliance with its "Code of Ethics" and "Code of Corporate Best Practices" as reflecting
concrete steps that it had taken in this area, and would rely upon these statements as a guarantee
that such steps had, in fact, been implemented.

**C.     Pre-Class Period False And Misleading Statements
        Regarding The Concrete Steps That Wal-Mex Had
        Taken To Ensure The Integrity Of Its Internal Controls**

199.    In fiscal years 2005 through 2010, Wal-Mex filed with the MSE annual reports and issued press releases to the investor public regarding its operations and financial condition. During fiscal years 2005 through 2010, Wal-Mex failed to inform its shareholders (through its silence) that it (and many of the high ranking executive officers at Wal-Mex) were (a) implicated in the suspected corruption in 2005; (b) knew of the suspected corruption in 2005; and (c) Wal-Mart had conducted an internal investigation in 2005-2006 into the suspected corruption at Wal-Mex, and thereafter covered it up.

200.    Like the statements made during the Class Period (discussed below), the pre-Class Period statements go beyond platitudinous expressions of commitment to high corporate standards.  Rather, they describe "concrete steps" that Wal-Mex claimed it had taken to ensure the integrity of its financial reporting when they knew that these statements were false and misleading.

201.    In or around April 2006, Wal-Mart, as the 70% controlling shareholder of Wal-Mex, authorized Solorzano (who was the acting President and CEO of Wal-Mex) to file with the MSE Wal-Mex's 2005 Annual Report.[17]  It was in the Wal-Mex 2005 Annual Report that the Audit Committee, of which Vega was the Chairman, represented to the market:

> Gentlemen:
>
> In compliance with Article 14 of the Mexican Securities Market Law and the rules and regulations of the Board of Directors, on behalf of the Audit Committee, I submit my report on the activities carried out during the year ended December 31, 2005.

---

[17]    From 2006-2008, Duke was the Chairman of the Wal-Mex Executive Committee and a member of the Wal-Mex Board.  Duke had knowledge of the corruption/bribery at Wal-Mex, and that the investigation into the same had been white-washed, *see* paragraph 37 above.

*During the course of our work, in addition to the Mexican Securities Market Law, we have taken into account the recommendations set forth in the Corporate Best Practices Code and in the Ethics Code for Wal-Mart de Mexico.* As part our surveillance process, the Committee met regularly with Company's Management, as well as with the External and Internal Auditors. In addition, we attended Real Estate, Treasury and Ethics Committee Meetings, as well as meetings to review financial results.

The Committee evaluated the performance of the Independent Auditors, who are required to issue an opinion on the reasonability of Company's financial statements and their compliance with Accounting Principles Generally Accepted in Mexico. It was agreed that the partners of Mancera S.C. (a member firm of Ernst &Young Global) meet the requirements for professional quality and independence of criteria and solvency. Accordingly, it was recommended that their services be retained to conduct the corresponding examination and issue the report on the financial statements of Wal-Mart de Mexico, S.A. de C.V. and its Subsidiaries as of December 31, 2005.

*We received detailed reports on the objectives, programs and development of the audit work, <u>both internal</u> and external, as well as on the findings and regularization programs. <u>Therefore, in our opinion, the effectiveness requirements are met to allow for the Company to operate within an environment of control</u>.*

*We were informed of the Company's legal situation and the control system in place for compliance with the Code of Ethics, regarding which there is nothing to report.*

Based on the work performed, we recommend that the Board of Directors submit to the Stockholders the Financial Statements of Wal-Mart de Mexico, S.A. de C.V. and Subsidiaries for the fiscal year ended December 31, 2005.

Sincerely,
Audit Committee Report
To the Board of Directors
Wal-Mart de Mexico, S.A. de C.V.
Ernesto Vega
Chairman
Mexico City, February 9, 2006

*See* Ex. B at p. 20 attached hereto (Emphasis added).

202.    The above-reference statements in paragraph 201 made by Vega and Wal-Mex go beyond generalized expressions of commitment to high corporate standards, and address concrete steps that Wal-Mex had taken to ensure the integrity of its financial reporting.  A reasonable investor would interpret Wal-Mex's statements about its allegedly elaborate internal controls operation as reflecting concrete steps that Wal-Mex had taken in this area, and might rely upon these statements as a guarantee that such steps had, in fact, been implemented.

203.    However, when the above statements were made, Vega knew or was reckless in not knowing about the bribery scheme in 2005; knew or was reckless in not knowing that Wal-Mex was not in compliance with the FCPA; rejected calls for a legitimate investigation regarding these FCPA violations; and failed to report these criminal acts to the DOJ, SEC and their Méxican counterparts, but nevertheless continued to reassure Wal-Mex shareholders of the concrete steps that they took to ensure the integrity of financial reporting.

204.    In or around April 2007, Wal-Mart, as the 70% controlling shareholder of Wal-Mex, authorized Solorzano (who was the acting President and CEO of Wal-Mex) to file with the MSE Wal-Mex's 2006 Annual Report.  It was in Wal-Mex's 2006 Annual Report that the Audit Committee, which Vega was a member, represented to the market:

> Gentlemen:
>
> In compliance with article 43 of the Mexican Securities Market Law in effect and the rules and regulations of the Board of Directors, this is to inform you of the operations carried out during the year ended on December 31, 2006.
>
> **In carrying out our work, we have adhered not only to the Mexican Securities Market Law but also to the recommendations contained in the Company's Code for Better Corporate Practices and the Ethics Code**.
>
> In order to comply with our supervision process, **we performed** the following:

a)      We analyzed the status of the internal control system and were thoroughly informed on ***the internal*** and external ***audit work programs and developments and of the main matters subject to improvements, as well as of follow up on preventive and corrective measures in place***. In our opinion, the Company complies with the effectiveness required to operate under a general control environment.

b)      We evaluated the performance of the external auditors, who are responsible for issuing an opinion on the reasonability of the entity's financial statements and their compliance with Mexican financial reporting standards, and we consider that the partners of Mancera, S.C. (a member of Ernst & Young Global) comply with the necessary requirements of professional quality and intellectual and economic independence, and therefore recommended their appointment to examine and issue a report on the financial statements of Wal-Mart de Mexico, S.A.B. de C.V. and Subsidiaries at December 31, 2006.

c)      We were informed of the accounting policies approved in 2006 and of the fact there were no changes affecting the figures contained in the financial statements and we followed up on the implementation of the provisions of the new Securities Market Law.

d)      ***In 2006, we attended a number of meetings to review the entity's financial statements, followed up on the annual investment plan, investigated on the development of current lawsuits and litigations, and verified compliance with the applicable legal standards and provisions with satisfactory results***.

***Based on the work performed, we recommend that the Board of Directors submit the financial statements of Wal-Mart de Mexico, S.A.B. de C.V. and subsidiaries for the year ended on December 31, 2006 to the Company's Stockholders' Meeting for approva***l.

The Committee was headed by Mr. Ernesto Vega Velasco until November 14, 2006, at which date a Stockholders' Meeting was held to adjust the Company's bylaws to the new provisions of the Securities Market law, and he remains a member of the Committee to date.

Sincerely,

Audit Committee
Mexico City, February 8, 2007.

Ex. C at p. 34 attached hereto (Emphasis added).

205.    The above-reference statements made by Vega and Wal-Mex were false and
misleading for the reasons discussed in paragraphs 202 and 203.

206.    In or around April 2008, Wal-Mart, as the 70% controlling shareholder of Wal-
Mex, authorized Solorzano to file with the MSE Wal-Mex's 2007 Annual Report.  It was in the
Wal-Mex 2007 Annual Report that Blanca Treviño (Chairwoman of the Audit and Corporate
Practice Committee in which Vega was also a member) represented to the market:

To the Board of Directors of Wal-Mart de Mexico, S.A.B. de C.V.

Dear Directors:

In compliance with Article 43 of the Mexican Securities Market
law in effect and the rules and regulations of the Board of
Directors, this is to inform you of the operations carried out in
regards to the year ended on December 31, 2007.

In carrying our work, *we have adhered not only to the Mexican
Securities Market Law but also to the recommendations
contained in the Company's Code for Better Corporate Practices
and the Code of Ethics*.

In order to comply with our supervision process, we performed the
following:

I.      As concerns Corporate Practices:

        a)      We were informed of:

        1.      The process to assess the performance of relevant
                executives. There are no observations to report.

        2.       Processes followed during the fiscal year to
                conduct operations with related parties, and the
                comprehensive compensation packages for the CEO

and other relevant executives listed under Note 6 of the company's financial statements.  There are no observations to report.

b)     The Board of Directors did not grant waivers to any board member, relevant executive or others in the chain of command for any privilege listed under article 28, section III, paragraph f) of the Mexican Securities Market law.

II.    Related to Audit:

a)     ***We analyzed the status of the internal control system, and were informed in detail of the programs and work done by <u>Internal</u> and Independent audit, as well as the main aspects requiring improvement and follow-up on implemented preventive and corrective measures***. Therefore, ***it is our opinion that all effectiveness requirements are being met to ensure that the Company operates within a general environment of control***.

b)     We evaluated the performance of the independent auditors, who are responsible for rendering an opinion on the reasonability of the company's financial statements and the compliance with the Mexican Financial Reporting Standards. We conclude that the partners of Mancera, S.C. (a member of Ernst & Young Global) meet the necessary professional skills, as well as independence in all intellectual and economic actions required, and therefore we recommend their appointment to examine and issue an opinion on the financial statements of Wal-Mart de Mexico, S. A. B. de C.V. and Subsidiaries, as of December 31, 2007.

c)     We attended a number of meetings to review the company's quarterly financial statements and recommended the release of the financial information.  We followed up on the investment plan for the year; we were informed of on-going legal proceedings to which the company is a party thereof;  and verified compliance with the

corresponding standards and legal provisions. Results were satisfactory.

d)   We were informed of accounting policies approved in 2007, finding no changes that would affect figures in the financial statements.

e)   We followed up on the decisions reached at Shareholders' and Board Meetings. Based on the work performed, and on the report of independent auditors, *it is our opinion that accounting and reporting policies and criteria followed by the Company are adequate and sufficient and have been applied consistently, as a result of which, the information presented by the CEO reasonably reflects the financial position and results of the company*.

