UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 27, 2017

------------------------------------------------------X
                                :

MICHAEL FOGEL, *individually and on*    :
*behalf of all others similarly situated,*   :
                                :

                    Plaintiff,   :
                                :

                    v.       :       13 Civ. 2282 (KPF)
                                :

WAL-MART DE MÉXICO SAB de CV,   :   OPINION AND ORDER
ERNESTO VEGA, SCOT RANK, and   :
WAL-MART STORES, INC.,          :
                                :

                  Defendants. :
                                :
------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

      Lead Plaintiff Michael Fogel ("Plaintiff") brings this class action lawsuit on behalf of purchasers (the "Class") of American Depository Shares ("ADRs") of Walmart de México SAB de CV ("Wal-Mex"), for the period between December 8, 2011, and April 24, 2012, inclusive (the "Class Period"). Relying heavily on a 2012 news article concerning anticompetitive conduct that ended in 2005, and a related investigation into that conduct that ended in 2006, Plaintiff alleges that Defendants Wal-Mex, Ernesto Vega, Scot Rank, and Wal-Mart Stores, Inc., ("Wal-Mart," and together, "Defendants"), violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, in public statements that were issued as late as 2012. Defendants have moved to dismiss Plaintiff's Second Amended Complaint (the "SAC") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) for failure to state a claim. Plaintiff

has cross-moved to strike the three appendices attached to Defendants' motion.

A review of the record makes clear that Plaintiff has taken advantage of two separate opportunities to replead his complaint in response to contemplated dispositive motions from Defendants. And, indeed, the size of the operative pleading has jumped from (approximately) 23 pages and 61 paragraphs to 128 pages and 289 paragraphs, exclusive of the many exhibits. The Court has carefully considered Plaintiff's SAC, but concludes that the additional text has not remedied the many pleading deficiencies identified by Defendants. Accordingly, and for the reasons outlined below, Defendants' motion is granted and Plaintiff's motion is denied.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    The Parties

Plaintiff is a holder of Wal-Mex ADRs that he purchased on March 7, 2012; March 26, 2012; and April 17, 2012. (*See* Dkt. #6, Ex. A; SAC ¶ 6). These purchases each occurred during the Class Period. (SAC ¶¶ 1, 6).

---

[1]    In resolving the instant motion, the Court has considered the SAC and the 63 exhibits attached thereto. (Dkt. #94). *See, e.g.*, *Hart* v. *FCI Lender Servs., Inc.*, 797 F.3d 219, 221 (2d Cir. 2015) (citing Fed. R. Civ. P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion. A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.")). Defendant requests that the Court take judicial notice of the Exhibits to the SAC, "not for the truth of the matters asserted therein, but for their existence, content, and the fact that each of the [e]xhibits was publicly available prior to April 5, 2013, the date the Original Complaint was filed." (Def. Br. 5 n.1). The Court has the power to do so, s*ee Staehr* v. *Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008), but need not here because the Court may consider these exhibits as part of the pleadings under Rule 10(c). To refer to the exhibits, the Court will use "SAC Ex. [exhibit designation]."

As relevant here, Defendant Wal-Mex "owns and operates a network of retail stores in México," Guatemala, El Salvador, Honduras, Nicaragua, and Costa Rica. (SAC ¶ 7). Six businesses comprise Wal-Mex: Bodega Aurrerá, Wal-Mart Supercenter, Superama, Sam's Club, Suburbia, and Vips. (*Id.* at ¶ 11).

Wal-Mex is a subsidiary of Defendant Wal-Mart.[2] More specifically, it is a subsidiary of Wal-Mart International, one of Wal-Mart's three divisions. (SAC ¶ 183). Plaintiff alleges that the parent and subsidiary are closely interrelated:

- Wal-Mex was created in 1997, at which time its principal shareholder was Wal-Mart, which owned 51% of Wal-Mex's shares. (*Id.* at ¶ 14).

- Today, Wal-Mart owns 70% of Wal-Mex and public shareholders own the rest. (*Id.* at ¶¶ 12, 14).[3] Mexico is

---

The Court has taken all well-pleaded allegations as true, as it must at this stage of the litigation. *See, e.g.*, *Peralta* v. *St. Luke's Roosevelt Hosp.*, No. 14 Civ. 2609 (KPF), 2015 WL 3947641, at *1 n.1 (S.D.N.Y. June 26, 2015). The Court has also reviewed the briefing submitted by the parties and will refer to it as follows: Defendants' Memorandum of Law in Support of their Motion to Dismiss the SAC (Dkt. #98) will be referred to as "Def. Br.," Plaintiff's Memorandum of Law in Opposition to Defendant's Motion (Dkt. #103) as "Pl. Opp.," and Defendant's Reply (Dkt. #106) as "Def. Reply."

With regard to Plaintiff's motion to strike the appendices attached to Defendants' opening brief, Plaintiff's Memorandum of Law in Support of Plaintiff's Motion to Strike Appendix Exhibits A, B, and C to Defendant's Motion to Dismiss the SAC (Dkt. #101) will be referred to as "Pl. Str. Br.," Defendants' Opposition to Plaintiff's Motion to Strike (Dkt. #107) as "Def. Str. Opp.," and Plaintiff's Reply (Dkt. #109), as "Pl. Str. Reply."

[2]  Defendants indicate that Wal-Mex is incorporated and maintains its headquarters in Mexico, while Wal-Mart is a Delaware corporation with its headquarters in Arkansas. (Def. Br. 5). Plaintiff does not plead these facts anywhere in the SAC. In other circumstances, this might raise questions regarding the Court's personal jurisdiction over Defendants. However, Defendants have not contested personal jurisdiction, and the Court thus considers the issue to be waived. *See Sinoying Logistics Pte Ltd.* v. *Yi Da Xin Trading Corp.*, 619 F.3d 207, 213 (2d Cir. 2010) ("Because personal jurisdiction can be waived by a party, a district court should *not* raise personal jurisdiction *sua sponte* when a defendant has appeared and consented, voluntarily or not, to the jurisdiction of the court." (emphasis in original) (internal citations omitted)).

[3]  Shareholders like Wal-Mart that own 20% or more of Wal-Mex's capital stock are given special powers according to Wal-Mex's Corporate Bylaws. (SAC ¶ 16 & Ex. H at 55). Wal-Mex's "supreme authority" is its "General Shareholder Assembly," the decisions of

the most successful foreign country in Wal-Mart's International segment. (*Id.* at ¶ 184).

- "Wal-Mart has the ability to designate at least a majority of the directors of Wal-Mex," "[m]any of the executives at Wal-Mex report directly to Wal-Mart," and "[m]any Wal-Mart executives reside on Wal-Mex's Board and committees." (*Id.* at ¶¶ 16-18; *see also id.* at ¶¶ 25-32).

- Wal-Mex issues Wal-Mart credit cards to its customers (*id.* at ¶ 23), and the "Investor Relations" section of Wal-Mex's Annual Reports from 2005 to 2012 "had an email exchange at Wal-Mart.com" (*id.* at ¶ 24).

Vega is a Wal-Mex employee who has held a variety of executive positions at the company. (SAC ¶ 8). In 2004, and again from 2009 to 2011, Vega was a member of the Wal-Mex Board of Directors (the "Wal-Mex Board"). (*Id.*). From 2005 to 2008, Vega was the Chairman of that Board, and in 2012 he was its alternate member. (*Id.*). Vega has also served on Wal-Mex's Audit and Corporate Practices Committees. (*Id.*). In 2004 and 2006 to 2009, Vega was a member of the Audit Committee, and in 2005 and 2010 to 2012 he served as its Chairman. (*Id.*).[4] And Vega was a member of the Wal-Mex Corporate Practice Committee from 2006 to 2009 before becoming its Chairman from 2010 to 2012. (*Id.*).[5] Plaintiff alleges that in these roles, Vega was involved

---

which Assembly shareholders owning at least 20% of shares may judicially oppose. (SAC ¶ 16 & Ex. H at 58).

[4]     The Wal-Mex Audit Committee has three members. (SAC ¶ 57). It is responsible for selecting Wal-Mex's "Independent Auditor," ensuring that "internal controls are appropriate and that Wal-Mex is in full compliance with all applicable accounting and legal regulations," and reviewing "any and all related-party operations in which Wal-Mex engages." (*Id.* at ¶¶ 57-58). The Committee "has the authority to review financial statements to ensure they fully reflect the financial situation of Wal-Mex," and "to retain lawyers and any other type of outside advisors required to assist in the performance of its duties." (*Id.* at ¶¶ 59-60).