In light of the above, we recommend that the Board of Directors submit the financial statements for Wal-Mart de Mexico, S.A.B. de C.V. and Subsidiaries for the year ended December 31, 2007 to the Company's Shareholders' Assembly for approval.

Sincerely,
Blanca Treviño
Chairperson
Audit and Corporate Practices Committee
Mexico City, February 7, 2008

Ex. D at p. 56 attached hereto (Emphasis added).

207.   The above-reference statements made were false and misleading for the reasons discussed in paragraphs 202 and 203.

208.   In or around April 2009, Wal-Mart, as the 70% controlling shareholder of Wal-Mex, authorized Solorzano to file with the MSE Wal-Mex's 2008 Annual Report.  It was in Wal-Mex's 2008 Annual Report that Blanca Treviño (Chairwoman of the Audit and Corporate Practice Committee in which Vega was also a member) represented to the market:

To the Board of Directors of Wal-Mart de Mexico, S.A.B. de C.V.

Dear Directors:

83

In compliance with Article 43 of the Mexican Securities Market law in effect and the rules and regulations of the Board of Directors, this is to inform you of the operations carried out in regards to the year ended on December 31, 2008.

In carrying out our duties, *we have adhered not only to the Mexican Securities Market law but also to the recommendations contained in the Company's Code for Better Corporate Practices and the Code of Ethics*.

In order to comply with our supervision process, we performed the following:

I.      As concerns Corporate Practices:

    a)      We were informed of:

        1.      The process to assess the performance of relevant executives and to authorize the succession plan. There are no observations to report.

        2.      Processes followed during the fiscal year to conduct operations with related parties, and the comprehensive compensation packages for the CEO and other relevant executives listed under Note 7 of the company's financial statements. Additionally, we were informed about the transfer pricing external review. There are no observations to report.

    b)      The Board of Directors did not grant waivers to any board member, relevant executive or others in the chain of command for any privilege listed under article 28, section III, paragraph f) of the Mexican Securities Market law.

II.     Related to Audit:

    a)      *We analyzed the status of the internal control system, and we were informed in detail of the programs and work done by Internal and Independent Audit, as well as the main aspects requiring improvement and follow up on implemented preventive and corrective measures*.

84

Therefore, ***it is our opinion that all effectiveness requirements are being met to ensure that the Company operates within a general environment of control***.

b)  We evaluated the performance of the independent auditors, who are responsible for rendering an opinion on the reasonability of the company's financial statements and the compliance with the Mexican Financial Reporting Standards. We conclude that the partners of Mancera, S.C. (a member of Ernst & Young Global) meet the necessary professional skills, as well as independence in all intellectual and economic actions required, and therefore we recommend their appointment to examine and issue an opinion on the financial statements of Wal-Mart de Mexico, S.A.B. de C.V. and Subsidiaries, as of December 31, 2008.

c)  We attended a number of meetings to review the company's quarterly and annual financial statements and recommended release of the financial information. We followed up on the investment plan of the year; we were informed of on-going legal proceedings to which the Company is a party thereof, and verified compliance with the corresponding standards and applicable regulations. Results were satisfactory.

d)  We were informed of accounting policies approved in 2008, finding no changes that would affect figures in the financial statements.

e)  We followed up on the decisions reached at Shareholders' and Board Meetings.

***Based on the work performed, and on the report of independent auditors, it is our opinion that accounting and reporting policies and criteria followed by the Company are adequate and sufficient and have been applied consistently, as a result of which, the information presented by the CEO reasonably reflects the financial position and results of the Company***.

In light of the above, we recommend that the Board of Directors submit the financial statements for Wal-Mart de Mexico, S.A.B. de

C.V. and Subsidiaries for the year ended December 31, 2008 to the
Company's Shareholders' Assembly for approval.

Sincerely,
Blanca Treviño
Chairwoman
Audit and Corporate Practices Committee
Mexico City, February 11, 2009

Ex. E at p. 54 attached hereto (Emphasis added).

209.    The above-reference statements made were false and misleading for the reasons

discussed in paragraphs 202 and 203.

210.    In or around April 2010, Wal-Mart, as the 70% controlling shareholder of Wal-

Mex, authorized Rank to file with the MSE Wal-Mex's 2009 Annual Report.  It was in Wal-

Mex's 2009 Annual Report that Blanca Treviño (Chairwoman of the Audit and Corporate

Practice Committee in which Vega was also a member) and Rank represented to the market:

To the Board of Directors of Wal-Mart de México, S.A.B. de C.V.

Dear Directors:

In keeping with Article 43 of the Securities Market Law in effect,
and the internal regulation approved by the Board of Directors, *we
wish to inform you of the activities undertaken* during the year
ended on December 31, 2009.

In carrying out our work, *we have adhered not only to the
Mexican Securities Market law but also to the recommendations
contained in the Company's Code for Better Corporate Practices
and the Code of Ethics*.

In order to comply with our supervision process, we performed the
following:

I.      As concerns Corporate Practices:

a)      We were informed of:

1.      The process to assess the performance of
relevant executives.

2.    Processes followed during the year to conduct operations with related parties, and the comprehensive compensation packages for the CEO and other relevant executives listed under Note 7 of the Company's financial statements. There are no observations to report.

b)    During extraordinary meetings, we advised the Board on the following matters:

1.    On November 23rd, 2009, approval for the acquisition of Walmart Centroamérica, taking into account that negotiations, operation terms and conditions were agreed upon as per market conditions, and that the operation is beneficial for all Wal-Mart de México, S.A.B. de C.V. shareholders.

2.    On December 17th, 2009, Scot Rank was appointed Chief Executive Officer as of January 18, 2010.

c)    The Board of Directors granted no waivers to any board member, relevant executive nor anyone else in the chain of command for any privilege listed under article 28, section III, paragraph f) of the Mexican Securities Market Law.

II.   Related to Audit:

a)    ***We analyzed the status of the internal control system, and we were informed in detail of the programs and work done by Internal and Independent Audit, as well as the main aspects requiring improvement and follow-up on implemented preventive and corrective measures. Therefore, <u>it is our opinion that all effectiveness requirements are being met to ensure that the Company operates within a general environment of control</u>.***

b)    We evaluated the performance of the independent auditors, who are responsible for rendering an opinion on the reasonability of the Company's

financial statements and the compliance with the Mexican Financial Reporting Standards. We conclude that the partners of Mancera, S.C. (a member of Ernst & Young Global) meet the necessary professional skills, as well as independence in all intellectual and economic actions required, and therefore we recommend their appointment to examine and issue an opinion on the financial statements of Wal-Mart de México, S.A.B. de C.V. and Subsidiaries, as of December 31, 2009.

c)     We attended a number of meetings to review the Company's quarterly and annual financial statements and recommended to release the financial information.

d)     We followed up on the investment plan of the year; we were informed of ongoing legal proceedings to which the Company is a party thereof, and verified compliance with the corresponding standards and legal provisions. Results were satisfactory.

e)     We were informed of accounting policies approved in 2009, finding no changes that would affect figures in the financial statements.

f)     We followed up on the decisions reached at Shareholders' and Board Meetings.

Based on the work performed, and on the report of independent auditors, *it is our opinion that accounting and reporting policies and criteria followed by the Company are adequate and sufficient and have been applied consistently, as a result of which, the information presented by the CEO reasonably reflects the financial position and results of the Company*.

In light of the above, we recommend that the Board of Directors submit the financial statements for Wal-Mart de México, S.A.B. de C.V. and Subsidiaries for the year ended December 31, 2009 to the Company's Shareholders' Assembly for approval.

Sincerely,
Blanca Treviño
Chairwoman
Audit and Corporate Practices Committee

Ex. F at p. 46 attached hereto (Emphasis added).

211.   The above-reference statements made were false and misleading for the reasons discussed in paragraphs 202 and 203.

212.   In or around April 2011, Wal-Mart, as the 70% controlling shareholder of Wal-Mex, authorized Rank to file with the MSE Wal-Mex's 2010 Annual Report.  It was in Wal-Mex's 2010 Annual Report that Vega (Chairman of the Audit and Corporate Practices Committee) and Rank represented to the market:

> Audit and Corporate Practice Committee Report
>
> To the Board of Directors for Wal-Mart de México, S.A.B. de C.V.
>
> Dear Directors:
>
> In accordance to Article 43 of the Securities Market Law in effect, and the internal regulation approved by the Board of Directors, *we wish to inform you of the activities undertaken* during the year ended on December 31, 2010.
>
> In the performance of our duties, *we have maintained strict compliance not only with the Mexican Securities Market Law, but we have also considered the recommendations contained in the Company's Code for Corporate Best Practices and the Code of Ethics*.
>
> *With the purpose of complying with our supervisory process, during the last year the Audit Committee has held five meetings to analize [sic] the overview of the most relevant issues related to Accounting, Legal, Operations, and Ethics of the Company, complemented by our involvement in the Treasury, Real Estate, Ethics, and Walmart de México Foundation Committees, and in the Year-Beginning and Year-End Meetings, emphasizing the following*:
>
> I.     As to Corporate Practices:
>
> a)     We were informed on:
>
> 1.     The performance assessment processes for relevant executives and the authorization of

the replacement plan, with no observations noted.