[5]     "The purpose of the Wal-Mex Corporate Practices Committee is to reduce the potential risk of conducting transactions that could compromise Company assets, or that could

with several persons who were implicated in a bribery scheme that the Court will describe in more detail below: (i) Eduardo Juárez, who was the "Vice President of Internal Audit of Wal-Mex" from 2005 to 2008 and "reported to Vega" in Vega's capacity as the Audit Committee's Chairman (*id.* at ¶¶ 9, 42); (ii) Cesaro Fernández, who served as Chairman of the Wal-Mex Board while Vega was a Board Member (*id.* at ¶ 10); (iii) Eduardo Castro-Wright, who was a member of the Wal-Mex Board at the same time as Vega (*id.* at ¶ 34); and (iv) R. Lee Stucky, who was an Audit Committee Member in 2005 while Vega was the Committee's Chairman and "reported to Vega," (*id.* at ¶¶ 53, 62 n.4, 71).

Rank is situated similarly to Vega. Rank joined Wal-Mex in 2000 as the Deputy Vice President of Bodega Aurrerá, and was named its Vice President six months later. (SAC ¶ 11). "In 2003, Rank became Senior Vice President of Self Service and oversaw all of the Bodega Aurrerá, Wal-Mart Supercenter and Superama units at Wal-Mex." (*Id.* (emphasis omitted)). By 2005, Rank had risen to serve as Wal-Mex's Executive Vice President and Chief Operating Officer, and as such was responsible for all six of its underlying businesses. (*Id.*). Rank served in this capacity until 2010, when he became the CEO of Wal-Mex, which position he maintained through 2012. (*Id.*). Rank additionally served as a member of Wal-Mex's Executive Committee and Board from 2010 to

---

favor a specific group of shareholders." (SAC ¶ 65). It is responsible for calling shareholder meetings; ensuring that shareholder meeting agendas include all necessary points; "[a]pproving policies governing the use and possession of Company assets; [a]ssisting the Wal-Mex Board in producing reports on accounting practices; and [a]uthorizing related-party transactions" and policies regarding the compensation of top management. (*Id.*).

2012,[6] and as a member of its Social Responsibility Committee in 2011 and 2012.[7] (*Id.*). As he did with regard to Vega, Plaintiff alleges that in these roles, Rank was involved with persons who were implicated in the Wal-Mex bribery scheme: (i) Xavier del Rio, who was the Senior Vice President of Real Estate at Wal-Mex from 2005 to 2009, and "reported to Rank" (*id.* at ¶¶ 48, 77, 78); (ii) Jose Luiz Rodriquezmacedo, who was Wal-Mex's Senior Vice President of Legal and Corporate Relations from 2010 to 2011, "where he answered to Rank who was then CEO of Wal-Mex" (*id.* at ¶ 49; *see also id.* at ¶ 75); and (iii) Eduardo Juárez, who "reported to Vega and Rank" (*id.* at ¶¶ 69, 76).

### 2. The Alleged Bribery Scheme

On April 21, 2012, the *New York Times* published an article by David Barstow titled, "Wal-Mart Hushed Up a Vast Mexican Bribery Case" (the "*Times* Article"). (SAC, Ex. Q & ¶ 181). The *Times* Article exposed an internal investigation of alleged bribery at Wal-Mex that was conducted by Wal-Mart in 2005 and 2006. (SAC, Ex. Q; *see also* SAC ¶¶ 84-181). Plaintiff's SAC

---

[6] The Wal-Mex Executive Committee has three members and "is charged with overseeing the strategic planning for Wal-Mex, evaluating executives[,] and establishing their compensation." (SAC ¶ 63).

[7] The Wal-Mex Social Responsibility Committee is responsible for

> [p]articipating in designing the strategy for corporate social responsibility and overseeing its implementation and performance; [a]nalyzing areas of opportunity and pinpointing areas for improvement regarding processes aimed at detecting the risks, needs, and concerns of Wal-Mex stakeholders; [d]efining the strategy for social responsibility, approving the action plan, and establish[ing] metrics with clearly defined indicators for each business format; and [o]verseeing and following through on the performance of social corporate responsibility [and] ensuring full compliance with all legislation in force.

(SAC ¶ 67).

reproduces the facts reported by Mr. Barstow as the bulk of the alleged facts underlying Plaintiff's claims for relief. (*Compare* SAC, Ex. Q, *with* SAC ¶¶ 84-181). The Court will recount them briefly here.

Plaintiff's timeline begins in 2003, when "Kroll Inc., ('Kroll'), a leading investigative firm, conducted a confidential investigation for Wal-Mart" concerning Wal-Mex. (SAC ¶ 84). Kroll "concluded that top Wal-Mex executives had failed to enforce their own anticorruption policies, ignored internal audits that raised red flags and even disregarded local press accounts" to perpetuate a systematic tax evasion scheme. (*Id.* at ¶¶ 84-85). Kroll also evaluated Wal-Mex's internal audit and antifraud units, which it "branded ... 'ineffective.'" (*Id.* at ¶ 86).

On September 21, 2005, Sergio Cicero, who "served as the Director of Legal at Wal-Mex," and who had worked for nearly 10 years in its real estate department before his 2004 resignation (SAC ¶ 35), emailed Martiza I. Munich, "who served as Vice President and General Counsel of Wal-Mart from 2003 to 2006" (*id.* at ¶¶ 19, 46), to inform her that he had information regarding "irregularities" that had been authorized by senior management at Wal-Mex. (*Id.* at ¶ 88). Munich promptly hired attorney Juan Francisco Torres-Landa to assist her in debriefing Cicero regarding the alleged "irregularities." (*Id.* at ¶¶ 54, 91; *see also* SAC, Ex. J). Cicero detailed an extensive bribery scheme, which had been "bolstered ... with fraudulent accounting," and which "implicated many of Wal-Mex's leaders." (*Id.* at ¶ 92). The purpose of the scheme was to facilitate the construction of "hundreds of new stores so fast

7

that competitors would not have time to react." (*Id.* at ¶ 95). Cicero was aware of the scheme because he himself "helped funnel bribes through gestores." (*Id.* at ¶ 97).[8] "[I]t was his job to recruit the gestores. He worked closely with them, sharing strategies on whom to bribe," and "also approved Wal-Mex's payments to [them]." (*Id.* at ¶ 98).

In November 2005, Wal-Mart Special Investigator Ronald Halter undertook a preliminary inquiry into Cicero's allegations. (SAC ¶¶ 39, 109-11). Halter and his team found evidence that appeared to confirm Cicero's allegations, and which also indicated that a prior audit had flagged potential bribery in 2004. (*Id.* at ¶¶ 111-21). Still other evidence suggested that Wal-Mex was making substantial donations to Mexican governmental entities. (*Id.* at ¶¶ 122-24). These findings were shared with Wal-Mart's Audit Committee, CEO, and General Counsel, and through them, the Wal-Mart Board. (*Id.* at ¶¶ 125, 141-42). Halter indicated that he had "reasonable suspicion ... to believe that Mexican and [United States] laws [had] been violated." (*Id.* at ¶ 142 (internal quotation marks omitted)). He also provided a plan "for a deeper investigation that would plumb the depths of corruption and culpability at Wal-Mex." (*Id.* at ¶ 143).

In January 2006, Munich advised Wal-Mart's leadership that Wal-Mart needed "to conduct an extensive investigation to root out wrongdoing." (SAC ¶ 152). But, Plaintiff alleges, "there was no interest at Wal-Mart or Wal-Mex in

---

[8]    "Gestores" are middlemen "used in México to help companies to perform a variety of tasks, from obtaining residency permits and resolving tax issues to obtaining planning authorization." (SAC ¶ 82).

making a good faith effort to fix the corruption problem," so "Munich submitted her resignation, effective February 1, 2006." (*Id.* at ¶ 153).

On February 3, 2006, a meeting was held "to discuss revamping Wal-Mart's internal investigations and to resolve the question of what to do about Cicero's allegations." (SAC ¶ 156). A new protocol was devised for internal investigations that "gave senior Wal-Mart executives — including executives at Wal-Mex being investigated — more control over internal investigations." (*Id.* at ¶ 158 (emphasis omitted)). Four days later, the Wal-Mex bribery investigation was transferred "to one of its earliest targets," Rodriquezmacedo. (*Id.* at ¶ 160). This transfer is alleged to have violated even the new protocol, according to which Wal-Mart's Corporate Investigations unit was still required to handle "significant" allegations, which Cicero's allegations had been deemed to be. (*Id.* at ¶ 164).

Rodriquezmacedo finished his investigation within just "a few weeks." (SAC ¶ 166). He concluded that there was no evidence of bribes paid to secure licenses or permits, or given to government authorities. (*Id.* at ¶ 167). He announced a "renewed commitment by Wal-Mex to Wal-Mart's anticorruption policy," but did not "recommend any disciplinary action against his colleagues." (*Id.* at ¶ 175). Wal-Mart's Director of Corporate Investigation Joseph R. Lewis found Rodriquezmacedo's report to be "lacking." (*Id.* at ¶¶ 157, 177-79). Yet,

on May 10, 2006, Rodriquezmacedo was told to finalize his report and conclude the investigation. (*Id.* at ¶ 180).[9]

All of this came to light when the *New York Times* published its article on April 21, 2012, "after months of investigation." (SAC ¶ 181). On the first two days of trading following the publication of the *Times* Article, "Wal-Mex's ADRs were pummeled," falling 12.2% on Monday, April 23, 2012, and a further 4.3% on Tuesday, April 24, 2012. (*Id.* at ¶ 249). Congress announced that it would be opening an investigation into the allegations reported in *Times* Article, which it did. (*Id.* at ¶¶ 250-54; *see also* SAC, Ex. EE). A press release published on February 24, 2014, indicated that Wal-Mex had decided to focus on remodeling old stores rather than continuing its campaign to open new ones. (SAC ¶ 255).