2.      Processes followed during the year to conduct transactions with related parties, which are mentioned by the management in Note 11 of the Company's Financial Statements, with no observations noted.

3.      Processes to determine the comprehensive compensation packages for the CEO and other relevant executives listed under Note 11 of the Company's Financial Statements. There were no observations noted.

b)      The Board of Directors did not grant any waivers to board members, relevant executives nor anyone else in the chain of command for privilege whatsoever specified under Article 28, Section III, Paragraph f) of the Security Markets Law.

II.     As to Audit:

a)      ***We analyzed the status of the internal control system and were informed in detail of the Internal and Independent Audit programs and work development, as well as the main aspects requiring improvement, and follow-up on preventive and corrective measures deployed. Therefore, our opinion is that all effectiveness requirements <u>have been properly met for the Company to operate under a general control environment</u>***.

b)      We evaluated the performance of the independent auditors who are in charge of rendering an opinion on the reasonability of the Company's Financial Statements and their compliance with Mexican Financial Information Standards. We therefore consider that the partners at Mancera, S.C. (a member of Ernst & Young Global) meet the necessary requirements of professional qualification and independence for intellectual and financial action and thus, we recommend their appointment to examine and issue an opinion on the Financial Statements for Wal-Mart de México, S. A. B. de C.V. and Subsidiaries as of December 31, 2010.

      c)       We attended several meetings to review the quarterly and annual financial statements for the Company and recommended the release of such financial information.

      d)       We followed up on Walmart Mexico's operations and accounting integration with Central America.

      e)       We were informed on the approved accounting policies throughout 2010, finding no changes that would have any material effect on the figures reported in the Financial Statements.

      f)       We followed up on the agreements reached at Shareholders and Board meetings.

Based on the work performed and the report from the independent auditors, *it is our opinion that the accounting and reporting policies and criteria followed by the Company are adequate and sufficient and have been consistently applied and as a result, the information submitted by the CEO reasonably reflects the financial position and results of the Company*.

Therefore, we recommend that the Board of Directors submit the Financial Statements for Wal-Mart de México, S.A.B. de C.V. and Subsidiaries, for the year ended on December 31, 2010 to the Shareholders' Meeting for their approval.

Sincerely,
Ernesto Vega
Chairman of the Audit and Corporate Practices Committees

Ex. G at p. 53-54 attached hereto (Emphasis added).

213.   The above-reference statements made were false and misleading for the reasons discussed in paragraphs 202 and 203.

    **D.**    **Class Period False And Misleading Statements Regarding The Concrete Steps That Defendants Had Taken To Ensure The Integrity Of Its Internal Control**

214.   On December 8, 2011, Wal-Mart, the 70% controlling shareholder of Wal-Mex, filed its Form 10-Q with the SEC for the third quarter of fiscal year 2012, which ended October

31, 2012 ("Wal-Mart's 3Q 2012 Form 10-Q") (Wal-Mart's 2012 fiscal year ran from February

1, 2011 through January 31, 2012), which included the following statement:

> ***During fiscal 2012***, the Company began conducting a voluntary internal review of its policies, procedures and internal controls pertaining to its global anti-corruption compliance program. ***As a result of information obtained during that review and from other sources, the Company has begun an internal investigation*** into whether certain matters, including permitting, licensing and inspections, were in compliance with the U.S. Foreign Corrupt Practices Act. The Company ***has engaged*** outside counsel and other advisors to assist in the review of these matters and ***has implemented, and is continuing to implement, appropriate remedial measures***. The Company ***has voluntarily disclosed its internal investigation to the U.S. Department of Justice and the Securities and Exchange Commission***. We cannot reasonably estimate the potential liability, if any, related to these matters.
>
> However, based on the facts currently known, we do not believe that these matters will have a material adverse effect on our business, financial condition, results of operations or cash flows. [Emphasis added].

215.   The message Wal-Mart (Wal-Mex's 70% controlling shareholder) delivered was

clear:

(a)   ***sometime after February 1, 2011***, Wal-Mart obtained information related

to "whether certain matters, including permitting, licensing and inspections, were in

compliance with the U.S. Foreign Corrupt Practices Act";

(b)   Wal-Mart was so proactive in protecting against foreign corruption, it had

uncovered the suspected corruption itself through Wal-Mart's own "voluntary internal

review of its policies, procedures and internal controls pertaining to its global

anticorruption compliance program";

(c)   Wal-Mart was so virtuous, and so true to its assurances, that upon learning

of the suspected corruption it promptly and proactively (i) engaged outside counsel to

conduct an internal investigation; and (ii) implemented appropriate remedial measures; and

      (d)    Wal-Mart was so virtuous, and so true to its assurances, that upon learning of the suspected corruption it promptly and proactively disclosed its internal investigation to the Department of Justice ("DOJ") and to the SEC.

216.    However, despite representing in its 3Q 2012 Form 10-Q that Wal-Mart had uncovered the suspected corruption "[d]uring fiscal 2012," Wal-Mart had actually learned of the suspected corruption during calendar year 2005, as demonstrated by the following email that Duke (President and CEO of Wal-Mart) received over six years before he signed the Wal-Mart 3Q 2012 Form 10-Q:

> -----Original Message-----
> From:  Thomas Mars
> Sent:  Sat Oct 15 17:58:07 2005
> To:    Mike Duke
> Cc:    Tom Hyde - Executive
> Subject:    IMPORTANT: WALMEX Memo
>
> Mike:
>
> The attached memorandum summarizes an interview conducted earlier this month with a former WALMEX in-house lawyer. The lawyer was terminated in September 2004 after 28 years with the company. The lawyer asserts in some detail alleged corruption by various WALMEX associates, including senior people.
>
> You'll want to read this. I'm available to discuss next steps.
>
> PS: Welcome to Wal-Mart International.

*See* Ex. W attached hereto.

217.    As is apparent, far from shock at such allegations from a former in-house lawyer, Wal-Mart's then-General Counsel, Mars, concluded his email jokingly with the message, "Welcome to Wal-Mart International." *See* Ex. W attached hereto and above. The memorandum Duke received along with this email provided pages of details concerning the

suspected corruption at Wal-Mex, one part of Wal-Mart International, which in turn is one part of Wal-Mart. Duke received a similar email two weeks later in late October 2005, which included details of corruption related to Wal-Mex's building of a store at Teotihuacán in México City, México.

218. From 2006 to 2008, Duke was also the Chairman of the Wal-Mex Executive Committee, and a member of the Wal-Mex Board at the same time he was Vice Chairman of Wal-Mart International – a segment of Wal-Mart. Moreover, in 2005, Duke was the Vice President, President and CEO of the Wal-Mart Stores Division. Duke had direct knowledge of the bribery/corruption at Wal-Mex (and the cover up) when he signed Wal-Mart's false and misleading Form 10-Q on December 8, 2011. *See* ¶ 214; Ex. J; *see also* the attachments to the January 10, 2013 letter from the United States Congress to Duke (Ex. HH) ("E-mail from Thomas Mars, General Counsel, Wal-Mart Stores, Inc., to Mike Duke, Vice Chairman of Wal-Mart International and Tom Hyde, Executive Vice President and Corporate Secretary, Wal-Mart Stores, Inc. (Oct. 15, 2005) ('To secure the approval from the Municipal Council and with the active reporting at that time to Jose Luis Rodriguez, Mex \$1,250,000.00 were delivered to 7 of the 11 Municipal County Members'"; "The National Institute of Anthropology and History (INAH) asked for an official donation of Mex \$400,000.00 but the INAH's President received an irregular payment of Mex \$150,000.00 to give approval for the corresponding construction site given its proximity to the archaeological site.").

219. From 2002 to February 2005, Castro-Wright was the President and CEO of Wal-Mex. From 2005 through July 2012, Castro-Wright was the Vice Chairman of Wal-Mart. Castro-Wright had direct knowledge of the bribery/corruption at Wal-Mex as he was implicated in it, he reported to Duke, and was the Vice Chairman of Wal-Mart when the false and

misleading Form 10-Q was released.  *See* Ex. J ("SC confirmed that the operation with irregular payments and handling through outside law firms for payments was directly known by Cesareo Fernandez, Eduardo Castro and Eduardo Juarez"; "SC did state having met with Javier del Rio and Eduardo Castro together, when some of the transactions were being discussed"); Ex. L ("These amounts were delivered pursuant to the instructions of Javier del Rio with the knowledge of the President (depending on the time, either Cesareo Fernandez or Eduardo Castro)"; "Javier del Rio authorized these actions with the approval of the Presidency, Eduardo Castro as the Comptroller was also aware of these issues.").