## B.    Procedural History

This lawsuit was filed April 5, 2013, against Vega and Wal-Mex. (Dkt. #1). On June 4, 2013, then-Class Member Fogel moved the Court for an order appointing Fogel as Lead Plaintiff in this case and approving his selected

---

[9]     Plaintiff contends that the fact that Wal-Mart undertook the investigation of corruption and bribery at Wal-Mex is important evidence of the interrelatedness of these entities. (SAC ¶ 19). For example, as early as 2006, Wal-Mart's Vice President and General Counsel advised other executives that they ought to indicate "that the work undertaken by the internal investigators was at the behest of Wal-Mart's counsel." (*Id.* (emphasis omitted) (quoting SAC, Ex. K)). Wal-Mart's 2014 Annual Report indicated that Wal-Mart "spent $282 million in the fiscal year end[ing] January 31, 2014 and $157 million the previous year," on its investigation into "the possible payment of foreign bribes." (*Id.* at ¶¶ 20-21). And Wal-Mart publically announced in its 2015 Form 10-K that it expected to incur costs incidental to its "on-going review and investigations ... and in defending the existing and any additional shareholder lawsuits and any governmental proceedings." (*Id.* at ¶ 19). In contrast, "there is no indication that Wal-Mex has incurred any cost regarding the bribery / corruption." (*Id.* at ¶ 22).

counsel as Lead Counsel.  (Dkt. #4-6).  This motion was granted on June 10, 2013.  (Dkt. #7).

On December 8, 2014, Plaintiff filed his First Amended Complaint (the "FAC"), bringing for the first time claims against Wal-Mart and Rank, in addition to the claims brought in Plaintiff's original Complaint.  (Dkt. #29).  The parties appeared before the Court on March 3, 2015, for a pre-motion conference, and the Court granted Defendants leave to file their contemplated motion to dismiss the FAC pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Dkt. #43-44).  Defendants filed their motion to dismiss on April 6, 2015 (Dkt. #46-49); Plaintiff filed his opposition on May 8, 2015 (Dkt. #51-53); and Defendants filed their reply on May 22, 2015.  (Dkt. #54).

Because Plaintiff had considerable difficulty serving the FAC on Rank, Rank was not served until October 22, 2015, by which point Defendants' motion to dismiss the FAC was fully briefed.  (*See* Dkt. #62).  When Rank appeared and indicated that he too wished to file a motion to dismiss the FAC, the Court directed the parties to appear for a second pre-motion conference.  (Dkt. #76-77).  That conference was held on December 30, 2015.  (Dkt. #81-82).  For the reasons there discussed on the record, the Court denied Defendants' pending motion to dismiss without prejudice to its renewal and set a schedule for Defendants to file their renewed motion.  (*Id.*).

Defendants filed their second motion to dismiss the FAC on February 5, 2016.  (Dkt. #85-87).  In lieu of his opposition, Plaintiff requested leave to file a second amended complaint (the "SAC") on April 4, 2016, which request

Defendants did not oppose. (Dkt. #91). The Court therefore ordered that the pending motion to dismiss be withdrawn, and granted Plaintiff leave to file the SAC. (Dkt. #92). The Court "anticipate[d] that this [would] be Plaintiff's last request to amend." (*Id.*).

Plaintiff filed the SAC on April 6, 2016. (Dkt. #93-95). Defendants filed their motion to dismiss the SAC on May 6, 2016. (Dkt. #96-98). Before filing his opposition to Defendants' motion, Plaintiff filed a Motion to Strike the three appendices attached to that motion. (Dkt. #100-01). Plaintiff then opposed Defendants' motion on June 6, 2016. (Dkt. #103). On June 28, 2016, Defendants filed their opposition to Plaintiff's motion to strike their appendices (Dkt. #107), as well as their reply in further support of their motion to dismiss the SAC (Dkt. #106). Plaintiff filed his reply in support of his motion to strike on July 15, 2016. (Dkt. #109).

Defendants have filed motions for oral argument with regard to both their motion to dismiss the SAC (Dkt. #99), and Plaintiff's motion to strike Defendants' appendices. (Dkt. #108). The parties have also provided the Court with notices of supplemental authority — Plaintiff on September 22, 2016, and Defendants on January 27, 2017 — to which notices each opposing party has responded. (Dkt. #110-15). The Court will address all of these pending motions and filings below.

## DISCUSSION

Broadly speaking, Plaintiff alleges that Defendants made material misrepresentations in Wal-Mex's 2004, 2005, 2006, 2007, 2008, 2009, 2010,

and 2011 Annual Reports (SAC, Ex. A-H); each report each was filed in April of the year following the year on it reports. (SAC ¶¶ 189-213). Plaintiff also raises claims based on Wal-Mex's website, Wal-Mart's December 8, 2011 Form 10-Q for third quarter of fiscal year 2012, and a series of Wal-Mex press releases and reports published by Wal-Mex's Audit and Corporate Practice Committees in January, February, March, and April of 2012. (*Id.* at ¶¶ 188-96, 214-25, 229; *see also* SAC Ex. H, X-DD). For the reasons described below, these claims must all be dismissed.

## A.     Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

The Court will consider later the pleading requirements applicable to securities class action complaints, and discusses here the general requirements of Federal Rule of Civil Procedure 12(b)(6). When considering a motion to dismiss under this rule, a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). In this regard, a complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by

reference.  *See, e.g.*, *Hart* v. *FCI Lender Servs., Inc.*, 797 F.3d 219, 221 (2d Cir. 2015) (citing Fed. R. Civ. P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion. A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.")).

"While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to '[nudge a plaintiff's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting *Twombly*, 550 U.S. at 570).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Several of Defendants' arguments concern the affirmative defense of timeliness.  In a motion to dismiss brought under Rule 12(b)(6), "a defendant may raise an affirmative defense ... if [that] defense appears on the face of the complaint." *Staehr* v. *Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (citing *McKenna* v. *Wright*, 386 F.3d 432, 436 (2d Cir. 2004)).  "The lapse of a limitations period is an affirmative defense that a defendant [typically] must plead and prove." *Id.* (citing Fed. R. Civ. P. 8(c)(1)).  However, courts

permit defendants to raise timeliness arguments in a Rule 12(b)(6) motion where they appear on the face of the complaint, because "[t]imeliness is 'material when testing the sufficiency of a pleading.'" *Id.* at 425-26 (quoting Fed. R. Civ. P. 9(f)); *see also Gavin/Solmonese LLC* v. *D'Arnaud-Taylor*, 68 F. Supp. 3d 530, 536 (S.D.N.Y. 2014) (citing *LC Capital Partners, LP* v. *Frontier Ins. Grp., Inc.*, 318 F.3d 148, 156 (2d Cir. 2003) (holding that when the relevant facts "can be gleaned from the complaint and papers … integral to the complaint, resolution of the issue on a motion to dismiss is appropriate")) (noting that while accrual begins at the date of discovery, and "[a]lthough the date at which discovery should have occurred can be a fact-intensive question, courts in this district often make this determination on a motion to dismiss"), *aff'd*, 639 F. App'x 664 (2d Cir. 2016) (summary order).

**B.      Several of Plaintiff's Claims Must Be Dismissed as Untimely**

**1.      Timeliness Under the Sarbanes-Oxley Act of 2002**

**a.      28 U.S.C. § 1658**

In the case of claims brought pursuant to Section 10-b and Rule 10b-5, the timeliness requirements are specified in Section 804 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), 28 U.S.C. § 1658. *See, e.g.*, *Merck & Co.* v. *Reynolds*, 559 U.S. 633, 638 (2010).[10] This provision states that

> a private right of action that involves a claim of fraud,
> deceit, manipulation, or contrivance in contravention of

---

[10]     These timeliness requirements apply with equal force to claims brought under Section 20(a). *See, e.g.*, *In re Poseidon Concepts Sec. Litig.*, No. 13 Civ. 1213 (DLC), 2015 WL 4111208, at *3 (S.D.N.Y. June 24, 2015) (considering application of Section 1658 to Section 10(a) and Section 20(a) claims); *In re Vivendi Universal, S.A. Sec. Litig.*, 281 F.R.D. 165, 166 (S.D.N.Y. 2012) (same).

> a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934, may be brought not later than the earlier of — (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation.