220.   Despite representing in its 3Q 2012 Form 10-Q that Wal-Mart had uncovered the suspected corruption at Wal-Mex through Wal-Mart's own proactive "voluntary internal review of its policies, procedures and internal controls pertaining to its global anti-corruption compliance program," Wal-Mart did not uncover the suspected corruption at Wal-Mex.  Just the opposite.  Wal-Mart, along with Wal-Mex, covered up the suspected corruption at Wal-Mex after a former in-house lawyer had brought it to Wal-Mart's attention over six years earlier.  Upon information and belief, the only information Wal-Mart and Wal-Mex actually uncovered "[d]uring fiscal 2012" was that *The New York Times* had learned of, and was actively investigating, the suspected corruption at Wal-Mex.  Rather than come clean, however, Wal-Mart and Wal-Mex concealed their awareness of *The New York Times*' investigation.  In addition, Wal-Mart used its 3Q 2012 Form 10-Q to rewrite history and mislead the public by painting a picture that bore no resemblance to the reality that *The New York Times* would reveal less than five (5) months later with its first article on this topic published on April 21, 2012.  Despite representing in its 3Q 2012 Form 10-Q that upon learning of the suspected corruption, Wal-Mart engaged outside counsel to conduct an internal investigation, in truth, after Wal-Mart

had learned of the suspected corruption at Wal-Mex, one of the ways Wal-Mart covered it up was to reject a proposed independent "Internal Investigation Work Plan" from outside counsel. Another way Wal-Mart covered up the suspected corruption at Wal-Mex was to assign the "investigation" to the very office implicated in executing and/or concealing the corruption scheme: Wal-Mex's General Counsel's Office.  That decision defied the advice of Wal-Mart International's Vice President and General Counsel, Munich, who left Wal-Mart International shortly after expressing her strong disagreement:

---

 -----Original Message-----
From:   Maritza Munich-Legal
Sent:   Wed Jan 18 16:04:31 2006
To:     Bob Ainley - AUDIT; Michael Fung; Ronald Halter; Tom Mars - Legal; Martin J. Weinstein (mweinstein@willkie.com)
Subject:        WALMEX: Examination of Real Estate Transactions

Further to the message below, and my communications of 1-16-06 and 1-17-06 to Bob, Michael and Ron (forwarding email communications with Sergio Cicero prior to 7 October 2005 and emails from April 2005 related to the IAS report of WALMEX donations), following are additional comments to Ron Halter's draft report of December 15, 2005:

                                   ***

     - The wisdom of assigning any investigative role to management of the business unit being investigated escapes me.  Given the serious nature of the allegations, and the need to preserve the integrity of the investigation, it would seem more prudent to develop a follow-up plan of action, independent of WALMEX management participation, and that includes external legal advise and professional, independent investigative resources.
*       Last paragraph
     - It is important to keep in mind that in his email to me of December 5, 2005, Sergio Cicero offers to provide information about "other cases that were managed at that time under the same formula." Accordingly, and as originally envisioned, the needed follow-up investigation should extend beyond the specific transactions contained in this draft report to other potentially suspect transactions not yet identified.


~Maritza
======================
MARITZA I. MUNICH
VP & General Counsel - International
WAL* MART STORES, INC.
(479) 277-2346

---

*See* Ex. K attached hereto.

221.    Despite representing in its 3Q 2012 Form 10-Q that upon learning of the suspected corruption, Wal-Mart implemented appropriate remedial measures, whatever remedial measures it may have implemented in 2011 were obviously not implemented in 2005, which is when Wal-Mart learned of the suspected corruption at Wal-Mex.

222.    Despite representing in its 3Q 2012 Form 10-Q that upon learning of the suspected corruption, Wal-Mart disclosed its internal investigation to the DOJ and to the SEC, Wal-Mart did nothing of the sort when it actually learned of the suspected corruption at Wal-Mex in 2005.  Instead, Wal-Mart "closed" the matter in 2006, without engaging outside counsel to conduct an internal investigation, without implementing whatever remedial measures were implemented in 2011, and without referring the matter to the DOJ, the SEC, or any other law enforcement agency or third-party entity.   In fact, the closest Wal-Mart came to a law enforcement referral was the involvement of its own Director of Corporate Investigations, who was a former FBI Agent, who reviewed the implicated Wal-Mex General Counsel's Office inquiry and report, and found it to be "truly lacking":

| From: | Joe Lewis |
| To: | Ken Senser |
| Cc: | Joe Lewis |
| Subject: | RE: Gestores |
| Date: | Wednesday, May 10, 2006 11:34:16 AM |
| Attachments: | RE GestoresReport (Draft)English version.msg |

Ken,
At the risk of being cynical, that report is exactly the same as the previous which I indicated was truly lacking ( see attached). The added paragraph at the end does not change my assessment.

Joseph R. Lewis
Director of Corporate Investigations
Wal-Mart Stores, Inc.
1300 Southeast 8th Street
Bentonville, AR.  72716
(w) 479-204-3077

*See* Ex. U attached hereto.

223.    Wal-Mart's 3Q 2012 Form 10-Q statement deceived the public, including both holders of Wal-Mart common stock and holders of Wal-Mex's ADRs, by omitting the fact that Wal-Mart and Wal-Mex knew of the suspected corruption in 2005 and that Wal-Mart conducted an internal investigation of Wal-Mex in 2005-2006.  Wal-Mart's statement was misleading because it left the public with the impression that it first learned of the suspected corruption in fiscal year 2012, promptly began an investigation, and then referred the matter to the DOJ and SEC.

224.    In response to the December 8, 2011 misleading statement by Wal-Mart, Wal-Mex, at the behest of its 70% controlling shareholder, remained silent and did nothing to correct the misleading statement by its controlling shareholder Wal-Mart and the misleading impression it created.[18]

225.    Upon release of Wal-Mart's Form 10-Q on December 8, 2011, Wal-Mart's shares increased slightly by $0.34 (an increase of 0.005%) and Wal-Mex's stock *increased $1.33* (an increase of 0.049%, approximately one hundred (100) times the percentage increase in Wal-Mart's common stock price):

|  | **12/8/11 (Close of Market)** | **12/9/11 (Close of Market)** |
|---|---|---|
| Wal-Mart Stock | $57.98 (10,350,00 shares traded) | $58.32 (10,058,900 shares traded) |
| Wal-Mex ADRs | $27.26 (87,900 shares traded) | $28.59 (112,300 shares traded) |

226.    Wal-Mart and Wal-Mex engaged in a scheme to defraud the market with respect to Wal-Mart common stock and Wal-Mex ADRs.  Scheme liability claims pursuant to Rule 10b-5(a) and (c) make deceptive conduct actionable.

---

[18]     At the time of this statement, in 2011, the Wal-Mex Board was comprised of: eleven (11) members, in which *five (5) of those members were also current high ranking officers of Wal-Mart*: Shelley Broader, Olga Gonzalez, Doug McMillon, Kristin Oliver, and Cathy R. Smith. *See* Wal-Mex 2011 Annual Report at p. 48 at Ex. H attached hereto.

227.   The very next day, on December 9, 2011, Wal-Mex issued a prelease entitled "Wal-Mart de México Y CentroAmérica is Part of the IPC Sustainable MSE Index."  Rank stated in relevant part:

> "We are very proud to be part of this new and important index. **Walmart de México y Centroamérica is committed to act with integrity and in full compliance of the law**.

*See* Ex. X attached hereto.  Rank and Wal-Mex continued to engage in a scheme with Wal-Mart to cover-up the corruption/bribery at Wal-Mex through this above statement.

228.   However, in this December 9, 2011 press release, Wal-Mex failed to inform its shareholders (through its silence) that it and many of the high ranking officers at Wal-Mex were (a) implicated in the suspected corruption in 2005; (b) knew of the suspected corruption in 2005; and (c) Wal-Mart had conducted an internal investigation in 2005-2006 into the suspected corruption at Wal-Mex.  Further, Defendants relentless push to open new stores and increase sales growth continued until the corruption was exposed.

229.   On January 9, 2012, Wal-Mex issued a press release entitled *Walmart de México y CentroAmérica Reached Record Sales in 2011*.  In this Wal-Mex press release, Rank stated in relevant part:

> "I am very pleased with the 13.3% sales increase achieved in 2011; which favorably compares with the 9.3% pro-forma increase in 2010.  The sales growth rate sped up at the end of the year, reaching a 15.6% increase for the fourth quarter.
>
> **Sales floor area increased 12.8%, as a result of investing in the opening of 441 stores, which added 7,023,272 sq. ft.** Our investment is also an opportunity for thousands of local suppliers; thanks to their support we were able to bring our value proposition to 467 cities in Mexico and Central America. I am also grateful with the 238,128 associates that collaborate in Walmart de México y Centroamérica for their commitment and effort to serve the 5 million customers who visit our 2,709 stores every day."

\*       \*       \*

Sales for the Fourth Quarter 2011 (October-December) were $115,463 million pesos. This figure represents a 15.6% increase over sales reported the same period last year.

\*       \*       \*

**Mexico Sales**

Throughout 2011, total sales for Mexico amounted to $329,690 million pesos. ***This figure represents an 11.5% increase over sales reported in 2010 and a comp stores growth of 3.8%.***

\*       \*       \*

During the month of **December**, we opened 69 units:

**Mexico**: 56 units.

- **13 Bodegas Aurrerá**, four in Monterrey, Nuevo León; two in Tijuana, Baja California; one in Chihuahua, Chihuahua; one in Mexico City; one in Guadalajara, Jalisco; one in Manzanillo, Colima; one in Pachuca, Hidalgo; one in Saltillo, Coahuila; and one in Toluca, Estado de México.
- **37 Bodegas Aurrerá Express**, five in Monterrey, Nuevo León; four in Guadalajara, Jalisco; four in Morelia, Michoacán; three in Aguascalientes, Aguascalientes; three in Mexico City; three in León, Guanajuato; three in Querétaro, Querétaro; three in Saltillo, Coahuila; two in Cuernavaca, Morelos; two in San Luis Potosí, San Luis Potosí; two in Veracruz, Veracruz; one in Acapulco, Guerrero; one in Pachuca, Hidalgo; and one in Puebla, Puebla.
- **One Walmart**, in Villahermosa, Tabasco.
- **Four Superamas**, one in Acapulco, Guerrero; one in Cancún, Quintana Roo; one in Guadalajara; Jalisco; and one in Monterrey, Nuevo León.
- **One Suburbia**, in Guadalajara, Jalisco.

\*       \*       \*

**2011 Openings**

***During 2011 we opened 441 units, which represented an increase of 12.8% in total sales floor: of 13.2% for Mexico and of 9.8% for Central America.***

*See* Ex. Y attached hereto (bold/italics added).