28 U.S.C. § 1658 (internal citation omitted). The former limitation is a statute of limitation, while the latter has been identified as a statute of repose. *See, e.g.*, *Merck & Co.*, 559 U.S. at 637 (identifying 28 U.S.C. § 1658(b)(1) as a "limitations statute"); *SRM Glob. Master Fund Ltd. P'ship* v. *Bear Stearns Companies L.L.C.* (hereinafter, "*SRM*"), 829 F.3d 173, 176 (2d Cir. 2016) ("Section 1658(b)(2), however, is not a statute of limitations. It is a statute of repose[.]"). This difference is critical, as it dictates both dates and means of accrual.

### b.  The Statute of Limitations

For purposes of the statute of limitations set forth in Section 1658(b)(1), the Supreme Court has instructed that "a cause of action accrues [i] when the plaintiff did in fact discover, or [ii] when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation' — whichever comes first." *Merck & Co.*, 559 U.S. at 637. "'[D]iscovery' as used in this statute encompasses not only those facts the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known[,] ... irrespective of whether the actual plaintiff undertook a reasonably diligent investigation." *Id.* at 648-53; *see also City of Pontiac Gen. Emps.' Ret. Sys.* v. *MBIA, Inc.* (hereinafter, "*City of Pontiac*"), 637 F.3d 169, 174 (2d Cir. 2011) ("In other words, the limitations period commences not when a reasonable investor would

have begun investigating, but when such a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation.").

In the Second Circuit, *Merck*'s "discovery" standard is linked to sufficiency for purposes of Federal Rule of Civil Procedure 12(b)(6). In *City of Pontiac*, the Second Circuit established that a "reasonably diligent plaintiff has not 'discovered' one of the facts constituting a securities fraud violation until he can plead that fact with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." 637 F.3d at 175. The court reasoned that

> [s]ince the purpose of [a statute of limitations] is to prevent stale claims, it would make no sense for a statute of limitations to begin to run before the plaintiff even has a claim: A claim that has not yet accrued could never be considered stale. Thus, in the limitations context, it makes sense to link the standard for "discovering" the facts of a violation to the plaintiff's ability to make out or plead that violation. Only after a plaintiff can adequately plead his claim can that claim be said to have accrued, and only after a claim has accrued can the statute of limitations on that claim begin to run.

*Id.* The court declined, however, to establish "the amount of particularity and detail a plaintiff must know before having 'discovered' [a] fact," because such a sufficiency determination "depend[s] on the nature of the fact." *Id.*

Following the *Merck* Court's lead, the Second Circuit has also refrained from "attempt[ing] to prescribe" a list "of the facts needed to constitute a securities law violation for purposes of the statute of limitations." *City of Pontiac*, 637 F.3d at 174. Instead, the Court adopted the *Merck* Court's

conclusion that at least "the facts constituting scienter, defined as 'a mental state embracing intent to deceive, manipulate, or defraud,'" must be discovered before a securities fraud statute of limitations may begin to run. *Id.* (quoting *Merck*, 559 U.S. at 648). Specifically focusing on the example of scienter, the court elaborated that the Sarbanes-Oxley statute of limitations would begin to run when "the plaintiff has uncovered — or a reasonably diligent plaintiff would have uncovered — enough information" to plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind, such that 'it is at least as likely as not that the defendant acted with the relevant knowledge or intent.'" *Id.* at 175 (internal quotation mark omitted) (quoting *Merck*, 559 U.S. at 649).

The court went on to explain, however, that scienter "discovery" was necessary but not sufficient: Discovery of the fact of scienter "by itself is not enough to trigger the statute of limitations," because "a statute of limitations cannot begin to run until [a] plaintiff's claim has accrued," and "[a] securities fraud claim does not accrue until after the plaintiff actually purchases (or sells) the relevant security." *City of Pontiac*, 637 F.3d at 176. Accrual therefore requires two things: (i) the actual purchase or sale of a security and (ii) either the actual discovery of scienter, or the possibility of scienter discovery by a hypothetical, reasonably diligent plaintiff. *See id.* at 175-76.

### c. The Statute of Repose

The Second Circuit has also outlined the differences between Sarbanes-Oxley's statute of limitations and its statute of repose. Significantly, the

18

statute of repose "is not subject to equitable tolling, and ... creates a substantive right in defendants to be free from liability after five years." *SRM*, 829 F.3d at 177 (internal citation omitted). And while the statute of limitations may not begin to run until a plaintiff's "claim has accrued," the statute of repose runs without exception "from the defendant's violation." *City of Pontiac*, 637 F.3d at 176. This is because a statute of repose "is not a limitation of a plaintiff's remedy, but rather defines the right involved in terms of the time allowed to bring suit." *SRM*, 829 F.3d at 176 (internal quotation marks omitted) (quoting *P. Stolz Family P'ship L.P.* v. *Daum*, 355 F.3d 92, 102 (2d Cir. 2004)).[11]

---

[11]    Plaintiff cites to *Arnold* v. *KPMG LLP*, 334 F. App'x 349 (2d Cir. 2009) (summary order), for the proposition that the statute of repose runs from the date of a plaintiff's transaction rather than the date of a defendant's misrepresentation. But *Arnold* is inapposite "because it addresses a scenario where the alleged misrepresentation was made after the purchase." *Intesa Sanpaolo, S.p.A.* v. *Credit Agricole Corp. & Inv. Bank*, 924 F. Supp. 2d 528, 536 (S.D.N.Y. 2013); *see also, e.g.*, *Arco Capital Corps.* v. *Deutsche Bank AG*, 949 F. Supp. 2d 532, 544 (S.D.N.Y. 2013) (distinguishing *Arnold* from cases in which "the last alleged misrepresentation predates the purchase," in which cases "courts in this Circuit have held that the repose period runs from the date of last misrepresentation"); *Boudinot* v. *Shrader*, No. 09 Civ. 10163 (LAK), 2012 WL 489215, at *4 & nn.42, 43, 45 (S.D.N.Y. Feb. 15, 2012) (noting that "[c]ourts in this district have treated Section 1658(b)(2) as a statute of repose and consistently stated that the five-year period begins to run from the time that the allegedly fraudulent representations were made," and collecting cases indicating as much). Moreover, in the years since *Arnold*, the Second Circuit has made plain its belief that it is the date of the misrepresentation, not the transaction, that matters for purposes of the Sarbanes-Oxley statute of repose. *See, e.g.*, *SRM Glob. Master Fund Ltd. P'ship* v. *Bear Stearns Cos. L.L.C.*, 829 F.3d 173, 177 (2d Cir. 2016) ("Because the complaint fails to allege that the defendants made any misrepresentations within five years of the filing of SRM's complaint, SRM's Section 10(b) and Rule 10b-5 claims are time-barred under § 1658(b)(2)'s five-year statute of repose."); *cf. City of Pontiac Gen. Emps.' Ret. Sys.* v. *MBIA, Inc.*, 637 F.3d 169, 176 (2d Cir. 2011) ("Unlike a statute of repose, which begins to run from the defendant's violation, a statute of limitations cannot begin to run until the plaintiff's claim has accrued.").

## 2. The Statute of Repose Bars Plaintiff's Claims Premised on Alleged Misrepresentations Made Prior to April 5, 2008

The Sarbanes-Oxley statute of repose bars, without exception, all of Plaintiff's claims that were brought more than five years after the Exchange Act violation on which they are premised. Therefore, before considering whether any of the claims in Plaintiff's SAC (filed on April 7, 2016) relate back to any of the claims in Plaintiff's two prior complaints (filed on April 5, 2013, and December 8, 2014, respectively), the Court can easily conclude that all claims premised on alleged material misrepresentations made prior to April 5, 2008, are untimely; these claims were untimely when the original Complaint was filed, and thus cannot be saved by the relation-back doctrine. Accordingly, the Court dismisses any of Plaintiff's claims that are premised on the Wal-Mex 2004, 2005, or 2006 Annual Reports.[12]

The Court further concludes that all claims brought for the first time in the FAC or SAC are barred to the extent that they are premised on Exchange Act violations that occurred prior to December 8, 2009, or April 7, 2011, respectively. Defendants contend this precludes Plaintiff's claims with regard to the 2007, 2008, and 2009 Annual Reports. (Def. Br. 17-18). However, the Court observes that Plaintiff alleged in his original Complaint that these annual reports contained material misrepresentations. (*See* Dkt. #1, ¶¶ 16-20, 23). Defendants contend that Plaintiff only challenged certain letters within these

---

[12] Because all claims based on the 2005 annual report and statements therein are time-barred, the Court will not address the potential misattribution in the original Complaint of a statement that is attributed to Vega in the SAC. (Def. Br. 8 n.7; *see also* Dkt. #1; SAC ¶ 190).

reports for the first time in the SAC. (Def. Br. 8-9, 17). But the Court cannot say with confidence that Plaintiff's broader challenges in his original Complaint to Wal-Mex's annual reports were not intended to encompass his later, more specific challenges to the letters therein. At this stage, the Court will resolve this inference in Plaintiff's favor. Therefore, the Court will not conclude on this basis that the statute of repose bars Plaintiff's claims with regard to the 2007, 2008, and 2009 Annual Reports.