230.    The above statement was false and misleading as Defendants measured Wal-Mex's success in sales growth and linked that success to its opening of new stores.  If the success of Wal-Mex's sales growth was made possible by the opening of new stores as a result of bribery, then a reasonable fact finder could conclude that attributing Defendants' success to sales growth made possible by the opening of new stores without disclosing the bribery scheme that made the rapid opening of new stores possible was misleading.  Moreover, because Defendants put the topic of the cause of its financial success at issue, then Defendants were obligated to disclose information concerning the source of Wal-Mex's success, since reasonable investors would find that such information would significantly alter the mix of available information.  Moreover, the statements by Rank and Wal-Mex put the source of its success in sales growth to the opening of new stores at issue, and such, the alleged failure to disclose the true source of this success in sales growth (*i.e.*, the bribery) was false and misleading.

231.    Further, as indicated in the chart below, after the bribery was disclosed to the market, the growth in Wal-Mex's sales dropped precipitously in 2012:

| Year | % of Sales in Mexico | % Comp Store Sales in Mexico |
|------|---------------------|------------------------------|
| 2005 | 13.7% Increase | 5.8% Increase |
| 2006 | 15.9% Increase | 5.9% Increase |
| 2007 | 9% Increase | 1.8% Increase |
| 2008 | 11.1% Increase | 4.6% Increase |
| 2009 | 10.4% Increase | 3.4% Increase |
| 2010 | 9.7% Increase | 3.2% Increase |
| 2011 | 11.5% Increase | 3.8% Increase |
| 2012 | 9.9% Increase | 3.8% Increase |
| **2013** | **3.3% Increase** | **1.3% Decrease** |
| **2014** | **3.4% Increase** | **0.2% Decrease** |

232.    The high percentage "of sales" and "comp store sales" at Wal-Mex from 2005 through 2012 were the result of new store openings occasioned by bribes and corruption, as

discussed above.   Defendants knew this to be true at the time they issued the statements regarding the percentage "of sales" and "comp store sales" during the Class Period.   These statements about the high percentage "of sales" and "comp store sales" at Wal-Mex from 2005 through 2012 were false and misleading because they were based on bribery and corruption and were unsustainable.   When the corruption at Wal-Mex was revealed to the market in April 2012, the growth in "of sales" and "comp store sales" in México dropped significantly (*see* ¶ 231).

233.   On February 8, 2012, Wal-Mex issued a press release entitled *WalMart de México y CentroAmérica Reports January 2012 Sales*.   The press release stated in relevant part:

> **Wal-Mart de México, S.A.B. de C.V. (WALMEX)** announces to its shareholders as well as to the public in general that during the month of January 2012, sales amounted to **$34,802 million pesos**. This figure represents a **13.1%** increase over sales reported the same month last year.
>
> Mexico Sales
>
> Total sales for Mexico increased **12.4%** over sales reported for the same month last year.   Comp store sales during the month, meaning all those units in operation for over a year, posted a 4.7% increase compared to the same month of 2011.
>
> Considering the **four-week period** from **December 31st, 2011 to January 27th, 2012**, as compared to the four-week period ending January 28th, 2011, total sales increased **16.3%** and comp store sales increased 8.3%.

**Mexico Sales Growth 2012**

| | Calendar | | | | Retail Calendar (Saturday-Friday) | |
|---|---|---|---|---|---|---|
| | Total Stores % | Comp Stores % | | Number of weeks | Total Stores % | Comp Stores % |
| January | 12.4 | 4.7 | | 4 | 16.3 | 8.3 |

**Openings**

During the month of **January**, we opened 11 units in **Mexico**:

- **Four Mi Bodegas Aurrerá**, one in Ciudad Armería, Colima; one in Córdoba, Veracruz; one in Pijijiapan, Chiapas; and one in Tangancicuaro, Michoacán.
- **Four Bodegas Aurrerá Express**, one in Aguascalientes, Aguascalientes; one in Cuernavaca, Morelos; one in León, Guanajuato; and one in Querétaro, Querétaro.
- **Two Sam´s Club**, one in Hidalgo del Parral, Chihuahua; and one in Tuxtla Gutiérrez, Chiapas.
- **One Vips**, in Guadalajara, Jalisco.

Additionally, during February, we have opened 2 units in Mexico:

- **Two Bodegas Aurrerá Express**, one in Quéretaro, Querétaro; and one in San Luis Potosí, San Luis Potosí.

*See* Ex. Z attached hereto.

234.    The above statements in paragraph 233 were false and misleading for the reasons discussed in paragraph 230 and 232 above.

235.    On February 20, 2012, Vega issued the following statement to the market regarding the elaborate internal controls operation as reflecting concrete steps that Defendants had taken in this area:

**Audit and Corporate Practice Committee Report**

To the Board of Directors for Wal-Mart de México, S.A.B. de C.V.

Dear Sirs,

In accordance to Article 43 of the Securities Market Law in effect and the internal regulations approved by the Board of Directors, we wish to inform you of the activities undertaken during the year ended on December 31, 2011.

***In the performance of our duties, we have maintained strict compliance not only with the Mexican Securities Market Law, but we have also considered the recommendations contained in the Company's Code for Corporate Best Practices and Code of Ethics.***

***With the purpose of complying with our supervisory process, the Audit and Corporate Practices Committees held four meetings***

*during the last year to examine a general overview of the most relevant issues in terms of company's Accounting, Legal, Operations and Ethics, supplemented by our involvement in the quarterly results analysis meetings and the Treasury, Real Estate and Ethics Committees, with emphasis on the following*:

I.      **As to Corporate Practices**:

    a)    We were informed of:

        1.    Performance assessment processes for relevant executives and the authorized replacement plan, with no observations noted.

        2.    Processes followed during the year to conduct transactions with related parties and relevant transfer price study, concepts which are mentioned by management in Note 11 of the Company's Financial Statements, with no observations noted.

        3.    Processes to determine comprehensive compensation packages for the CEO and other relevant executives listed under Note 11 of the Company's Financial Statements, no observations were noted.

    b)    The Board of Directors did not grant any waivers to board members, relevant executives or any other person with any of the authorities specified under Article 28, Section III, Paragraph f) of the Security Markets Law.

II.     **As to Audit**:

    a)    *We analyzed the status of the internal control system and were informed in detail of the Internal and Independent Audit programs and work development, as well as the main aspects requiring improvement and follow-up on implemented preventive and corrective measures. Therefore, our opinion is that all effectiveness requirements have been properly met for the Company to operate under a general control environment*.

b)      We evaluated the performance of the independent auditors who are responsible for rendering an opinion on the reasonability of the Company's Financial Statements and their compliance with Mexican Financial Information Standards. We, therefore, consider that the partners at Mancera, S.C. (a member of Ernst & Young Global) meet the necessary requirements of professional qualification and independence for intellectual and financial action and thus, we recommend their appointment to examine and issue an opinion on the Financial Statements for Wal-Mart de México, S. A. B. de C.V. and Subsidiaries as of December 31, 2011. No additional or supplementary services for this concept were provided during 2011.

c)      *We attended several meetings to review the company's quarterly and annual financial statements and recommended the release of such financial information*.

d)      We were informed of the approved accounting policies during year 2011 with no changes found which would have any material effect on the Financial Statements figures.

e)      Concerning item g) of the above mentioned article, we were informed of the International Financial Information Standards adoption process in effect starting January 1, 2012 with no observations noted.

f)      We followed up on the agreements reached at Shareholders' and Board meetings.

*Based on work performed and a report from the independent auditors, it is our opinion that the accounting and reporting policies, and criteria followed by the Company are adequate and sufficient and have been consistently applied. As a result, the information submitted by the CEO reasonably reflects the Company's financial position and results.*

Therefore, we recommend that the Board of Directors submit for approval the Financial Statements of Wal-Mart de México, S.A.B. de C.V. and Subsidiaries for the year ended on December 31, 2011 before the Shareholders' Meeting.

105

Sincerely,
Ernesto Vega, P.A.
Chairman of the Audit and Corporate Practices Committees
Mexico City, February 20, 2012

*See* Ex. AA attached hereto (Emphasis added).

236. The above-reference statements made by Vega go beyond generalized expressions of commitment to high corporate standards, and address concrete steps that Defendants had taken to ensure the integrity of its financial reporting. A reasonable investor would interpret Wal-Mex's statements about its allegedly elaborate internal controls operation as reflecting concrete steps that Defendants had taken in this area, and would rely upon these statements as a guarantee that such steps had, in fact, been implemented.

237. However, when the above statements were made, Defendants knew or were reckless in not knowing that they were false because Defendants knew or were reckless in not knowing about the bribery scheme in 2005; knew or were reckless in not knowing that they were not in compliance with the FCPA; rejected calls for a legitimate investigation regarding these FCPA violations; and failed to report these criminal acts to the DOJ, SEC and their Méxican counterparts, but nevertheless continued to reassure their shareholders of the concrete steps that they took to ensure the integrity of financial reporting, "internal controls" and "full compliance with the law." Further, Defendants' relentless push to open new stores and increase sales growth continued and only stopped when the corruption/bribery was exposed in April 2012.

238. On February 20, 2012, Wal-Mex issued a press release entitled *WalMart de México y CentroAmérica Reports Results for the Fourth Quarter 2011*. The press release stated in relevant part:

106

**Today Wal-Mart de México, S.A.B. de C.V. (WALMEX)**
reported financial results for the year 2011. Net sales increased
**13.3%**. Net Income for the year amounted to **$22,254 million
pesos** and represented 5.8% of total revenues, a growth of **13.8%**
over last year's levels.

With regards to the results achieved by the Company, Scot Rank,
Executive President and Chief Executive Officer for Walmart de
México y Centroamérica said:

"I am proud to once again report that we achieved solid results in
2011, both in the fields of Finance and Social Responsibility.