### 3. The Statute of Limitations Bars Plaintiff's New Claims

The Court next considers which, if any, of Plaintiff's claims raised for the first time in his amended complaints is barred by the Sarbanes-Oxley statute of limitations. Here, the statute of limitations could accrue no earlier than two years after (i) Plaintiff actually purchased his Wal-Mex ADRs and (ii) Plaintiff uncovered "or a reasonably diligent plaintiff would have uncovered ... enough information" to plead "with particularity facts giving rise to a strong inference that [Defendants] acted with the required state of mind." *City of Pontiac*, 637 F.3d at 176 (internal quotation mark omitted) (quoting *Merck*, 559 U.S. at 649). In this case, that date would be no later than two years after April 24, 2012, which is (i) the latest date on which a Class Member could have purchased a Wal-Mex ADR, and (ii) three days after the publication of the *Times* Article, upon which publication at least "a reasonably diligent plaintiff would have uncovered ... enough information to plead with particularity facts giving rise to a strong inference that [Defendants] acted with the required state of mind." *Id.*

The statute of limitations would seem to bar Plaintiff's claims against Wal-Mart and Rank, who were not named and against whom no allegations were levied prior to December 8, 2014, the date of filing of the FAC. (*Compare* Dkt. #1, *with* Dkt. #29). Defendants further argue that it bars Plaintiff's new claims, raised for the first time in his amended complaints, against original defendants Wal-Mex and Vega. (Def. Br. 15-16). For reasons that the Court will outline in the following section, Defendants are correct: The relevant statute of limitations bars all of Plaintiff's claims against Wal-Mart and Rank, as well as those claims against Wal-Mex and Vega that were raised for the first time in Plaintiff's amended complaints.

### 4. Plaintiff's Later-Added Claims Do Not Relate Back to the Original Complaint Under Federal Rule of Civil Procedure 15

#### a. Relation Back Under Rule 15

Plaintiff's time-barred claims are only saved if the Court finds, pursuant to Federal Rule of Civil Procedure 15(c), that they "relate back" to Plaintiff's timely-filed claims.[13] *See, e.g.*, *VKK Corp.* v. *Nat'l Football League*, 244 F.3d 114, 128 (2d Cir. 2001) ("If a complaint is amended to include an additional defendant after the statute of limitations has run, the amended complaint is not time-barred if it 'relates back' to a timely filed complaint."). As relevant

---

[13]     Any argument for equitable tolling is precluded by the Supreme Court's plain statement that equitable tolling is "fundamentally inconsistent" with the statute of limitations in federal securities cases. *Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson*, 501 U.S. 350, 363 (1991). Though equitable tolling could still apply where an investor had inquired about a probable fraud but was frustrated in that inquiry by a defendant's deliberate concealment of the violation, this possibility is inapposite: Plaintiff has not alleged any attempt to undertake an inquiry of this sort. *See In re Zyprexa Prods. Liab. Litig.*, 549 F. Supp. 2d 496, 540-41 (E.D.N.Y. 2008) (citing *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 426 n.17 (S.D.N.Y. 2003)).

here, Federal Rule of Civil Procedure 15(c) provides that "[a]n amendment to a pleading relates back to the date of the original pleading when ... the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading" or

> the amendment changes the party ... against whom a complaint is asserted, and ... the party to be brought in by amendment (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c).

Defendants do not dispute that the claims raised against Wal-Mart and Rank arise out of the same conduct, transaction, or occurrence that Plaintiff attempted to set out in his original Complaint. They argue, however, that (i) Wal-Mart and Rank lacked notice and would be prejudiced in defending on the merits, and (ii) these Defendants did not know, and had no reason to know, that Plaintiff's action would be brought against each but for a misidentification. (Def. Br. 10-15). Additionally, Defendants contend that Plaintiff's new claims against Wal-Mex and Vega cannot relate back because they involve "entirely new legal theories," which are "based on entirely different facts." (*Id.* at 16).

### b. Rule 15 and New Parties to a Litigation

The Supreme Court has made clear that when Rule 15 is invoked to save the untimely addition of a new party, a proper relation-back analysis focuses on "what the party to be added knew or should have known, not on the

amending party's knowledge or its timeliness in seeking to amend the pleading." *Krupski* v. *Costa Crociere S. p. A.*, 560 U.S. 538, 541 (2010). In *Krupski*, the Court addressed a situation wherein a plaintiff was injured while aboard a cruise ship and sued one entity, "Costa Cruise Lines," to recover for her injuries. *Id.* at 541-44. After the statute of limitations expired, the plaintiff was made aware that a related entity, "Costa Crociere S.p.A.," was in fact the party liable for her injuries. *Id.* at 543-44. The plaintiff filed an amended complaint and the first-sued entity was dismissed upon the parties' joint stipulation. *Id.* at 544. The district court then dismissed the amended complaint, finding that it was untimely and did not relate back. *Id.* at 544-45.

The Supreme Court held that this was error, because the complaint made clear that the plaintiff "meant to sue the company that 'owned, operated, managed, supervised and controlled' the ship on which she was injured," and sued Costa Cruise "mistakenly" because she believed "that Costa Cruise performed those roles." 560 U.S. at 544-45. The Court thus reasoned that "Costa Crociere should have known, within the Rule 4(m) period, that it was not named as a defendant in that complaint only because of [the plaintiff's] misunderstanding about which 'Costa' entity was in charge of the ship — clearly a 'mistake concerning the proper party's identity.'" *Id.* at 554-55 (quoting Fed. R. Civ. P. 15(c)).

The Court distinguished its holding from a case in which "the original complaint and the plaintiff's conduct compel the conclusion that the failure to name the prospective defendant in the original complaint was the result of a

fully informed decision as opposed to a mistake concerning the proper

defendant's identity, [wherein] the requirements of Rule 15(c)(1)(C)(ii) [would

not be] met." *Krupski*, 560 U.S. at 552; *see also id.* at 549 ("We agree that

making a deliberate choice to sue one party instead of another while fully

understanding the factual and legal differences between the two parties is the

antithesis of making a mistake concerning the proper party's identity."). Such

a result reflects Rule 15's "balance [of] the interests of the defendant protected

by the statute of limitations with the preference ... for resolving disputes on

their merits." *Id.* at 550. The Court explained that its intent was to draw a line

that would protect the "strong interest in repose" of "[a] prospective defendant

who legitimately believed that the limitations period had passed without any

attempt to sue him," while preventing "windfall[s]" for those prospective

defendants "who understood, or who should have understood, that [they]

escaped suit during the limitations period only because the plaintiff

misunderstood a crucial fact about [their] identit[ies]." *Id.*

Dismissal of the claims against Wal-Mart and Rank would not result in a

windfall for either Defendant. For starters, Plaintiff has never suggested that

he made a mistake of law or fact when he sued Wal-Mex and Vega but not

Rank and Wal-Mart. (Def. Br. 12; *see* Dkt. #1). Indeed, Plaintiff knew at the

time he brought this case that Rank was the CEO of Wal-Mex; his original

Complaint challenges statements within Wal-Mex's 2010 and 2011 Annual

Reports, which reports plainly identify Rank as the company's CEO. (*See* Def.

Br. 12; *see* Dkt. #1). He also knew that Wal-Mart was Wal-Mex's parent

company, again on the basis of the filings challenged in his original complaint, as well as the *Times* Article from which Plaintiff draws the bulk of his factual allegations. And this is not a case like *Krupski*, where Plaintiff's original Complaint makes clear that he meant to sue Wal-Mex's CEO, leadership, or parent company and simply sued the wrong individual or entity by mistake. Rank's name, title, and alleged misstatements are not referenced at all in the original Complaint, nor is Wal-Mart's relationship to Wal-Mex or its alleged misstatement. (*See* Dkt. #1). These Defendants therefore cannot be said to have had any reason to know that this suit would have been brought against them but for Plaintiff's misidentification.

Rather, this is a case where "[Plaintiff's] failure to [name these defendants] in the original complaint ... must be considered a matter of choice, not mistake." *Enter. Mortg. Acceptance Co., LLC, Sec. Litig.* v. *Enter. Mortg. Acceptance Co.*, 391 F.3d 401, 405 n.2 (2d Cir. 2004), *as amended* (Jan. 7, 2005) (internal quotation marks omitted) (quoting *Cornwell* v. *Robinson*, 23 F.3d 694, 705 (2d Cir. 1994)); *see also Fischer* v. *Forrest*, Nos. 14 Civ. 1304 (PAE) (AJP) & 14 Civ. 1307 (PAE) (AJP), 2017 WL 128705, at *10-11 (S.D.N.Y. Jan. 13, 2017) (holding that plaintiff's decision to sue individuals rather than corporation, though "strategically curious," was not the kind of "'mistake' that Rule 15 contemplates"); *In re Vitamin C Antitrust Litig.*, 995 F. Supp. 2d 125, 129 (E.D.N.Y. 2014) ("In an 'additional party' case like this one, there generally will be no 'mistake concerning' the proper party's 'identity.' The plaintiff has sued the right defendant, and simply neglected to sue another defendant who

might also be liable.  If the drafters of Rule 15 had meant to allow relation back in this situation, they could have easily done so.").