In Mexico we maintained the profitable growth for which Walmart
is known; in Central America we made strong investments aimed
at setting the foundations for our future growth. Consolidated sales
totaled $379.0 billion pesos, 13.3% more than last year and
EBITDA amounted to $37.4 billion pesos, some 12.4% than the
previous year.

*    *    *

Main figures are:

| Results<br>January – December | 2011 | | 2010* | | Growth |
|---|---|---|---|---|---|
| | Millon $ | % | Millon $ | % | % |
| Net Sales | 379,021 | | 334,511 | | 13 |
| Other Income | 1,885 | | 1,346 | | 40 |
| Total Revenues | 380,906 | 100.0 | 335,857 | 100.0 | **13** |
| Cost of Sales | 297,208 | 78.0 | 261,798 | 77.9 | 14 |
| Gross Profit | 83,698 | 22.0 | 74,059 | 22.1 | 13 |
| General Expenses | 53,619 | 14.1 | 47,015 | 14.0 | 14 |
| Operating Income | 30,079 | 7.9 | 27,044 | 8.1 | **11** |
| Comprehensive Financing Result | 191 | 0.0 | 460 | 0.1 | (58) |
| Income Before Taxes on Profits | 30,198 | 7.9 | 27,630 | 8.2 | 9 |
| Net Income (Controlling Interest) | 22,254 | 5.8 | 19,550 | 5.8 | **14** |
| EBITDA | 37,415 | 9.8 | 33,294 | 9.9 | **12** |

*Central American operation is included since March 2010.

**2011 Openings**
During **2011**, we opened **441** units.

**Mexico**: 365 units.
310 Bodegas Aurrerá

       42  Bodegas
       60  Mi Bodegas
       208  Bodegas Express
   21 Walmarts
   16 Sam's Clubs
   13 Superamas
   4  Suburbia
   1  Restaurant

*See* Ex. BB attached hereto.

239.    The above statements in paragraph 238 were false and misleading for the reasons

discussed in paragraph 230 and 232 above.

240.    On March 7, 2012, Wal-Mex issued a press release entitled *Wal-Mart de México y*

*CentroAmérica Reports February 2012 Sales*.  The press release stated in relevant part:

> **Wal-Mart de México, S.A.B. de C.V. (WALMEX)** announces to
> its shareholders as well as to the public in general that during the
> month of February **2012**, sales amounted to **$29,940 million pesos**.
> This figure represents a **14.6%** increase over sales reported the
> same month last year.

|  | Total Sales | | | | | |
|  | February | | | January – February | | |
|  | 2012 Million MXP | 2011 Million MXP | % Gr. | 2012 Million MXP | 2011 Million MXP | % Gr. |
|---|---|---|---|---|---|---|
| **Mexico** | 25,791 | 22,531 | 14.5 | 55,941 | 49,343 | 13.4 |
| **Central America*** | 4,149 | 3,587 | 15.6 | 8,801 | 7,534 | 16.8 |
| **Consolidated** | 29,940 | 26,118 | 14.6 | 64,742 | 56,877 | 13.8 |

*Central America sales growth figures are impacted by variations in exchange rates

> **Mexico Sales**
>
> Total sales for Mexico increased **14.5%** over sales reported for the
> same month last year. Comp store sales during the month, meaning
> all those units in operation for over a year, posted a **6.2%** increase
> compared to the same month of 2011.
>
> Considering the **four-week period** from **January 28th** to
> **February 24th, 2012**, as compared to the four-week period ending
> February 25th, 2011, total sales increased **11.4%** and comp store
> sales increased **3.4%.**

**Mexico Sales Growth 2012**

| | Calendar | | | Retail Calendar (Saturday-Friday) | | |
|---|---|---|---|---|---|---|
| | Total Stores % | Comp Stores % | Number of weeks | Total Stores % | Comp Stores % |
| January | 12.4 | 4.7 | 4 | 16.3 | 8.3 |
| February | 14.5 | 6.2 | 4 | 11.4 | 3.4 |
| | | | | | |
| January - February | 13.4 | 5.4 | 8 | 13.9 | 5.9 |

**Openings**

During the month of **February**, we opened 8 units

Mexico: 7 units.

- **Six Bodegas Aurrerá Express**, two in San Luis Potosí, San Luis Potosí; one in Mexico City; one in Monterrey, Nuevo Léon; one in Querétaro, Querétaro and one in Toluca; Estado de México.
- **One Sam's Club**, in Monclova, Coahuila

\*     \*     \*

Additionally, during **March**, we have opened 3 units in **Mexico**:

- **Two Bodegas Aurrerá Express**, in Coatzacoalcos, Veracruz.
- **One Walmart**, in Morelia, Michoacán.

*See* Ex. CC attached hereto (emphasis in original).

241.    The above statements in paragraph 240 were false and misleading for the reasons discussed in paragraph 230 and 232 above.

242.    On April 10, 2012, Wal-Mex issued a press release to the investing public entitled *Wal-Mart de México y CentroAmérica Reports March 2012 Sales*.  The press release stated in relevant part:

> **Wal-Mart de México, S.A.B. de C.V. (WALMEX)** announces to its shareholders as well as to the public in general that during the month of March 2012, sales amounted to **$31,828 million pesos**. This figure represents a **14.0%** increase over sales reported the same month last year. Beginning on January 1st, 2012 the

International Financial Reporting Standards (IFRS) were adopted by the Company.

\*     \*     \*

**Mexico Sales**

Total sales for Mexico increased **13.7%** over sales reported for the same month last year. Comp store sales during the month, meaning all those units in operation for over a year, posted a **5.6%** increase compared to the same month of 2011.

Considering the five-week period from **February 25th** to **March 30th 2012**, as compared to the five-week period ending April 1st, 2011, total sales increased **10.6%** and comp store sales increased **2.7%.**

### Mexico Sales Growth 2012

| | Calendar | | | Retail Calendar (Saturday-Friday) | | |
|---|---|---|---|---|---|---|
| | Total Stores % | Comp Stores % | Number of weeks | Total Stores % | Comp Stores % |
| January | 12.6 | 4.8 | 4 | 16.4 | 8.4 |
| February | 14.6 | 6.4 | 4 | 11.5 | 3.5 |
| March | 13.7 | 5.6 | 5 | 10.6 | 2.7 |
| | | | | | |
| January - March | 13.6 | 5.6 | 13 | 12.7 | 4.8 |

\*     \*     \*

**Openings**

During the month of **March**, we opened 27 units in **Mexico**:

- **One Bodega Aurrerá** in Mexico City.
- **Three Mi Bodegas Aurrerá**, one in Bochil, Chiapas; one in Temascalcingo, Estado de México and one in Tequixquiac, Estado de México.
- **Bodegas Aurrerá Express**, three in Aguascalientes, Aguascalientes; three in Ahome, Sinaloa; three in Coatzacoalcos, Veracruz; two in Guadalajara, Jalisco; two in Mazatlán, Sinaloa; two in San Luis Potosí, San Luis Potosí; one in Mexico City; one in Culiacán, Sinaloa; one in Monterrey, Nuevo León; one in Puebla, Puebla; one in Saltillo, Coahuila; one in Tepic, Nayarit; and one in Veracruz, Veracruz.
- **One Walmart** in Morelia, Michoacán.

110

Additionally, during April, we have opened 3 units in Mexico:

- **Three Bodegas Aurrerá Express**, two in Tehuacán, Puebla; and one in Puebla, Puebla.

*See* Ex. DD attached hereto (emphasis in original).

243.    The above statements in paragraph 242 were false and misleading for the reasons discussed in paragraph 230 and 232 above.

244.    On April 18, 2012, Wal-Mart, as the 70% controlling shareholder of Wal-Mex, authorized Rank and Vega to file with the MSE Wal-Mex's 2011 Annual Report.  It was in Wal-Mex's 2011 Annual Report that Rank and Vega represented to the market:

**Audit and Corporate Practice Committee Report**

To the Board of Directors for Wal-Mart de México, S.A.B. de C.V.

Dear Sirs,

In accordance to Article 43 of the Securities Market Law in effect and the internal regulations approved by the Board of Directors, we wish to inform you of the activities undertaken during the year ended on December 31, 2011.

*In the performance of our duties, we have maintained strict compliance not only with the Mexican Securities Market Law, but we have also considered the recommendations contained in the Company's Code for Corporate Best Practices and Code of Ethics.*

*With the purpose of complying with our supervisory process, the Audit and Corporate Practices Committees held four meetings during the last year to examine a general overview of the most relevant issues in terms of company's Accounting, Legal, Operations and Ethics, supplemented by our involvement in the quarterly results analysis meetings and the Treasury, Real Estate and Ethics Committees, with emphasis on the following*:

I.       **As to Corporate Practices**:

        a)      We were informed of:

1.    Performance assessment processes for relevant executives and the authorized replacement plan, with no observations noted.

2.    Processes followed during the year to conduct transactions with related parties and relevant transfer price study, concepts which are mentioned by management in Note 11 of the Company's Financial Statements, with no observations noted.

3.    Processes to determine comprehensive compensation packages for the CEO and other relevant executives listed under Note 11 of the Company's Financial Statements, no observations were noted.

b)    The Board of Directors did not grant any waivers to board members, relevant executives or any other person with any of the authorities specified under Article 28, Section III, Paragraph f) of the Security Markets Law.