Rank and Wal-Mart "legitimately believed that the limitations period had passed without any attempt to sue [them]."  *Krupski*, 560 U.S. at 550.  Plaintiff's claims against Defendants Rank and Wal-Mart do not relate back to Plaintiff's original Complaint, and must be dismissed as untimely.[14]

### c.   Rule 15 and New Claims Against Existing Defendants

The Court next considers whether Plaintiff's alleged "new" claims against original Defendants Wal-Mex and Vega are likewise time-barred.  The procedural rule is the same, and the interest-balancing is analogous:  "Under Rule 15, the central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute

---

[14]    The Court therefore does not need to address Plaintiff's argument that Wal-Mart is liable vicariously for Wal-Mex's conduct because Wal-Mex was its agent.  (Pl. Opp. 9-12).  The Court observes, however, that such an argument fails on multiple levels, including its absence from the relevant pleadings and its seeming disregard for the corporate form.

Nor must the Court address Defendants' contention that Plaintiff's claims against Wal-Mart fail because Wal-Mart's December 2011 statement was not made "in connection with" the purchase of Wal-Mex ADRs (Def. Br. 34-37), though the Court doubts that Plaintiff has alleged adequately that Wal-Mart's misrepresentation "concern[ed] the value, nature or investment characteristics of the securities at issue," as required to plead "connection with."  *Marini* v. *Adamo*, 995 F. Supp. 2d 155, 191-92 (E.D.N.Y. 2014), *aff'd*, 644 F. App'x 33 (2d Cir. 2016) (summary order), *and aff'd*, 644 F. App'x 33 (2d Cir. 2016) (summary order) (quoting *Louros* v. *Kreicas*, 367 F. Supp. 2d 572, 588 (S.D.N.Y. 2005)) (citing *Wharf (Holdings) Ltd.* v. *United Int'l Holdings, Inc.*, 532 U.S. 588, 596-97 (2001)); *see also In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 623 (S.D.N.Y. 2003) ("*Nortel I*"), *aff'd sub nom. Ontario Pub. Serv. Emps. Union Pension Tr. Fund* v. *Nortel Networks Corp.* ("*Nortel III*"), 369 F.3d 27, 34.  Though the Second Circuit has "broadly construed the phrase 'in connection with,'" *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 156 (2d Cir. 1998), it has not done so to the extent that "a shareholder of one company [may] bring a private Section 10(b) or Rule 10b-5 claim against a second company based on alleged misstatements pertaining to the second company's stock."  *Nortel I*, 238 F. Supp. 2d at 624 (evaluating "in connection with" to determine plaintiffs' standing).

of limitations by the general fact situation alleged in the original pleading."
*Avila* v. *Riexinger & Assocs., LLC*, 644 F. App'x 19, 23 (2d Cir. 2016) (summary
order) (quoting *Slayton* v. *Am. Express Co.*, 460 F.3d 215, 228 (2d Cir. 2006),
*as amended* (Oct. 3, 2006)). "For example, where an initial complaint alleges a
'basic scheme' of defrauding investors by misrepresenting earnings and
profitability, an allegation of accounts receivable manipulation in an amended
complaint will relate back because it is a 'natural offshoot' of that scheme."
*Slayton*, 460 F.3d at 228. "In contrast, even where an amended complaint
tracks the legal theory of the first complaint, claims that are based on an
'entirely distinct set' of factual allegations will not relate back." *Id.* (citing *Nettis*
v. *Levitt*, 241 F.3d 186, 193 (2d Cir. 2001) ("It is true that both sets of claims
concern the same ultimate event: [defendant's] decision to fire [plaintiff].
Nonetheless, the proposed amendment alleged retaliation based on an entirely
distinct set of protected employee activity.")).

Ultimately, the Court finds that the new claims fall into the latter
category. Plaintiff claims in the SAC that Wal-Mart's December 2011 Form 10-
Q was materially misleading; that Wal-Mex failed to correct these
misrepresentations at Wal-Mart's behest; and that Wal-Mex and Vega misled
ADR purchasers in the Wal-Mex press releases and in Audit & Corporate
Practice Group reports published in December 2011, and January, February,
March, and April 2012. In contrast, Plaintiff's original Complaint identifies
Defendants' "materially false and misleading statements" as being found on the
Wal-Mex website and in the company's 2004, 2005, 2006, 2007, 2008, 2009,

2010, and 2011 Annual Reports, the alleged falsity of which was revealed by the *New York Times* on April 22, 2012. (Dkt. #1, ¶¶ 10-23, 35). This is therefore not a case where Plaintiff's SAC "does not allege a new claim but renders prior allegations more definite and precise." *Slayton*, 460 F.3d at 228 (citing *Stevelman* v. *Alias Research Inc.*, 174 F.3d 79, 87 (2d Cir. 1999)). Quite to the contrary, Plaintiff's SAC brings new claims with regard to Wal-Mex and Wal-Mart based on the December 2011 10-Q and new claims with regard to Wal-Mex and Vega premised on Wal-Mex's press releases and the Audit & Corporate Practice Group reports.

Plaintiff's original Complaint alleged liability limited to that arising from "[e]ach of the annual financial statements which the Company disseminated to the investing public during the Class period." (Dkt. #1, at ¶ 45). It did not put Wal-Mex or Vega on notice that Plaintiff would later bring these new claims "based on an 'entirely distinct set' of factual allegations." *Slayton*, 460 F.3d at 228. Accordingly, the Court dismisses as untimely the SAC's claims against Defendants Wal-Mex and Vega arising from their alleged material misstatements made outside the Wal-Mex Annual Reports.

## C. As to the Remaining Claims, Plaintiff Fails to State a Claim Under Section 10(b), 20(a), and Rule 10b-5

To review, the Court has dismissed, on timeliness grounds, all of Plaintiff's claims against Defendants Rank and Wal-Mart, as well as those claims arising from the Wal-Mex 2004, 2005, and 2006 Annual Reports; the December 2011 10-Q; and the Wal-Mex press releases and Audit & Corporate Practice Group reports published in December 2011, and January, February,

March, and April 2012.  It now considers whether Plaintiff has pleaded adequately that Defendants Wal-Mex and Vega violated Section 10(b), Rule 10b-5, and Section 20(a) by making false and materially misleading statements in the 2007, 2008, 2009, 2010, or 2011 Wal-Mex Annual Reports or on the Wal-Mex website.  Because Section 20(a) liability can only arise if there is a primary violation by a controlled person, the Court considers first the antecedent issue of whether Plaintiff has adequately pleaded that any Defendant violated Section 10(b) and Rule 10b-5.  *See SRM*, 829 F.3d at 177 (quoting *ECA & Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.* (hereinafter, "*ECA*"), 553 F.3d 187, 207 (2d Cir. 2009)).  It concludes that Plaintiff has not, and dismisses all of Plaintiff's remaining claims.

### 1.    Pleading Requirements for Securities Fraud Claims

Under Section 10(b) of the Exchange Act, it is

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.  Rule 10b-5, promulgated by the SEC under Section 10(b), further provides that a person may not

> employ any device, scheme, or artifice to defraud[;] ... make any untrue statement of a material fact or ... omit to state a material fact necessary in order to make the

30

> statements made, in the light of the circumstances under which they were made, not misleading[;] or … engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[;] in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. "Although Section 10(b) does not expressly provide for a private right of action, courts have long recognized an implied private right of action under Section 10(b) and Rule 10b-5." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 376 (S.D.N.Y. 2013) (citing *Superintendent of Ins. of State of N.Y.* v. *Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971) ("It is now established that a private right of action is implied under [Section] 10(b).")).

To succeed on a Section 10(b) and Rule 10b-5 claim, a plaintiff must prove "[i] a material misrepresentation or omission by the defendant; [ii] scienter; [iii] a connection between the misrepresentation or omission and the purchase or sale of a security; [iv] reliance upon the misrepresentation or omission; [v] economic loss; and [vi] loss causation.'" *GAMCO Inv'rs, Inc.* v. *Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co.* v. *Erica P. John Fund, Inc.*, — U.S. —, 134 S. Ct. 2398, 2407 (2014)). Such claims are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b). *See, e.g.*, *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (affirming that securities fraud claims must satisfy the heightened pleading standards of both Rule 9(b)

and the PSLRA); *Arco Capital Corp.* v. *Deutsche Bank AG*, 949 F. Supp. 2d 532, 539 (S.D.N.Y. 2013) (same).