**II.    As to Audit**:

a)    *We analyzed the status of the internal control system and were informed in detail of the Internal and Independent Audit programs and work development, as well as the main aspects requiring improvement and follow-up on implemented preventive and corrective measures. Therefore, our opinion is that all effectiveness requirements have been properly met for the Company to operate under a general control environment*.

b)    We evaluated the performance of the independent auditors who are responsible for rendering an opinion on the reasonability of the Company's Financial Statements and their compliance with Mexican Financial Information Standards. We, therefore, consider that the partners at Mancera, S.C. (a member of Ernst & Young Global) meet the necessary requirements of professional qualification and independence for intellectual and financial

action and thus, we recommend their appointment to examine and issue an opinion on the Financial Statements for Wal-Mart de México, S. A. B. de C.V. and Subsidiaries as of December 31, 2011. No additional or supplementary services for this concept were provided during 2011.

c) *We attended several meetings to review the company's quarterly and annual financial statements and recommended the release of such financial information*.

d) We were informed of the approved accounting policies during year 2011 with no changes found which would have any material effect on the Financial Statements figures.

e) Concerning item g) of the above mentioned article, we were informed of the International Financial Information Standards adoption process in effect starting January 1, 2012 with no observations noted.

f) We followed up on the agreements reached at Shareholders' and Board meetings.

*Based on work performed and a report from the independent auditors, it is our opinion that the accounting and reporting policies, and criteria followed by the Company are adequate and sufficient and have been consistently applied. As a result, the information submitted by the CEO reasonably reflects the Company's financial position and results*.

Therefore, we recommend that the Board of Directors submit for approval the Financial Statements of Wal-Mart de México, S.A.B. de C.V. and Subsidiaries for the year ended on December 31, 2011 before the Shareholders' Meeting.

Sincerely,
Ernesto Vega, P.A.
Chairman of the Audit and Corporate Practices Committees
Mexico City, February 20, 2012

*See* Ex. H at p. 68-69 attached hereto (Emphasis added).

245.     The above-referenced statements made by Vega and authorized by Rank to be filed with the MSE go beyond generalized expressions of commitment to high corporate standards, and address concrete steps that Wal-Mex had taken to ensure the integrity of its financial reporting.   A reasonable investor would interpret Wal-Mex's statements about its allegedly elaborate internal controls operation as reflecting concrete steps that Wal-Mex had taken in this area, and would rely upon these statements as a guarantee that such steps had, in fact, been implemented.

246.     However, when the above statements were made, Defendants knew or were reckless in not knowing that they were false because Defendants knew or were reckless in not knowing about the bribery scheme in 2005;  knew or were reckless in not knowing that they were not in compliance with the FCPA; rejected calls for a legitimate investigation regarding these FCPA violations; and failed to report these criminal acts to the DOJ, SEC and their Méxican counterparts, but nevertheless continued to reassure their shareholders of the concrete steps that they took to ensure the integrity of financial reporting, "internal controls" and "full compliance with the law."  Further, Defendants' relentless push to open new stores and increase sales growth continued and only stopped when the corruption/bribery was exposed in April 2012.

247.     A reasonable investor would interpret Vega's statements about its allegedly elaborate internal controls operation as reflecting concrete steps that Defendants had taken in this area, and would rely upon these statements as a guarantee that such steps had, in fact, been implemented.

248.     On April 21, 2013 (Saturday), *The New York Times* released an article by David Barstow entitled "Wal-Mart Hushed Up A Vest Mexican Bribery Case."

249.    On the first two days of trading after publication of *The New York Times* article, Wal-Mex ADRs were pummeled, falling $5.24 -- from a close of $43.06 on Friday, April 20, 2012, to a close of $37.82 on Monday, April 23, 2012 (a drop of 12.2%) and $36.20 on Tuesday, April 24, 2012 (a further drop of 4.3%).

## IX.    CONGRESS' INQUIRY OF WAL-MART REGARDING THE BRIBERY AT WAL-MEX

250.    April 23, 2012, United States Congressmen announced an investigation into Wal-Mart about the allegations of bribery at Wal-Mex reported in *The New York Times*.  *See* Ex. EE attached hereto.

251.    On May 17, 2012, after examining hundreds of internal Wal-Mart documents, the Congressmen requested access to Maritza Munich, former General Counsel for Wal-Mart International, who advised the company to hire outside counsel to investigate the bribery allegations in 2005-2006.  Shortly after her advice was ignored in 2006, Ms. Munich had resigned.

252.    On June 12, 2012, Congressmen wrote to Wal-Mart stating that Wal-Mart had not been cooperative with their investigation and had refused to provide key documents and access to Maritza Munich.  The letter also noted that Wal-Mart's outside counsel briefed the Congressmen, and although lawyers could provide few details about Wal-Mart's FCPA violations, they communicated that they were brought on to review Wal-Mart's anti-corruption policies in Mexico, Brazil and China and that they recommended that Wal-Mart expand its review to India and South Africa, which they view as high-risk countries.  *See* Ex. FF attached hereto.

253.    On August 14, 2012, Congressmen reiterated that Wal-Mart had not cooperated with their investigation, failing to provide access to documents and key witnesses.  The letter

also stated that the Congressmen had obtained company documents indicating that "Wal-Mart may have had compliance issues relating not only to bribery, but also to "*questionable financial behavior" including tax evasion and money laundering in Mexico*." *See* Ex. GG attached hereto (emphasis added).

254.     On January 10, 2013, in response to Wal-Mart claims that senior executives had no knowledge of allegations of bribery to open a controversial store near the Teotihuacán pyramids, the Congressmen sent attachments documenting that senior Wal-Mart executives including Duke were informed of the Wal-Mex bribery allegations as early as 2005. *See* Ex. HH attached hereto.

## X.     POST CLASS PERIOD

255.     On February 24, 2014, *Reuters* issued a press release entitled "Mexico's Walmex to open fewer stores in 2014, focus on remodeling."   The press release stated in relevant part:

> MONTERREY, Feb 24 (Reuters) – Mexico's Wal-Mart de Mexico said it will increase its business investment 7 percent this year but shift its focus to remodeling existing stores rather than opening new stores.
>
> Wal-Mart de Mexico, which has slowed store openings amid a U.S. Department of Justice bribery investigation, will spend 15 billion pesos ($1.1 billion) in 2014 but it will only increase its floor space by 5.2 percent, Chief Financial Officer Rafael Matute told analysts on Monday.

## XI.     PLAINTIFF'S CLASS ACTION ALLEGATIONS

256.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Wal-Mex's ADRs between December 8, 2011 through April 24, 2012, inclusive, seeking to pursue remedies under the Exchange Act.

257.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Wal-Mex and/or Wal-Mart or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

258.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

259.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

260.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Wal-Mart de México; and

(c)    whether the members of the Class have sustained damages and, if so, the proper measure of damages.

261.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.   LOSS CAUSATION

262.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

263.     During the Class Period, Plaintiff and the Class purchased ADRs of Wal-Mex at artificially inflated prices and were damaged thereby.   The price of Wal-Mex's ADRs significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

264.     As a result of Defendants' scheme, Wal-Mex ADRs were overvalued throughout the Class Period.  *The New York Times*' revelation on April 21, 2012 of the facts and circumstances Defendants had misrepresented and concealed exposed Defendants' bribery scheme, violations of the FCPA and the overvaluation of Wal-Mex ADRs because of the scheme and FCPA violations.  One measure of that inflated value was Wal-Mex's ADR price, which fell $5.24 per share to close at $37.82 per share on April 23, 2012, the first trading day after the publication of *The New York Times* article, a decline of over 12% on volume of 200,294,800 shares, an amount which is in excess of the normal trading volume.  Wal-Mex ADRs continued to drop on April 24, 2012, to close at $36.20 per share on volume of

94,544,500 shares, as the market continued to process the implications of Wal-Mex's bribery scheme, the failure of Wal-Mex and Wal-Mart to timely disclose the bribery scheme, the cover-up by Wal-Mex and Wal-Mart, the FCPA violations by Wal-Mex and Wal-Mart, the failure by Wal-Mex and Wal-Mart to have adequate financial reserves set aside to deal with the scandal, the false accounting records of Wal-Mex and Wal-Mart and the wrongful course of conduct by Wal-Mex and Wal-Mart. The revelation of Defendants' actions demonstrated that investors had paid more for Wal-Mex ADRs than they would have paid but for the Defendants' wrongful conduct.

265. The market's reaction mirrored the reactions of analysts, journalists, and academics. On April 23, 2012, *Forbes* reported that, "[a]fter a decade of carefully encouraging companies to report misbehavior early, the Justice Department may be under pressure to make an example of Wal-Mart." The article referred to an analysis that showed SEC and DOJ penalties for FCPA violations are usually about 1% to 2% of annual sales, *which would amount to $4.5 billion for Wal-Mart. The article also explained that "[t]he greater impact will be on Wal-Mart's Mexican growth. A slowdown in new store openings could mean a 5% decrease in growth, a $1.3 billion loss, according to the UBS analysis.*"

266. Also on April 23, 2012, *Reuters* reported that "[a]llegations that Wal-Mart Stores Inc. stymied an internal investigation into extensive bribery at its Mexican subsidiary are likely to lead to years of regulatory scrutiny and could eventually cost some executives their jobs." According to Michael Koehler, a professor at Butler University and FCPA expert, "'Because of Wal-Mart's inaction for a very long time, it's likely its exposure is only going to increase.'" Deutsche Bank retail analyst said that if the allegations are proven true, "'[i]t would put a

broadside in the growth engine of the company.'"  "'Unlike prior PR stories in recent years, this will be a material distraction for Wal-Mart on multiple fronts.'"

267.    On April 24, 2012, the *Los Angeles Times* reported that, according to BMO Capital Markets analyst Wayne Hood, "[t]he bribery allegations 'will be used against the company by activists and companies when it attempts to open stores in the U.S. and abroad, and could make it more difficult to attract management talent in international markets.'"