Under Rule 9(b), a plaintiff must "state with particularity the circumstances constituting [a] fraud." Fed. R. Civ. P. 9(b). This requires that a plaintiff's complaint: "[i] specify the statements that the plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent." *Rombach* v. *Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Mills* v. *Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). In contrast, "intent, knowledge, and other conditions of mind may be averred generally." *Kalnit* v. *Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting Fed. R. Civ. P. 9(b)).

In turn, the PSLRA "requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quoting *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 193 & n.12 (1976)) (citing 15 U.S.C. § 78u-4(b)(1), (2)). To satisfy the second requirement, a complaint must give "rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). A "strong inference" that a defendant acted with scienter is not an irrefutable inference, though it "must be more than merely plausible or reasonable[.]" *Tellabs*, 551 U.S. at 314. It cannot be identified "in a vacuum," as "[t]he inquiry is inherently comparative[.]" *Id.* at 323. A "strong inference" is

an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

To evaluate whether the PSLRA's standard has been met, courts consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc.*, 551 U.S. at 323 (emphasis in original); *see also id.* at 326 ("[The court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically. ... [A] court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"). And "[w]hen the defendant is a corporate entity, ... the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

The facts pled ultimately must show "that the defendants had the motive and opportunity to commit fraud" or constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. "In order to raise a strong inference of scienter through 'motive and opportunity' to defraud, [a plaintiff] must allege that [defendants] 'benefitted in some *concrete and personal way* from the purported fraud.'" *Id.* (emphasis added) (quoting *Novak* v. *Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)). It is not enough for a plaintiff to show "[m]otives that are common to most corporate officers, such as the

desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation[.]" *Id.*; *accord, e.g., Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) ("[A] generalized motive ... which could be imputed to any publicly owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter.").

In the absence of a showing of motive, a plaintiff must plead conscious misbehavior or recklessness. Conscious recklessness is a "state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC* v. *Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quotation mark and emphasis omitted) (quoting *Novak*, 216 F.3d at 312). To plead conscious recklessness adequately, a plaintiff must allege facts showing "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendants or so obvious that the defendant must have been aware of it." *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000); *accord Rothman* v. *Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (quoting *Rolf* v. *Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)). A plaintiff may allege that a defendant "engaged in deliberately illegal behavior, knew facts or had access to information suggesting his public statements were not accurate, or failed to check information that he had a duty to monitor." *Nathel* v. *Siegal*, 592 F. Supp. 2d 452, 464 (S.D.N.Y. 2008) (citing *Novak*, 216 F.3d at 311). Opinions or predictions can be the basis for scienter "if they are worded as guarantees or are supported by specific statements of fact, or if the speaker

does not genuinely or reasonably believe them." *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (citation omitted).

### 2. Plaintiff Has Not Pleaded Facts Supporting a Strong Inference of Scienter

#### a. Vega's Status Is an Insufficient Basis for Scienter

Here, Plaintiff has not alleged that Vega stood to benefit in a concrete, personal way from the purported fraud.[15] The Court therefore focuses its analysis on whether Plaintiff has pleaded adequately a theory of conscious recklessness.

Plaintiff has attempted to plead that Vega knew facts or had access to information suggesting that his public statements were not accurate, or failed to check information that he had a duty to monitor. Specifically, Plaintiff alleges that Vega had knowledge of the bribery scheme because Eduardo Juárez, the "Vice President of Internal Audit of Wal-Mex" from 2005 to 2008, "reported to Vega" in Vega's capacity as the Audit Committee's Chairman; from this reporting structure, Plaintiff asserts, "Vega knew or was reckless in not knowing that bribery was taking place at Wal-Mex." (SAC ¶¶ 69-70). Elsewhere, Plaintiff adds that Vega's scienter derives from his "position within Wal-Mex which made [him] privy to confidential information concerning Wal-Mex." (*Id.* at ¶ 271).

---

[15] Plaintiff alleges in his opposition papers that the Court should infer motive from the fines and other costs Wal-Mart has had to pay since Wal-Mex's alleged bribery came to light. (Pl. Opp. 1-2). But this argument fails because (i) it was not pled in the SAC and (ii) it is an argument for the kind of "generalized" motive that courts in this Circuit routinely reject. *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

These allegations fall well short of the high bar required for Plaintiff to plead adequately conscious misbehavior or recklessness on the part of Vega. Plaintiff alleges that Juárez "reported" to Vega, but this allegation is conclusory, derived solely from Vega's job title. That is, Plaintiff invites the Court to speculate that because Vega was responsible for supervising a culpable individual, that individual must have reported to Vega directly, and must have conveyed information that would make Vega at least reckless not to know of the alleged bribery in which that individual was involved. The Court declines Plaintiff's invitation, as courts in this Circuit have done consistently in similar circumstances. *See, e.g.*, *In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 142 (E.D.N.Y. 2008) ("[Defendants'] membership in a committee with oversight responsibilities was not sufficient to give rise to an inference of recklessness."); *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 231 (S.D.N.Y. 2004) ("The Court refuses to indulge [plaintiff's] invitation to infer [defendant's] scienter from the fact that executives who reported to [defendant] (both directly and indirectly) may have engaged in fraudulent behavior.").

Indeed, "[c]ourts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." *Strougo* v. *Barclays PLC*, 105 F. Supp. 3d 330, 350 (S.D.N.Y. 2015) (alteration in original) (internal quotation marks omitted) (quoting *Plumbers & Steamfitters Local 773 Pension Fund* v. *Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010)); *see also id.* at 350 n.131 ("Plaintiffs

argue that '[defendant] met regularly with members of the Business Practices Review Committee,' but there is no allegation that this Committee presented any information contradicting the public statements[.]"); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13 Civ. 8846 (LGS), 2014 WL 7176187, at *6 (S.D.N.Y. Dec. 16, 2014) (quoting *Plumbers & Steamfitters Local 773 Pension Fund*, 694 F. Supp. 2d at 300). And considering the very strong competing inferences that Vega supervised Juárez but did not know of the bribery — because the relationship between the two was attenuated, or because an employee is likely to hide his wrongdoing from his supervisor — the Court cannot find Plaintiff's offered inference more compelling. Therefore, the Court finds that Plaintiff has not pleaded scienter adequately with regard to Vega.

### b. Plaintiff Has Pleaded Insufficient Facts to Impute Scienter to Wal-Mex

To the extent that Wal-Mex's scienter is derived from Vega's, on the theory that his scienter is "imputed to the corporation," Plaintiff has not pleaded scienter on behalf of Wal-Mex. The Court considers, however, whether Plaintiff has pleaded sufficient facts to permit corporate scienter to be imputed from an employee other than Vega. *See In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515-16 (S.D.N.Y.) ("[T]he individual making an alleged misstatement and the one with scienter do not have to be one and the same." (citing *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005))), *opinion corrected on denial of reconsideration*, 612 F. Supp. 2d 397 (S.D.N.Y. 2009). The Court notes that "there is no formulaic method or

seniority prerequisite for employee scienter to be imputed to the corporation," though "scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants." *Id.*

Somewhat curiously, in the scienter section of the SAC, Plaintiff expressly addresses the scienter of "Defendants Wal-Mart, Vega, and Rank," and does not address the scienter of Wal-Mex. (*See* SAC ¶¶ 270-74). This omission alone may merit a finding that Plaintiff has failed to plead scienter adequately with regard to Wal-Mex. However, Plaintiff discusses Wal-Mex employees from whom Wal-Mex's scienter could be imputed, and he may have intended these discussions to constitute allegations of Wal-Mex's scienter. Giving Plaintiff the benefit of this inference, as the Court is required to do at this stage, the Court considers whether Plaintiff has alleged adequately scienter on the part of any Wal-Mex employee other than Vega, with regard to the alleged false and materially misleading statements in the 2007, 2008, 2009, 2010, or 2011 Wal-Mex Annual Reports and on the Wal-Mex website.

The only possible candidate is Rank. And with regard to Rank, Plaintiff alleges only that he knew of the bribery because of his position within Wal-Mex. (SAC ¶¶ 72-79). Specifically, Plaintiff alleges that Rank "was the executive driving the opening of the new Wal-Mex stores" that Plaintiff alleges were facilitated by bribery. (*Id.* at ¶ 73). Plaintiff also alleges that Rank had knowledge of the bribery scheme because Wal-Mex employees Rodriquezmacedo, Juárez, and Del Rio "reported to Rank" in his capacity as Executive Vice President and COO of Wal-Mex, such that "Rank knew or was

reckless in not knowing that bribery was taking place at Wal-Mex." (*Id.* at ¶ 79). These allegations fail to demonstrate Rank's scienter for the same reasons that Plaintiff's allegations regarding Vega failed to demonstrate Vega's scienter. Put simply, the Court cannot infer scienter from Rank's position alone. Because Plaintiff has failed to plead scienter with adequate specificity with regard to Vega, Rank — and, by extension, Wal-Mex — Plaintiff has failed to state a Section 10(b) and Rule 10b-5 claim as a matter of law.[16]

### 3. Plaintiff Has Failed to Plead an Actionable Misrepresentation or Omission

Given the preceding disposition, the Court need not reach Defendants' further grounds for dismissal. However, the Court agrees with Defendants that Plaintiff has also failed to allege an actionable misrepresentation or omission. Though Plaintiff's identification of the challenged statements in the 2007, 2008, 2009, 2010, or 2011 Wal-Mex Annual Reports is not as specific as the Court would like, and as is required, the Court agrees with Defendants that all of the statements from these reports and from the Wal-Mex website that are quoted in the SAC are inactionable, immaterial puffery. *See City of Pontiac Gen. Emps.' Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) ("It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery.'").