268.    On April 26, 2012, *The Wall Street Journal*'s MarketWatch reported that UBS analyst Robert Carroll, citing research by three professors, estimated ***Wal-Mart's investigation and legal fees from the corruption at Wal-Mex would amount to $2.76 billion***.

269.    On April 30, 2012, *The New York Times* reported that in the wake of *The New York Times*' revelation of the facts Defendants had concealed, a Wal-Mart building permit in Los Angeles was "getting a once-over."  In New York, the City Council is investigating a possible land deal with the retailer's developer in Brooklyn.  A state senator in California is pushing for a formal audit of a proposed Wal-Mart in San Diego.  And in Boston and its suburbs, residents are pressuring politicians to disclose whether they have received contributions from the company." According to Dorian T. Warren, a political science professor at Columbia who is writing a book about Wal-Mart, "'[o]vernight, the environment has shifted in terms of Wal-Mart's strategy in big cities, in winning over local politicians.'"

## XIII.   SCIENTER ALLEGATIONS

270.    Defendants Wal-Mart, Vega, and Rank acted with scienter because they: (i) knew or were reckless in not knowing that the public statements issued or disseminated were materially false and misleading and/or contained material omissions; (ii) knew or were reckless in not knowing that such statements would be issued or disseminated to the investing public;

and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents or were reckless in doing so.

271.    As set forth herein, Defendants Wal-Mart, Vega, and Rank, by virtue of their receipt of information reflecting the true facts regarding Wal-Mex, their control over, receipt and/or modification of Wal-Mex's allegedly materially misleading statements and omissions, and/or their position within Wal-Mex which made them privy to confidential information concerning Wal-Mex, participated in the fraudulent scheme alleged herein.

272.    Further, Wal-Mart acted with scienter as it owned approximately 70% of the outstanding ADRs of Wal-Mex and knew or was reckless in not knowing its omission in its December 8, 2011 Form 10-Q that the Wal-Mex corruption had been revealed in 2005 and investigated in 2005 and 2006 was materially misleading.  This is supported by Plaintiff's allegations that Duke, who was also Chairman of the Wal-Mex Executive Committee and a Board member of Wal-Mex since 2006, in an email from a top Wal-Mart lawyer in October 2005, had been given a detailed description of the suspected corruption allegations; that top executives at Wal-Mart and Wal-Mart International, including Duke, rejected calls for a legitimate independent investigation and effectively shut down the investigation by assigning it to Wal-Mex's General Counsel's Office, the very office implicated in the corruption scheme; and that Wal-Mart recognized the materiality of the 2005 and 2006 events in its June 2012 Form 10-Q, when it disclosed that it was investigating whether prior allegations of violations of the FCPA were appropriately handled.  In fact, the district court in the securities class action on behalf of Wal-Mart common stock purchasers in *City of Pontiac General Employees' Retirement Sys. v. Wal-Mart Stores, Inc., et al.*, Case No. 12-CV-5162 (W.D. Ark.) held:

> Plaintiff also alleges that Defendants knew that the omission in the
> December 2011 statement of the 2005-2006 events was materially

misleading. The information that Defendants consciously chose to omit include facts about when and how Defendants first learned of the suspected corruption and how they first responded to these allegations. It was only after the *New York Times* article was published that Defendants acknowledged that the suspected corruption was the subject of allegations in 2005 and that there were questions about how Defendants handled these allegations in 2005-2006. Plaintiff alleges that this shows that Defendants were concerned about exposure of their alleged mishandling of the suspected corruption. ***The inference that Defendants intentionally omitted certain information is just as strong, if not stronger, than any competing plausible inference. The Court agrees with Judge Setser's straightforward reasoning and conclusion that Plaintiff sufficiently alleges allegations that both Defendants acted with the requisite scienter.***

See Ex. LL at p. 6 attached hereto (emphasis added)

273.    Wal-Mart (a 70% majority shareholder of Wal-Mex) had a motive to suppress the corruption/bribery scandal at Wal-Mex in order to protect the value of and stock price on its 70% ownership of Wal-Mex's ADRs.  For example, upon release of Wal-Mart's false and misleading Form 10-Q on December 8, 2011, Wal-Mart succeeded in protecting its investment as its own shares increased slightly by $0.34 (an increase of 0.005%), but Wal-Mex's stock *increased $1.33* (an increase of 0.049%, approximately one hundred (100) times the percentage increase in Wal-Mart's stock price):

|  | 12/8/11 (Close of Market) | 12/9/11 (Close of Market) |
|---|---|---|
| Wal-Mart Stock | $57.98 (10,350,00 shares traded) | $58.32 (10,058,900 shares traded) |
| Wal-Mex ADRs | $27.26 (87,900 shares traded) | $28.59 (112,300 shares traded) |

274.    Wal-Mart, as the controlling shareholder of Wal-Mex, benefitted from the false and misleading statement made in its Form 10-Q, dated December 8, 2011.  Sufficient facts are pled to suggest that Wal-Mart knew that its December 8, 2011 Form 10-Q was false and misleading as Duke, the President and CEO of Wal-Mart, actually knew of the bribery/corruption at Wal-Mex during calendar year 2005, as demonstrated by the following email that Duke received over six years before he signed the Wal-Mart 3Q 2012 Form 10-Q:

```
-----Original Message-----
From:   Thomas Mars
Sent:   Sat Oct 15 17:58:07 2005
To:     Mike Duke
Cc:     Tom Hyde - Executive
Subject:     IMPORTANT: WALMEX Memo

Mike:

The attached memorandum summarizes an interview conducted earlier this month with a former
WALMEX in-house lawyer. The lawyer was terminated in September 2004 after 28 years with the
company. The lawyer asserts in some detail alleged corruption by various WALMEX associates, including
senior people.

You'll want to read this. I'm available to discuss next steps.

PS: Welcome to Wal-Mart International.
```

*See* Ex. W attached hereto.

**Applicability of Presumption of Reliance:**
**<u>Fraud On The Market Doctrine</u>**

275.     At all relevant times, the market for Wal-Mex's ADRs was an efficient market for

the following reasons, among others:

(a)     Wal-Mex's ADRs trades over-the-counter (OTC) with trading volume in

the hundreds of thousands and millions of shares throughout the Class Period;

(b)     Wal-Mex regularly communicated with public investors via established

market communication mechanisms, including through regular disseminations of press

releases on the national circuits of major newswire services and through other wide-

ranging public disclosures, such as communications with the financial press and other

similar reporting services and publication of similar materials on Wal-Mex's corporate

webpage available to any investor with an internet connection;

(c)     Wal-Mex was followed by several securities analysts during the Class Period who periodically issued reports which were publicly available and entered the public marketplace.  *See* Ex. II attached hereto; and

(d)     Wal-Mart, as the 70% controlling shareholder of Wal-Mex, regularly communicated to the market on how its international segment, which included Wal-Mex, was performing.

276.     As a result of the foregoing, the market for Wal-Mex's ADRs promptly digested current information regarding Wal-Mex from all publicly-available sources including statements made by Wal-Mart and reflected such information in the price of Wal-Mex's ADRs. Under these circumstances, all purchasers of Wal-Mex's ADRs during the Class Period suffered similar injury through their purchase of Wal-Mex's ADRs at artificially inflated prices. Therefore, a presumption of reliance applies.

## FIRST CLAIM

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

277.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

278.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Wal-Mex's ADRs at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

279.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Wal-Mex's ADRs in an effort to maintain artificially high market prices for Wal-Mex ADRs in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

280.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Wal-Mex's financial well-being, business relationships, and prospects, as specified herein.

281.     Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Wal-Mex's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Wal-Mex and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Wal-Mex's ADRs during the Class Period.

282.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of supporting the artificially inflated price of Wal-Mex's ADRs.

283.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Wal-Mex's ADRs was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Wal-Mex's ADRs were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the ADRs trades, and/or in the absence of material, adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Wal-Mex's ADRs during the Class Period at artificially high prices and were damaged thereby.

284.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

285.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of Wal-Mex ADRs during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of the Exchange Act
### Against Defendants Rank, Vega and Wal-Mart

286.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

287.    Defendants Rank, Vega and Wal-Mart acted as controlling persons of Wal-Mex within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of

Defendants Rank and Vega's high-level position, and Defendant Wal-Mart's 70% controlling interest in Wal-Mex, and their awareness of Wal-Mex's operations and/or intimate knowledge of the false statements described herein that were disseminated to the investing public, Defendants Rank, Vega, and Wal-Mart had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Wal-Mex, including the content and dissemination of the various statements which Plaintiff contends are false and misleading whether by omission or misrepresentation.   Defendants Rank, Vega, and Wal-Mart were provided with or had unlimited access to Wal-Mex's internal controls, and the financial condition of Wal-Mex, issued the statements that Plaintiff alleges are materially false and misleading whether by omission or misrepresentation, and/or had the ability to cause the statements to be corrected shortly after these statements were issued but failed to do so.

288.    In particular, Defendants Rank, Vega, and Wal-Mart had direct and supervisory involvement in the day-to-day operations of Wal-Mex and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

289.    As set forth above, Defendants Rank, Vega and Wal-Mart violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.   By virtue of their positions as controlling persons, Defendants Rank, Vega and Wal-Mart are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of the wrongful conduct of Defendants Rank, Vega and Wal-Mart, Plaintiff and other members of the Class suffered damages in connection with their purchases of Wal-Mex's ADRs during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding damages in favor of Plaintiff and the other Class members against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XIV.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  April 6, 2016

GAINEY McKENNA & EGLESTON

By:  */s/ Thomas J. McKenna*
    Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY  10016
Telephone: 212-983-1300
Facsimile: 212-983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Lead Counsel for Plaintiff and the Putative Class*

Ronald J. Mann, Esq.
435 W. 116th Street
New York, NY 10027

*Of Counsel*