---

[16] Plaintiff argues that Wal-Mart had scienter (i) because its former CEO Michael Duke had scienter and (ii) based on its 70% ownership of Wal-Mex, which gave Wal-Mart a motive to keep its internal bribery investigation a secret. (SAC ¶¶ 272-73). Because the Court has already determined that all claims against Wal-Mart were untimely, however, Plaintiff's arguments with regard to Wal-Mart's scienter are inapposite.

Even if these statements represented allegations of "concrete steps," as Plaintiff contends, Plaintiff has alleged no facts demonstrating that the statements were false, as Rule 9(b) requires; that is, Plaintiff has provided no reason for the Court to infer that the "concrete steps" described in Wal-Mex's publications were not taken. *See Rombach*, 355 F.3d at 174 ("To succeed on this claim, plaintiffs must do more than say that the statements in the press releases were false and misleading; they must demonstrate with specificity why and how that is so."). There is as well the problem of timeliness: The challenged statements made prior to the December 8, 2011 start of the class period are inactionable to the extent that they were known to be false when they were made, as Plaintiff has alleged they were in his scienter arguments. *See Wilder* v. *News Corp.*, No. 11 Civ. 4947 (PGG), 2014 WL 1315960, at *7-9 (S.D.N.Y. Mar. 31, 2014) (citing and discussing at length *Lattanzio* v. *Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007)) ("[K]nowingly false or misleading statements made prior to the Class Period are not actionable."). And the Court has already determined that the newly-pleaded claims arising from the statements made after December 8, 2011, during the class period are untimely and barred by the Sarbanes-Oxley statute of limitations.

### 4. Plaintiff Has Not Adequately Pleaded Scheme Liability

The Court also declines to allow Plaintiff to circumvent the PSLRA's scienter requirements by recasting his misrepresentation claims as scheme liability claims under one of several theories. (Pl. Opp. 36-49). If, as Plaintiff contends, this effort is not an attempt to recast Plaintiff's misrepresentation

claims, but actually "an entirely new theory encompassing different conduct," the claim fails because it is untimely. *Caldwell* v. *Berlind*, 543 F. App'x 37, 40 (2d Cir. 2013) (summary order) (citing *Slayton*, 460 F.3d at 228). Plaintiff clarifies in his opposition that the alleged scheme was in fact the "illegal bribery scheme" that Wal-Mex perpetuated from 2003 to 2006. (Pl. Opp. 37). Clearly, any claim arising from this scheme would be barred by the Sarbanes-Oxley statute of repose.

Conversely, if as Defendant contends, Plaintiff's scheme liability claim is simply Plaintiff's misrepresentation claim in new clothes, Plaintiff's claim fails because "[s]cheme liability under subsections (a) and (c) of Rule 10b-5 hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement." *S.E.C.* v. *Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011); *see also In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012) ("[T]he three subsections of Rule 10b-5 are distinct, and courts must scrutinize pleadings to ensure that misrepresentation or omission claims do not proceed under the scheme liability rubric."). Under any theory, Plaintiff's scheme liability claim fails and must be dismissed.

### 5.    Plaintiff Fails to State a Claim Under Section 20(a)

Section 20(a) establishes that "[e]very person who, directly or indirectly, controls any person liable under [the Exchange Act and its implementing regulations] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 78t(a). To state a Section 20(a) claim, a plaintiff must

show [i] "a primary violation by the controlled person"; [ii] "control of the primary violator by the defendant"; and [iii] that the controlling person "was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns*, 493 F.3d at 108.

Here, Plaintiff falls at the first hurdle. Having failed to state a claim under Section 10(b), Plaintiff has failed to establish the requisite "primary violation" for purposes of Section 20(a). *See, e.g.*, *SRM*, 829 F.3d at 177 ("[B]ecause [plaintiff] fails to state a claim under Section 10(b), we agree ... that its Section 20(a) claim 'must also fail for want of a primary violation.'" (quoting *ECA*, 553 F.3d at 207)); *Gavin/Solmonese LLC*, 639 F. App'x at 670 (same). Plaintiff's claims under Section 20(a) must be dismissed.

## D.    Plaintiff's Motion to Strike Is Denied

On June 3, 2016, before filing his opposition to Defendants' motion to dismiss, Plaintiff filed a Motion to Strike the three appendices attached to Defendants' motion. (Dkt. #100-01). Plaintiff argues that Defendants' appendices "effectively circumvent[ed]" this Court's order imposing briefing length limits "by more than quadrupling the length of a permissible submission." (Pl. Str. Br. 1).

The Court certainly has the authority to strike exhibits and pages that are attached to circumvent its page limits, as Plaintiff's motion aptly argues. (Pl. Str. Br. 2-3 (collecting cases)). Here, however, the Court does not find that Defendants' appendices were attached in an attempt to skirt the Court's orders, but rather credits Defendants' argument that their appendices were

intended to serve as mere organizational tools. (Def. Str. Opp. 2-3 (citing *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 65 (S.D.N.Y. 2009))). And, to be clear, the Court is more troubled by *both* parties' formatting stratagems (including the excessive use of single-spaced bullet points and footnotes) than it is by Defendants' appendices. Finally, the Court notes that Plaintiff's motion is effectively mooted by both the fact that the Court did not utilize Defendants' appendices in reaching its decision in this case and the Court's decision to grant Defendants' motion to dismiss the SAC in its entirety.

**E.  Plaintiff's Application for Leave to Amend Is Denied**

Plaintiff requests leave to amend the SAC and file a Third Amended Complaint rectifying its deficiencies. (Pl. Opp. 40). Because the Court finds that further amendment would be futile, Plaintiff's request is denied.

Rule 15(a)(2) provides that a court should freely give leave to amend "when justice so requires." *McCarthy* v. *Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007); *see also* Fed. R. Civ. P. 15(a). "This permissive standard is consistent with [the Second Circuit's] 'strong preference for resolving disputes on the merits.'" *Williams* v. *Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (per curiam) (quoting *New York* v. *Green*, 420 F.3d 99, 104 (2d Cir. 2005)).

However, leave to amend may be denied if the amendment would be futile. *See, e.g., Knife Rights, Inc.* v. *Vance*, 802 F.3d 377, 389 (2d Cir. 2015). Amendment is futile if the "amended portion of the complaint would fail to state a cause of action." *Parker* v. *Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000); *see also Kassner* v. *2nd Ave. Delicatessen Inc.*, 496 F.3d 229,

244 (2d Cir. 2007) (holding that amended complaint must be "sufficient to withstand a motion to dismiss under [Federal Rule of Civil Procedure] 12(b)(6)"). Leave to amend may also be denied "when a party has been given ample prior opportunity to allege a claim," *De Jesus* v. *Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 72 (2d Cir. 1996), or "where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice the defendant," *Cerni* v. *J.P. Morgan Sec. LLC*, No. 15 Civ. 5389 (AJN), 2016 WL 5805300, at *7 (S.D.N.Y. Sept. 20, 2016) (internal quotation mark omitted) (quoting *Kenney* v. *Clay*, 172 F. Supp. 3d 628, 643 (N.D.N.Y. 2016)).

Plaintiff's request for leave to file a Third Amended Complaint implicates all of the grounds for futility. Many of Plaintiff's claims are time-barred, which deficiencies further amendment could not remedy. Plaintiff has had two prior opportunities to amend his complaint, after having been advised of its deficiencies by Defendants in two different motions to dismiss. (Dkt. #51, 54, 87, 92). Plaintiff has therefore been afforded a more-than-ample opportunity to allege his claims. Precisely for this reason, the Court indicated in granting Plaintiff leave to file the SAC that it did not anticipate further amendment requests. (Dkt. #92). And ultimately, despite Plaintiff's several amendments, the core of his claims remains unchanged: Plaintiff alleges liability premised upon facts outlined in the 2012 *Times* Article. Plaintiff has had three chances to establish a claim based on these facts, and does not present adequate justification for a fourth. Plaintiff's motion for leave to amend is denied.

**CONCLUSION**

For the reasons outlined above, Defendants' motion to dismiss the SAC for failure to state a claim is GRANTED WITH PREJUDICE. Plaintiff's motion to strike Defendants' appendices, though it is mooted given this result, is DENIED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     February 27, 2017
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge